File Date: _Jan 2, 2008_____

Case No: _08cv0029_____

ATTACHMENT # _____1_____

EXHIBIT _____E_____

TAB (DESCRIPTION) _____

# Exhibit E

# CERTIFICATION

State of Texas      )
                   ) ss.
Dallas County     )

Policy Number:  CPP 3081153 02        Company:  Milwaukee Mutual Insurance
Named Insured:  Architectural Sealants, Inc.     As of Date or Period: 10/17/02 to 10/17/03

____Debbie Dodson_____, being first duly sworn on oath, deposes and says that:

1.    I am Operations Supervisor of Unitrin Business Insurance, and a fully authorized representative of the above named, affiliated Company.   As such, I have full access to the insurance records and files for the identified policy of insurance issued by the Company.

    ☒   2.     I have reviewed and compared the attached pages to such records and files and hereby certify that with the exception of any forms or endorsements identified in paragraph 3, the same are a true and correct copy of the above identified policy of insurance as reflected in the Company's records and files as of the above date.

*(select either)*
or

    ☐   2.     I have reviewed and compared the attached pages to such records and files and hereby certify that with the exception of any forms or endorsements identified in paragraph 3, the same are a true and correct copy of the above identified policy of insurance as reflected in the Company's records and files. The above policy was cancelled on      .*(insert effective date of cancellation)*

    ☒   3.     The attached copy does not vary from the above identified policy.

*(select either)*
or

    ☐   3.     The attached copy varies from the above identified policy, as follows:

| The original form or endorsement no. | Varies from the attached form or endorsement no. | Because (*state reason for variance*) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

Dated this 2nd day ofOctober, 2007.

Signed and sworn to before me on the above date by

_____           _____
Notary Public, State of Texas                 **Debbie Dodson**
My Commission 01\24\11

DANIELLE M KAZMIERCZAK
Notary Public, State of Texas
My Commission Expires
January 24, 2011



**MILWAUKEE INSURANCE**

## Commercial General Liability Declarations

Company Copy

# THIS IS AN OCCURRENCE POLICY

**Coverage provided by:**
MILWAUKEE MUTUAL INSURANCE COMPANY

**Declarations:**
ENDORSEMENT

**Named Insured and Mailing Address:**
ARCHITECTURAL SEALANTS, INC.
6525 W. STEGER
MONEE, IL  60449

**Policy Number:**
CPP30811530282

**Previous Policy Number:**
CPP30811530182

**Legal Status:**
CORPORATION

**Business Description:**
COMMERCIAL CAULKING
FOR WINDOWS AND FLOORS

**Agency Number and Name:**
11  03096    THILMAN & FILIPPINI, LLC (C)

**Policy Period:**
From: 10/17/2002  to: Until Cancelled        at 12:01 A.M. Standard Time at your mailing address shown above.

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

**Description of Premises:**    SEE ATTACHED SCHEDULE GLSCD

**Coverages Provided:**    SEE ATTACHED SCHEDULE GLSCD

**Limits of Insurance:** Coverage is provided where a limit of liability is shown for the coverage.

| | |
|---|---:|
| Each Occurrence Limit: | $ 1,000,000 |
| General Aggregate Limit (other than Products-Completed Operations): | $ 2,000,000 |
| Products-Completed Operations Aggregate Limit: | $ 2,000,000 |
| Medical Expense Limit: | $ 5,000 |
| Personal & Advertising Injury Limit: | $ 1,000,000 |
| Fire Damage Limit: | $ 100,000 |

**Total Premium:** AS BILLED

## * AMENDMENT INFORMATION *

Effective: 01/12/2003        Premium Adjustment: NIL

ADDITIONAL INSURED IS ADDED WITH FORM CG2026

GLDEC 03/94

**GLDEC 03/94**                                                                                    Page 2 of 2

### Endorsements Applicable:

| | | | |
|---|---|---|---|
| GLSCD 0394 | 33-0481 0399 | 12278 1097 | CG0300 0196 |
| 2279A 0982 | 30-5000 0401 | CG0001 0798 | CG0200 0487 |
| CG2147 0798 | IL0003 0498 | IL0017 1198 | IL0021 1185 |
| CG2028 1185 | | | |

---

**Location of all premises you own, rent or occupy:**     SEE ATTACHED SCHEDULE GLSCD

---

**Date of Issue:**  04/09/2003

---

**Countersigned by Authorized Representative**

## General Liability Schedule

Company Copy

**Location of Premises**

No. 001
6525 W. STEGER
MONEE, IL 60449

No. 001
6525 W. STEGER
MONEE, IL 60449

No. 001
6525 W. STEGER
MONEE, IL 60449

**Policy Number:** CPP30811530282

No. 001
6525 W. STEGER
MONEE, IL 60449

| Prem. & Bldg. | | Classification | Code Number | Premises Operations | Products Completed Operations | Owners Contractors Protective | Railroad Protective |
|---|---|---|---|---|---|---|---|
| 001 | 001 | PAINT-EXTERIOR-EXC 3 STORY-NOC | 98303 | X | X | | |
| 001 | 001 | CONTR-EXECUTIVE SUPERVISOR PROD/COMP OP SUBJ TO GEN AGG LIMIT | 91580 | X | X | | |
| 001 | 001 | PAINT-EXTERIOR-3/LESS STY-NOC | 98304 | X | X | | |
| 001 | 001 | PAINT-INTERIOR-BLDG/STRUCTURE | 98305 | X | X | | |

| Prem. & Bldg. | | Premium Basis | | |
|---|---|---|---|---|
| | | Exposure | Premium Base | Exposure Base |
| 001 | 001 | $ 50,000 | PAYROLL | PER 1000 |
| 001 | 001 | $ 120,000 | PAYROLL | PER 1000 |
| 001 | 001 | $ 320,000 | PAYROLL | PER 1000 |
| 001 | 001 | $ 130,000 | PAYROLL | PER 1000 |

GLSCD 03/94

POLICY NUMBER:  CPP30811530282                      **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Name of Person or Organization:**

ALEXANDER EQUIPMENT CO.
ATTN:LINDA
1511 COMMERCE DRIVE
BOURBANNIS, IL  60914

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person(s) or organization(s), subject to the following additional exclusions:

This insurance does not apply:

1. To any "occurrence" which takes place after the equipment lease expires;

2. To "bodily injury" or "property damage" arising out of the sole negligence of the person or organization shown in the Schedule.

POLICY NUMBER:                                          **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person(s) or organization(s), subject to the following additional exclusions:

This insurance does not apply:

1. To any "occurrence" which takes place after the equipment lease expires;
2. To "bodily injury" or "property damage" arising out of the sole negligence of the person or organization shown in the Schedule.

**CG 20 28 11 85**          Copyright, Insurance Services Office, Inc., 1984          **Page 1 of 1**      □

## Commercial General Liability Declarations



**MILWAUKEE INSURANCE**

Company Copy

## THIS IS AN OCCURRENCE POLICY

**Coverage provided by:**

MILWAUKEE MUTUAL INSURANCE COMPANY

**Declarations:**

RENEWAL

**Named Insured and Mailing Address:**

ARCHITECTURAL SEALANTS, INC.
6525 W. STEGER
MONEE, IL  60449

**Policy Number:**

CPP30811530282

**Previous Policy Number:**

CPP30811530182

**Legal Status:**

CORPORATION

**Business Description:**

COMMERCIAL CAULKING
FOR WINDOWS AND FLOORS

**Agency Number and Name:**

11  03096    THILMAN & FILIPPINI, LLC (C)

**Policy Period:**

From: 10/17/2002  to: Until Cancelled          at 12:01 A.M. Standard Time at your mailing address shown above.

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

**Description of Premises:**    SEE ATTACHED SCHEDULE GLSCD

**Coverages Provided:**    SEE ATTACHED SCHEDULE GLSCD

**Limits of Insurance:**  Coverage is provided where a limit of liability is shown for the coverage.

| | |
|---|---|
| Each Occurrence Limit: | $ 1,000,000 |
| General Aggregate Limit (other than Products-Completed Operations): | $ 2,000,000 |
| Products-Completed Operations Aggregate Limit: | $ 2,000,000 |
| Medical Expense Limit: | $ 5,000 |
| Personal & Advertising Injury Limit: | $ 1,000,000 |
| Fire Damage Limit: | $ 100,000 |

**Total Premium:** AS BILLED

### * AMENDMENT INFORMATION *

Effective:                    Premium Adjustment:

GLDEC 03/94

**GLDEC 03/94**                                                                            Page 2 of 2.

**Endorsements Applicable:**

| | | | |
|---|---|---|---|
| GLSCD 0394 | 33-0481 0399 | 12278 1097 | CG0300 0196 |
| 2279A 0982 | 30-5000 0401 | CG0001 0798 | CG0200 0487 |
| CG2147 0798 | IL0003 0498 | IL0017 1198 | IL0021 1185 |

**Location of all premises you own, rent or occupy:**    SEE ATTACHED SCHEDULE GLSCD

**Date of Issue:** 10/21/2002

_____

**Countersigned by Authorized Representative**

# General Liability Schedule

Company Copy

## Location of Premises

No. 001
6525 W. STEGER
MONEE, IL 60449

No. 001
6525 W. STEGER
MONEE, IL 60449

No. 001
6525 W. STEGER
MONEE, IL 60449

**Policy Number:** CPP30811530282

No. 001
6525 W. STEGER
MONEE, IL 60449

| Prem. & Bldg. | | Classification | Code Number | Premises Operations | Products Completed Operations | Owners Contractors Protective | Railroad Protective |
|---|---|---|---|---|---|---|---|
| 001 | 001 | PAINT-EXTERIOR-EXC 3 STORY-NOC | 98303 | X | X | | |
| 001 | 001 | CONTR-EXECUTIVE SUPERVISOR PROD/COMP OP SUBJ TO GEN AGG LIMIT | 91580 | X | X | | |
| 001 | 001 | PAINT-EXTERIOR-3/LESS STY-NOC | 98304 | X | X | | |
| 001 | 001 | PAINT-INTERIOR-BLDG/STRUCTURE | 98305 | X | X | | |

| Prem. & Bldg. | | Premium Basis | | |
|---|---|---|---|---|
| | | Exposure | Premium Base | Exposure Base |
| 001 | 001 | $ 50,000 | PAYROLL | PER 1000 |
| 001 | 001 | $ 120,000 | PAYROLL | PER 1000 |
| 001 | 001 | $ 320,000 | PAYROLL | PER 1000 |
| 001 | 001 | $ 130,000 | PAYROLL | PER 1000 |

GLSCD 03/94

# CONTRACTORS COVERAGE EXPANSION ENDORSEMENT

### This Endorsement Changes The Policy. Please Read it Carefully.

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

### (1) AGGREGATE LIMITS OF INSURANCE (PER PROJECT)

The General Aggregate limit under LIMITS OF INSURANCE (SECTION III) applies separately to each of your projects away from premises owned by or rented to you.

### (2) AGGREGATE LIMITS OF INSURANCE (PER LOCATION)

The General Aggregate limit under LIMITS OF INSURANCE (SECTION III) applies separately to each of your "locations" owned by or rented to you.

"Locations" means premises involving the same or connecting lots, or premises whose connection is inter-rupted only by a street, roadway, waterway or right-of-way railroad.

### (3) MEDICAL PAYMENTS

Subject to all the times of SECTION III – LIMITS OF INSURANCE, the Medical Expense Limit is the higher of:

a. $10,000; or

b. The amount shown in the Declarations for Medical Expense Limit.

This provision does not apply if COVERAGE C. MEDICAL PAYMENTS is excluded either by the provisions of the Coverage Part or by endorsement.

### (4) ADDITIONAL INSURED BY CONTRACT OR AGREEMENT

Under SECTION II – WHO IS AN INSURED, is amended as follows:

Each of the following is also an insured:

    a. Any person or organization you are required by a written contract, agreement, or permit to name as an insured, but only with respect to liability arising out of:

        1. "your work" performed for that insured at the location designated in the contract, agreement, or permit; or

        2. premises owned or used by you.

    b. This insurance does not apply unless the contract, agreement, or permit is made prior to the "bodily injury" or "property damage".

### (5) WAIVER OF SUBROGATION

Under SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS, the following is added to Condition 8. Transfer of Rights of Recovery Against Others to Us:

If you have waived those rights before a loss, our rights are waived also.

### (6) NAMED INSURED

Under SECTION II – WHO IS AN INSURED, is amended as follows:

Any organization over which you maintain ownership of more than 50% will be a Named Insured if there is no other similar insurance available to that organization. However,

    a. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you ac-quired or formed the organization; and

    b. Coverages B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

33-0481 (0399)

**(7) NEWLY FORMED OR ACQUIRED ORGANIZATION**

In paragraph **4.a.** SECTION II – WHO IS AN INSURED, "90th day is changed to 180th day".

This provision does not apply if newly formed or acquired organizations' coverage is excluded either by provision of the Coverage Part or by endorsement.

**(8) LIMITED PROFESSIONAL LIABILITY**

The following is added to paragraph **2.**, Exclusions of COVERAGES A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) and paragraph **2.**, Exclusions of COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by you, but only with respect to your providing engineering, architectural or surveying services in your capacity as an engineer, architect or surveyor.

Professional services include:

**1.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

**2.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.

This exclusion does not apply to your operations in connection with construction work performed by you or on your behalf.

**(9) NON-OWNED WATERCRAFT**

Exclusion **g.** of COVERAGE A (Section I) does not apply to any watercraft under 51 feet long that is neither:

    **a.** Owned by you; nor

    **b.** Being used to carry persons or property for a charge

This provision applies to any person, who with your consent, either uses or its responsible for the use of a watercraft.

This insurance is excess over any other valid and collectible insurance available to the insured whether primary, excess, or contingent.

**(10) CONTRACTUAL LIABILITY FOR PERSONAL INJURY AND ADVERTISING INJURY**

Exclusion **a.(4)** of Coverage B (SECTION I) is deleted.

**(11) BROAD NOTICE OF OCCURRENCE**

Paragraph **2.a.** of the Duties In The Event of Occurrence, Offense, Claim or Suit Condition (SECTION IV) is deleted and replaced by the following:

You must see to it we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. Knowledge of an "occurrence" or an offense by your "employees" shall not, in itself, constitute knowledge to you unless your partners, "executive officers", directors or insurance manager shall have actually received notice. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and,

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**(12) UNINTENTIONAL FAILURE TO DISCLOSE HAZARDS**

Based on our reliance on your representations as to existing hazards, if unintentionally you should fail to disclose all such hazards at the inception date of your policy, we will not deny coverage under this Coverage Part because of such failure.

**(13) NOTICE OF OCCURRENCE**

The following is added to the Duties In The Event of Occurrence, Offense, Claim or Suit CONDITION, (SECTION IV):

e. If you report an "occurrence" to your workers' compensation insurer which develops into a liability claim for which coverage is provided by this Coverage Part, failure to report such "occurrence" to us at the time of the "occurrence" shall not be deemed in violation of paragraphs a., b., and c. above.  However, you shall give written notice of this "occurrence" to us as soon as you are made aware of the fact that this "occurrence" is a liability claim rather than a workers' compensation claim.

33-0481 (0399)

## Additional Insured - Primary Coverage

### This endorsement changes the policy. Please read it carefully.

**Name of Person or Organization:**

BLANKET PRIMARY NON-CONTRIBUTORY ADDL
INSUREDS APPLY WHEN REQUIRED BY CONTRACT
& ON FILE WITH MILWAUKEE INSURANCE

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the schedule, but only with respect to liability arising out of your work for that insured by or for you.

Furthermore, the following is added to **SECTION IV COMMERCIAL GENERAL LIABILITY CONDITIONS paragraph 4, Other Insurance:**

4. Other Insurance
   This insurance is primary for the person or organization, shown in the schedule, but only with respect to liability arising out of your work for that insured by or for you. Other insurance afforded to that insured will apply as excess and not contribute as primary to the insurance afforded by this endorsement.

**In all other respects the terms, limits and conditions of this policy remain unchanged.**

POLICY NUMBER:  CPP30811530282

COMMERCIAL GENERAL LIABILITY
CG 03 00 01 96

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Amount and Basis of Deductible PER CLAIM or PER OCCURRENCE |
|---|---|
| Bodily Injury Liability | |
| OR | |
| Property Damage Liability | $ 500 |
| OR | |
| Bodily Injury Liability and/or Property Damage Liability Combined | |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage", however caused):

A. Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

B. You may select a deductible amount on either a per claim or a per "occurrence" basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

1. **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

   a. Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

   c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

      (1) "Bodily injury";

      (2) "Property damage"; or

      (3) "Bodily injury" and "property damage" combined

   as the result of any one "occurrence".

   If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.

   With respect to "property damage", person includes an organization.

2. **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

a. Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

b. Under Property Damage Liability Coverage, to all damages because of "property damage"; or

c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

(1) "Bodily injury";

(2) "Property damage"; or

(3) "Bodily injury" and "property damage" combined

as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

C. The terms of this insurance, including those with respect to:

1. Our right and duty to defend the insured against any "suits" seeking those damages; and.

2. Your duties in the event of an "occurrence", claim, or "suit"

apply irrespective of the application of the deductible amount.

D. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

    Copyright, Insurance Services Office, Inc., 1994    CG 03 00 01 96

## General Form Endorsement

Page 1 of 1

This endorsement forms a part of Policy No. CPP30811530282
and is effective 10/17/2002

Policy Period    From: 10/17/2002   To: 10/17/2003

**Issued to:**
ARCHITECTURAL SEALANTS, INC.

IT IS HEREBY UNDERSTOOD AND AGREED THAT THERE IS A
$500 PD DEDUCTIBLE APPLYING TO FORM 12278.

**In all other respects the terms, limits and conditions of this policy remain unchanged.**

2279 09/82

## Read Your Policy Carefully

This policy is legal contracts between you and us. The information on this page is not the insurance contract and only the actual policy provisions will control. The policy sets forth in detail the rights and obligations of both you and us. **It is therefore important that you read your policy carefully.**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of the policy.

### Mutual Company Membership and Voting Notice

While this policy is in force, you are a member of Milwaukee Mutual Insurance Company of Milwaukee, Wisconsin. You are entitled to vote either in person or by proxy at the Annual Meeting of your Company. This meeting is held at the Home Office in Milwaukee, Wisconsin or at such other place as may be designated by the Board of Directors in accordance with Company By-Laws, on the third Thursday of May each year at 2:00 p.m.

### Mutual Company Conditions

This policy is non-assessable. This means that as a member of Milwaukee Mutual Insurance Company you have no responsibility for our debts or obligations. Your responsibility is limited to the premium charges for your insurance.

This policy is signed by the President and Secretary of the insurance company and, if required by State law, this policy shall not be valid unless countersigned on the Declarations page by its authorized representative.

President

Secretary

COMMERCIAL GENERAL LIABILITY
CG 00 01 07 98

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

  (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

  (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

  (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

  (2) The "bodily injury" or "property damage" occurs during the policy period.

c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

### 2. Exclusions

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

  (1) That the insured would have in the absence of the contract or agreement; or

  (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

    (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

Copyright, Insurance Services Office, Inc., 1997

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

Copyright, Insurance Services Office, Inc., 1997

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

    Copyright, Insurance Services Office, Inc., 1997

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance ; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

a. "Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) Arising out of a criminal act committed by or at the direction of any insured;

(5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(6) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(7) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(8) Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

(9) Committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section; or

(10) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

b. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## COVERAGE C MEDICAL PAYMENTS

### 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

Copyright, Insurance Services Office, Inc., 1997

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

   (1) First aid administered at the time of an accident;

   (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

   (3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard".

g. Excluded under Coverage **A**.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

   (1) Agrees in writing to:

      (a) Cooperate with us in the investigation, settlement or defense of the "suit";

      (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

      (c) Notify any other insurer whose coverage is available to the indemnitee; and

      (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

 Copyright, Insurance Services Office, Inc., 1997   CG 00 01 07 98   ☐

(2) Provides us with written authorization to:

    (a) Obtain records and other information related to the "suit"; and

    (b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

    **(1)** "Bodily injury" or "personal and advertising injury":

        **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

        **(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(1)(a)** above;

        **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

        **(d)** Arising out of his or her providing or failing to provide professional health care services.

    **(2)** "Property damage" to property:

        **(a)** Owned, occupied or used by,

        **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

    you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

    **(1)** With respect to liability arising out of the maintenance or use of that property; and

    **(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C**;

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A**; and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Copyright, Insurance Services Office, Inc., 1997

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over:

**(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(d)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability.

**(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

**2.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

c. All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you in the territory described in **a.** above; or

(b) The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    Copyright, Insurance Services Office, Inc., 1997    CG 00 01 07 98    ☐

**b.** Does not include "bodily injury" or "property damage" arising out of:

　(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

　(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

　(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

　**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

　**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

　**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

　**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Your product" means:

　**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

　　**(1)** You;

　　**(2)** Others trading under your name; or

　　**(3)** A person or organization whose business or assets you have acquired; and

　**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

　**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

　**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**21.** "Your work" means:

　**a.** Work or operations performed by you or on your behalf; and

　**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

　**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

　**b.** The providing of or failure to provide warnings or instructions.



COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** CANCELLATION (Common Policy Conditions) is replaced by the following:

CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. **a.** We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   **b.** If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **c.** If we cancel for a reason other than nonpayment of premium, we will mail the notice at least:

      **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification of the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supercedes any provision to the contrary:

NONRENEWAL

1. If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to:

   **a.** You; and

   **b.** The broker, if known to us, or the agent of record.

2. Even if we do not comply with these terms, this policy will terminate:

   **a.** On the expiration date, if:

      **(1)** You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

      **(2)** We have indicated our willingness to renew this policy to you or your representative; or

      **(3)** You have notified us or our agent that you do not want to renew this policy.

   **b.** On the effective date of any other insurance replacing this policy.

**C.** Mailing of Notices

We will mail all cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

 Copyright, Insurance Services Office, Inc., 1987, 1992 **Page 1 of 1** ☐

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

  **(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

  **(1)** Whether the insured may be liable as an employer or in any other capacity; and

  **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

  **(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

  **(1)** Whether the insured may be liable as an employer or in any other capacity; and

  **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

INTERLINE
IL 00 03 04 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
BUSINESSOWNERS POLICY
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage:"

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material," if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste " at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured;" or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties;

   "Nuclear material" means "source material," "Special nuclear material" or "by-product material;"

   "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor;"

IL 00 21 11 85          Copyright, Insurance Services Office, Inc., 1983, 1984          **Page 1 of 2**          ☐

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

    **(a)** Any "nuclear reactor;"

    **(b)** Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste;"

    **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;"

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

# Exhibit F



# F.H. PASCHEN, SN NIELSEN, INC.
### GENERAL CONTRACTORS

## SUBCONTRACT AGREEMENT
### CONTRACT NUMBER 353-009



JUL 17 2000

**Date:**          June 21, 2000

**Contractor:**    F.H. Paschen/SN Nielsen, Inc.
701 Lee Street, Suite 550
Des Plaines, IL 60016

**Project:**       Performing Arts Center (JC11R) & Instructional Conference Center (JC11W)
William Rainey Harper College
1200 West Algonquin, Palatine, Cook County, Illinois 60067
CDB Project No. 810-032-016 / CDB Contract No. 50-0735-81

**Owner:**         State of Illinois, Capital Development Board
William G. Stratton Building, Third Floor
401 South Spring Street
Springfield, Illinois 62706-4050

| | C | A |
|---|---|---|
| PM | | |
| PE | | |
| SUPR | | |
| OM | | |
| FIELD | | |
| MO | | |
| | | |

**Architect:**     Burnidge Cassell Associates
2425 Royal Boulevard
Elgin, Illinois 60123

**Subcontractor:** Architectural Sealants, Inc.
6525 West Steger Road
Monee, Illinois 60449-9404
Contact: Tom Best
Phone: (708) 534-6666 Fax: (708) 534-6674

**Subcontract Price:**   $61,500.00
Sixty One Thousand Five Hundred Dollars and 00/100

**General Contract Dated:**     February 29, 2000

**Performance Bond and Payment Bond:**     Not required

**Retainage Percentage:**     10%

This Agreement, including the Schedules attached hereto and incorporated herein, is made this 21st day of June, 2000, by and between **F. PASCHEN/SN NIELSEN, INC.** (hereinafter the "Contractor") and **ARCHITECTURAL SEALANTS, INC.** (hereinafter the "Subcontractor").

For the consideration hereinafter set forth, Subcontractor covenants and agrees with Contractor as follows:

EXHIBIT
E

1. **DESCRIPTION OF WORK**

Subcontractor shall perform and furnish all the work, labor, supervision, services, plant equipment, tools, scaffolds, appliances, materials, and all other things necessary for the incorporation into the Project of the work described in Schedule A (hereinafter the "Work"). The Work shall be performed in accordance with this Agreement and the Contract Documents identified in Schedule B, and the Additional Provisions, if any, set forth in Schedule E to this Agreement.

2. **CONTRACT DOCUMENTS**

Subcontractor represents and agrees that it has examined and understands this Agreement and the other Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which the Work is to be performed, and that it enters into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of Contractor, or of Owner or Architect, or of any of their respective officers, agents, servants, or employees.

It is further agreed that the provisions of the contract between the Contractor and the Owner (hereinafter the "General Contract") including but not limited to, the General and Supplementary Conditions, the Plans and Specifications, all Contract Requirements, and the particular Specifications relating to the Work of Subcontractor, insofar as they are applicable, are hereby incorporated herein by this reference and are binding upon the Subcontractor. A copy of the General Contract is on file at the Contractor's office and has been inspected by Subcontractor.

3. **RELATIONSHIPS**

The Work to be performed pursuant to this Agreement is a portion of the work to be provided by Contractor to Owner under the General Contract and is to be performed and furnished to the satisfaction of the Contractor, Architect, and Owner. The decision of the Owner or the Owner's designated representative as to the true construction, meaning and intent of the Plans and Specifications shall be final and binding upon the parties hereto. Contractor will furnish to Subcontractor such additional information and Plans as may be prepared by Architect to further describe the Work to be performed and furnished by Subcontractor, and Subcontractor shall conform to and abide by same.

The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and, to the extent that provisions of the General Contract apply to the Work of the Subcontractor, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under the General Contract, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under the General Contract, assumes toward the Owner and Architect.

In addition to the rights and powers set forth in this Agreement, Contractor shall have the benefit of all rights, remedies and redress against Subcontractor which the Owner, by the Contract Documents, has against Contractor. If any provision of this Agreement is inconsistent or conflicts with any provision of the General or Supplementary Conditions of the Contract Documents, the provision in this Agreement shall control. In the event there is a conflict between any provision of this Agreement and any provision of the Special Conditions or the Plans and Specifications, the provision in this Agreement shall control. In the event there is a conflict between any provision of this Agreement and any provision of the Special Conditions or the Plans and Specifications, the provision in the Special Conditions or the Plans and Specifications, as the case may be, shall govern.

- 2 -

4.    **SUBCONTRACT PRICE**

The sum to be paid Subcontractor for the satisfactory and timely performance and completion of the Work and of all the duties, obligations and responsibilities of Subcontractor under this Agreement and the other Contract Documents shall be the price set forth above (hereinafter the "Subcontract Price") which shall be paid subject to the conditions stated herein, except that if all or a portion of the Work is to be performed on a unit price basis, then the Subcontract Price shall be deemed an estimated total price for the Work and the actual Subcontract Price shall be computed in accordance with the lump sum prices, if any, and the unit prices set forth in Schedule C, based on actual quantities determined in accordance with the Contract Documents. Receipt of payment from the Owner to the Contractor for Subcontractor's Work is an absolute condition precedent to the Subcontractor's right to payment.

5.    **PROGRESS PAYMENTS**

a)    As a condition to filing a request for payment, or at any time upon request by the Contractor, Subcontractor shall submit a schedule of values of the various portions of the Work, including quantities, if required by the Contractor. On or before the Progress Estimate Date, Subcontractor shall submit to Contractor, in the form required, a written progress estimate showing the proportionate value of the Work installed to the date, from which shall be deducted the current retainage, all previous payments, and all charges for services, materials, equipment and other items furnished by Contractor to or chargeable to Subcontractor. The "Progress Estimate Date" shall be the first business day of the month, unless otherwise designated by the Contractor in writing to the Subcontractor. Subcontractor agrees that it shall furnish a release of liens and such information, evidence and substantiation with respect to the nature and extent of all obligations incurred by Subcontractor for or in connection with the Work, all payments made by Subcontractor thereon and the amounts remaining unpaid, to whom and the reasons therefore.

Contractor shall pay to Subcontractor, upon receipt of payment from the Owner, an amount equal to the value of Subcontractor's completed Work, to the extent allowed and paid by Owner to Contractor on account of Subcontractor's Work, less all previous payments and less the amount of current retainage. The term "previous payments" shall include all amounts already paid on account of the Work, all charges for materials or services furnished by Contractor and properly chargeable to Subcontractor and all costs incurred by Contractor properly chargeable to Subcontractor as obligations of Subcontractor. The term "current retainage" shall be calculated in accordance with the Retainage Percentage set forth above. Receipt of Progress Payments from the Owner to Contractor is an absolute condition precedent to the Subcontractor's right to payment.

b)    Subcontractor shall be required to file daily subcontractor work reports on the form provided by Contractor. Failure of Subcontractor to provide Contractor with such reports in a timely manner shall be cause for the withholding of Progress Payments.

6.    **FINAL PAYMENT**

A final payment, including the unpaid balance of the Subcontract Price and retention to the extent allowed and paid by Owner to Contractor on account of Subcontractor's Work, shall be made within sixty (60) days after the last of the following to occur: a) full completion of the Work by Subcontractor, b) final acceptance thereof by Architect and Owner, c) final payment by

Owner to Contractor on account of Subcontractor's work, d) the furnishing of satisfactory evidence by Subcontractor that Subcontractor has paid in full all persons furnishing labor or materials in connection with the Work including any taxes or governmental charges with respect thereto or with respect to the Work, and that neither Subcontractor nor any persons claiming under or through Subcontractor has filed or has the right to maintain a lien or other claim against Owner, Contractor, Contractor's Surety, if any, on the Project and e) the delivery of all guarantees, warranties, bonds, instruction manuals, performance charts, diagrams, as-built drawings and similar items required of Subcontractor or its suppliers with respect to the Work.

7.  **NO LIENS**

a)    As often as required by Contractor, Subcontractor shall furnish an affidavit showing the names and addresses of all persons who shall have furnished labor or materials for the Work and the amount due or to become due to each such person.  Progress payments may be made in the form of checks payable jointly to Subcontractor and any of the Subcontractor's equipment lessors, material suppliers, or anyone else to whom the Subcontractor owes money for this Project.    The Contractor will not be under any obligation, however, to issue joint payment checks, but may do so in the event that there is a reasonable likelihood that such obligations of the Subcontractor, as described above, may not be timely paid by the Subcontractor and/or could become the obligation of the Contractor under any surety bond issued by the Contractor or under the applicable mechanic's lien law.

b)    Subcontractor, for itself and for its subcontractors, laborers and materialmen and all other directly or indirectly acting for, through or under it or any of them covenants and agrees that no liens for or on account of any work, labor, services, materials, equipment or other items performed or furnished for or on account of the Project will be filed.  Subcontractor, for itself and its subcontractors, laborers and materialmen and all others above mentioned does hereby expressly waive, release and relinquish all rights to file or maintain such liens and further agrees that this waiver of the right to file or maintain such liens shall be an independent covenant and shall apply as well to work, labor and services performed and materials, equipment and their items furnished under any change order or supplemental agreement for extra or additional work in connection with the Project as well as to the original Work covered by this Agreement. Subcontractor shall, as often as requested by Contractor, furnish a separate release of lien for itself, its subcontractors and suppliers.  Subcontractor shall indemnify (including the payment of reasonable attorneys fees), defend and hold harmless Contractor from Subcontractor's failure to properly pay any laborer, supplier, subcontractor and/or equipment lessor for work, materials, and/or equipment supplied to the Project.

8.  **PAYMENTS WITHHELD**

a)    Contractor's right to withhold money, shall include, but shall not be limited to, money withheld because of 1) a claim being made or lien being filed with or against Contractor, its Surety, if any, the Owner, the Project or the premises upon which the Project is located, by any person claiming that Subcontractor or any subcontractor or other person under it has failed to make payment for any labor, services, materials, equipment, taxes or other items or obligations furnished or incurred for in connection with the Work, 2) Subcontractor or any subcontractor or other person under it has caused damage to the Work or to any other work on the Project, or 3) the Subcontractor has failed to perform or is otherwise in default under any of the terms or provisions of this Agreement.

- 4 -

Contractor may apply and charge against the Subcontractor so much of the amount withheld as may be required to satisfy any of the foregoing purposes. If the amount withheld is insufficient to fully satisfy said purposes, Subcontractor shall be liable to the Contractor for the difference.

b)    If for any reason the Contractor deems it necessary under the terms and conditions of this Agreement to withhold from the Subcontractor money retained or any other money claimed by the Subcontractor, then the Contractor shall not be liable for the payment of interest on said money.

9.    **TIMELY EXECUTION OF THE WORK**

It is understood that completion of the Work and its several parts within the time allotted is of the essence. Subcontractor agrees to: a) provide a schedule and, upon request, revised schedules of the Work to Contractor for its use in scheduling the Project, b) provide at the Project site the materials, equipment, laborers and supervision necessary to begin the Work upon the Contractor's order to do so, and to furnish sufficient forces, supervision, equipment and materials, at such other times and for such other periods as Contractor may direct, and c) perform the Work and all parts thereof, promptly, diligently, and in such order and sequence as Contractor may direct to assure the efficient, expeditious and timely prosecution of the entire work for the Project. Contractor reserves the right to modify any progress schedule with respect to the required sequence or duration of the Work or any portion thereof, and Contractor makes no representation that Subcontractor will be able to commence, prosecute, or complete the Work in accordance with any progress schedule.

Subcontractor shall cooperate and coordinate with others participating in the construction of the Project and shall not delay, impede or otherwise impair their work. Subcontractor shall use its best efforts to diligently pursue its work in order to permit Contractor to meet the dates for Subcontractor's Work as they relate to its own work and the work of others and to achieve the completion dates established in the schedule for the overall project.

Should Subcontractor or any of its officers, agents, servants, or employees fail to begin, continue or complete the Work as herein provided, or otherwise unreasonably delay the progress of the Work so as to cause any additional cost, expense, liability, or damage to Contractor or Owner, Subcontractor shall and does hereby agree to compensate Contractor or Owner for and indemnify them against all costs, expenses, damages, and liability.

Contractor may direct Subcontractor, upon forty-eight (48) hours prior written notice, to provide additional labor and supervision or to work overtime and if so directed, Subcontractor shall work said overtime or provide such additional labor and supervision. Provided that Subcontractor is not in default under any of the terms or provisions of this Agreement or of any of the other Contract Documents, and further providing that the progress of the Work has not been delayed by Subcontractor or any of its officers, agents, servants or employees, then Subcontractor will be paid the premium time rate for any such overtime or additional labor, if any, at rates which have been previously approved by the Contractor in writing, plus taxes imposed by law on such premium wages if required to be paid by Subcontractor. If, however, the progress of the Work or of the Project has been delayed by the Subcontractor, then the Subcontractor shall, at its own cost and expense, work such overtime or provide such additional labor and supervision as may be necessary to make up for all time lost and to avoid delay in the completion of the Work and of the Project.

10.   **LIQUIDATED DAMAGES**

In the event that Subcontractor shall fail in the performance of the Work to be performed under this Subcontract by and at the time or times referred to, or agreed to in the progress schedule or the Subcontractor is otherwise responsible for the late completion of the Project, and a time extension has not been issued either by the Owner or the Contractor, Subcontractor shall pay to Contractor, as damages, all such actual damages or liquidated damages suffered by Contractor by reason of such default; including, but not limited to, damages assessed by the Owner pursuant to any applicable provisions of the General Contractor or other Contract Documents.   The Contractor shall have the right to deduct from any monies otherwise due or to become due to Subcontractor or to sue for and recover compensation or damages for the non-performance of this Agreement at the time or times stipulated or provided for herein.

11.   **EXTENSIONS OF TIME/DELAY CLAIMS**

a)   Should Subcontractor be delayed in the commencement, prosecution or completion of the Work by the act, omission, neglect or default of Contractor, Owner, and/or of anyone employed by Contractor, Owner, or of any other contractor or subcontractor on the Project, or by any damage caused by fire or other casualty or by the combined action of workmen in no way chargeable to Subcontractor's control and not due to any fault, neglect, act or omission on its part, then Subcontractor may be entitled to an extension of time in which to complete its Work. Such extension may be for a period equivalent to the time lost by reason of any and all of the aforesaid causes, as determined by Contractor.   It is expressly agreed, however, that the Contractor shall not be liable to the Subcontractor for any delays whether caused by the Contractor, its other subcontractors, the Owner or other independent contractors of the Owner unless an extension of time for such delays is first granted to the Contractor by the Owner and, except to the extent and amount that the Contractor is actually paid therefore by the Owner, subcontractor or others for the specific use and payment of Subcontractor's claim arising from said delays.

b)   If the Subcontractor is delayed in the prosecution of its Work due to the acts of the Owner and/or its agents and the Subcontractor suffers delay damages therefrom, the Contractor agrees to transmit to the Owner any claims submitted to it by the Subcontractor.   The Owner's decision regarding such claims will be final and binding upon Subcontractor. It is agreed that in no event will the Contractor be liable for Subcontractor's claims for delay; the Contractor under this provision merely acts as a conduit to provide the Subcontractor access to the Owner to seek reimbursement for damages incurred for delays caused by the Owner and/or its agents.

12.   **CHANGE ORDERS/EXTRAS**

Subcontractor shall not make any changes, additions or deletions in the Work, except upon written order of Contractor.  Contractor shall have the right to make changes, additions and/or deletions in the Work, upon written order to Subcontractor.  The value of the Work as changed, added, or deleted shall be stated in the written order, approved by Contractor, and the Subcontract Price shall be adjusted as provided in the Contract Documents or as hereinafter provided.  No extra work or changes from Plans and Specifications or from this Agreement will be recognized or paid for unless agreed to in writing before the extra work is started or the changes made.  All such orders must be signed by an authorized representative of the Contractor.

-6-

Should the parties be unable to agree on the amount of the addition or the reduction from the Subcontract Price, Subcontractor shall proceed with the Work, as changed, added or deleted, promptly upon the written order of Contractor from which order the stated value of such Work shall be omitted, and the determination of the amount of such addition or reduction by the Owner as provided in the General Contract shall be binding on the Subcontractor and the Contractor.

It is understood and agreed that any claims for extras demanded by the Subcontractor arising from omissions and/or discrepancies in the Plans or Specifications shall not be binding upon the Contractor or honored by the Contractor except to the extent previously approved and the extent actually paid for by the Owner. In case of Work omitted by the Subcontractor, Contractor shall have the right to withhold from payments due or to become due the Subcontractor an amount which, in the Contractor's opinion, is equal to the value of such Work until such time as the value thereof is determined by agreement or by equitable adjustment upon completion of the Work.

All changes, additions or deletions in the Work ordered in writing by Contractor shall be deemed to be a part of the Work hereunder and shall be performed and furnished in accordance with all the terms and provisions of this Agreement and the other Contract Documents.

Any change which will affect work performed by another Subcontractor shall be specifically brought to the attention of the Contractor. Failure to convey such notification shall cause the Subcontractor who originates the change to bear any additional cost which may result from such change or modification.

13.   **GUARANTEE**

Subcontractor guarantees that the Work, including any materials or equipment furnished in connection therewith, shall be free from defects in material and workmanship and shall conform to and meet the requirements of this Agreement, the General Contract, the Contract Documents and any Additional Provisions, if any. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. Subcontractor shall furnish any separate guarantee for the Work or portions thereof as required under any of the applicable Contract Documents.

Subcontractor's guarantee shall be in addition to any other warranty or remedy required by law or by this Agreement.

14.   **DETAILS OF THE WORK**

Notwithstanding the dimensions given on the Plans, Specifications and other Contract Documents, it shall be the obligation and responsibility of Subcontractor to take such measurements as will insure the proper matching and fitting of the Work with contiguous work.

Subcontractor shall prepare and submit to Contractor such shop drawings as required to describe completely the details and construction of the Work. Approval of shop drawings shall not relieve Subcontractor of its obligations to perform the Work in strict accordance with the Plans, Specifications, Additional Provisions, if any, and the other Contract Documents, nor of its responsibility for the proper matching and fitting of the Work with contiguous work. Prior approval of equipment and/or material in connection with a previous project shall not be construed by Subcontractor as giving an approval for use on this Project.

- 7 -

Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, Subcontractor shall carefully examine such other work, determine whether it is fit, ready and in suitable condition for the proper and accurate performance of the Work hereunder, use all reasonable means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any such improper conditions and defects to Contractor in writing and allow a reasonable time to have such improper conditions and defects remedied.

15. **INSPECTION AND DEFECTIVE WORK**

Subcontractor shall provide sufficient, safe and proper facilities at all times for the inspection of the Work by Contractor, Owner and Architect and their authorized representatives. Subcontractor shall, within forty-eight (48) hours after receiving written notice from Contractor, remove all materials, whether worked or unworked, and take down and rebuild all portions of the Work condemned by Architect or Contractor as unsound, defective or improper or as in any way failing to conform to the Contract Documents. Subcontractor, at its own expense and cost, shall replace same with proper and satisfactory work and materials and make good all work damaged or destroyed by or as a result of such unsound, defective, improper or non-conforming work or materials or by the taking down, removal or replacement thereof.

Subcontractor agrees and understands that neither Contractor nor Architect will provide continuous or exhaustive inspection of Subcontractor's Work and that Subcontractor is fully responsible for the materials, procedures, methods and techniques utilized and for providing completed Work to the full satisfaction of the Contractor and Architect. Neither failure to inspect the Work nor, upon inspection, failure to uncover defects in the Work shall be deemed acceptance of the Work by Contractor or Architect.

16. **SUBCONTRACTOR**

The Subcontractor warrants that it is sufficiently fiscally responsible to carry out the work as provided in this Agreement, together with all other work it may have on hand or undertake whether it be with the Contractor or others. Should the Subcontractor's financial condition change in any manner from that at the time of entering into this Agreement, it shall immediately notify the Contractor so that procedures may be instituted to help safeguard the performance by the Subcontractor hereunder.

The Contractor may, at any time, make inquiries as to the financial condition of the Subcontractor including, but not necessarily limited to, lower-tier subcontractors, suppliers, etc. that are supplying material and/or services to the Project, any other creditors, and Subcontractor's banker, Certified Public Accountant, and Surety, if any.

The Contractor may institute such financial and other measures, including those provided elsewhere in this Agreement, when, in Contractor's sole determination, the best interests of the Project would be served thereby.

17. **SECOND TIER SUBCONTRACTORS**

Subcontractor shall not sublet the work to be performed under this Agreement either in whole or in part without the prior, express, and written consent of Contractor. All subcontracts under this Agreement shall be subject to the provisions of the General Contract and this Agreement but shall create no contractual relationship with Contractor.

18. **COMPLIANCE WITH LAW AND PERMITS**

Subcontractor shall obtain and pay for all necessary permits, patents and licenses pertaining to the Work and shall comply with all Federal, State, Municipal and local laws, ordinances, rules, regulations, standards, orders, notices, and requirements as may be applicable to the Project, including, among others, those relating to safety, utilization of minority employees, discrimination in employment, and fair employment or equal opportunity. Subcontractor shall be responsible for all damages and penalties and shall indemnify and hold harmless the Contractor from and against all damages, penalties and liability which may arise out of Subcontractor's failure to secure and pay for any such licenses and permits or its failure to comply fully with any and all applicable laws, ordinances, rules and regulations. Subcontractor shall furnish, upon demand, such proof as Contractor or Owner may require showing compliance with applicable laws and regulations and/or the correction of any violation.

19. **SAFETY**

a)     Subcontractor shall take reasonable safety precautions with respect to its Work and shall comply with all safety measures initiated by Contractor and the Owner and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including, but not limited to, applicable OSHA Standards. Subcontractor shall report within three (3) days to Contractor any injury to any of the Subcontractor's employees at the Project site.

b)     Subcontractor understands and agrees that neither Contractor nor Architect will make continuous or exhaustive inspections to assure Subcontractor's compliance with applicable safety rules, regulations or requirements. Subcontractor shall be solely responsible to assure the safety of its own equipment, appliances, material, and working conditions, techniques, and procedures, and Contractor is not responsible in any manner for the safety of Subcontractor's Work. If the Subcontractor fails to correct unsafe procedures, acts or conditions within a reasonable time of notification by Contractor, however, Contractor may (but has no contractual obligation to do so ) correct the unsafe practice and backcharge the Subcontractor for these costs. Repeated failures to correct unsafe practices may result in the termination of this Agreement. In the event Contractor receives a penalty from OSHA as a result of a violation of OSHA by Subcontractor and Contractor is cited under the multi-employer worksite rule, Subcontractor agrees to defend, indemnify and hold harmless Contractor for the imposition of any fines and/or penalties.

c)    Subcontractor agrees that all applicable Material Safety Data Sheets (MSDS) required pursuant to the Hazardous Communication Standards (29 CFR § 1915.1200) for the proper performance of the Subcontractor's obligation, are to be provided by the Subcontractor. All MSDS forms shall be mailed to the Project Job Site address and should reference this Agreement and the Project name and number. Subcontractor shall indemnify and hold harmless the Contractor from any liability, claim, loss or expense arising out of or in connection with Subcontractor's failure to abide by this requirement.

## 20.    CLEAN-UP

a)    Subcontractor shall, at its own cost and expense (1) keep the premises free at all times from all waste materials, packing materials and other rubbish generated by Subcontractor in locations or containers as designated by Contractor, 2) clean and remove from its own Work and from all contiguous work areas any soiling, staining, mortar, plaster, concrete, or dirt resulting from the execution of its Work in each area, 3) perform such cleaning as may be required to leave the Work area "broom clean" and 4) at the completion of its Work, remove all of its tools, equipment, scaffolds, shanties, and surplus materials and perform final clean-up as required by Contractor.

b)    If the Subcontractor is lax in its cleaning, the Contractor will give notice to the Subcontractor's field personnel and written notice to the Subcontractor that the cleaning is not being kept current. If after twenty four hours (24) notice, Subcontractor has failed to abide with clean up requirements, Contractor shall perform the Subcontractor's cleaning and backcharge the Subcontractor for the costs.

## 21.    LABOR

a)    Subcontractor agrees that in the preparation of the material and the performance of the Work, it will employ only such workers as will work in harmony with the other workers employed by Contractor or the other Subcontractors, and Subcontractor further agrees that it will, at the request of Contractor, discharge and remove from the Project premises, any person designated by the Contractor as being detrimental to the Project. The right of the Contractor to request the discharge of any workers employed by Subcontractor shall not be construed to constitute the Contractor as the employer of any workers employed by the Subcontractor.

b)    Subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional disputes which may be in effect either nationally or in the locality in which the Work is being done and that it shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this paragraph shall not be in violation of or in conflict with any provisions of law applicable to the settlement of such disputes. Should Subcontractor fail to carry out or comply with any of the foregoing provisions, Contractor shall have the right, in addition to any other remedies provided by this Agreement or other Contract Documents or by law, upon forty-eight (48) hours written notice to Subcontractor, for all or any portion of the Work and, for the purpose of completing the Work, to enter upon the Project premises and take possession, in the same manner, to the same extent and upon the same terms and conditions applicable for failure to prosecute the Work.

c) Subcontractor agrees to adhere strictly to all laws and regulations in connection with employment of labor, including, but not limited to, those contained in the specifications, bulletins and all subsequent amendments and modifications thereof, which are part of the General Contract and which form a part of this Agreement. Subcontractor further agrees that any penalty imposed upon Contractor due to any infraction of these requirements or violations thereof by Subcontractor shall be charged to and borne by Subcontractor.

22. **GENERAL INDEMNIFICATION**

Subcontractor hereby assumes the entire responsibility for any and all damage or injury of any kind or nature whatsoever (including death resulting therefrom), to all persons, whether employees of the Subcontractor or otherwise, and to all property caused by, resulting from, arising out of or occurring in connection with the execution of the Work; and if any claims for such damage or injury (including death resulting therefrom) be made or asserted, Subcontractor agrees to indemnify and save harmless Contractor, and Owner, their officers, agents, servants, and employees from and against any and all such claims, and further from and against any and all loss, cost, expenses, liability, damage or injury, including legal fees and disbursements Contractor, Owner, their officers, agents, servants, or employees may directly or indirectly sustain, suffer or incur as a result of Subcontractor's work. Subcontractor further agrees to and does hereby assume, on behalf of Contractor, and Owner, their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against Contractor or Owner, their officers, agents, servants, or employees upon or by reason of such claims. The Subcontractor agrees to pay on behalf of Contractor, or Owner, their officers, agents, servants, and employees the amount of any judgment so entered, upon proof of judgment and submission of evidence or finding by a court of competent jurisdiction that such judgment arose out of or occurred in connection with the execution of the work of Subcontractor.

23. **RENTED OR LOANED EQUIPMENT**

In the event Contractor rents or loans equipment, machines, and/or tools to Subcontractor, and whether or not such rental or loan includes the providing of Contractor's operator, Subcontractor hereby agrees to make no claim whatsoever against Contractor for any personal injuries or property damages caused in the course of carrying out Subcontractor's request for the rental or loaned equipment. It is further understood and agreed that in the event that such equipment is operated by employees or agents of Contractor that such operators shall for the purpose of this Agreement, and for such purpose only, by considered subject to the direction and control of Subcontractor so that Subcontractor, as between Contractor and Subcontractor, shall be considered as being liable for any and all negligent acts or omissions of such operators.

Subcontractor hereby agrees to defend, indemnify and hold harmless the Contractor against any and all claims, loss or damages, including reasonable attorneys fees, that may arise from Contractor's complying with or attempt to comply with Subcontractor's request for rented or loaned equipment. This indemnification shall apply regardless of whether or not such personal injuries or property damages may be the result of the negligence, in whole or in part, of Contractor or its employees or otherwise due to the fault of Contractor or its employees.

**24.  DEFAULT**

It shall be considered an event of default under this Agreement if Subcontractor should: 1) refuse or neglect to supply sufficient workmen or materials of the proper quality and quantity, 2) fail in any respect to prosecute the Work with promptness and diligence, or cause the stoppage, delay, interference with, or damage to the work of Contractor and Owner or any other contractors or subcontractors on the Project, 3) fail to perform in accordance with any of the terms or provisions of this Agreement or of the other Contract Documents, 4) allow a petition in bankruptcy or for an arrangement or reorganization to be filed by or against it, 5) become insolvent or be adjudicated as bankrupt or go into liquidation, either voluntarily or involuntarily or under court order, or made a general assignment for the benefit of creditors, or 6) the Architect shall have determined that the Work or any portion thereof is not being performed in accordance with the Contract Documents.

Upon the occurrence of an event of default, Contractor shall have the right, in addition to any other remedies provided by this Agreement and the other Contract Documents or by law, after forty-eight (48) hours notice to Subcontractor also a) to perform and furnish any such labor and materials for the Work and to deduct the cost thereof from any moneys due or to become due to Subcontractor under this Agreement, and/or b) terminate the employment of Subcontractor, for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which Subcontractor hereby transfers and assigns to Contractor for such limited purpose and for whatever period of time is necessary for completion of the Work.

In case of such termination of the employment of Subcontractor, Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of Contractor, Owner, and Architect, and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by Contractor and/or Owner in completing the Work, such excess shall be paid by Contractor to the Subcontractor; provided, however, that if such cost and expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor. Such cost and expense shall include, not only the cost of completing the Work to the satisfaction of the Contractor, Owner and Architect, but also all other damages incurred or suffered by reason of or resulting from Subcontractor's default. In the event it becomes necessary for the Contractor to collect any deficiency from the Subcontractor by legal action, the Subcontractor agrees to reimburse Contractor for all of its reasonable attorney's fees and costs incurred in connection with such action.

**25.  COOPERATION**

Subcontractor and its subcontractors, if any, shall cooperate with Contractor and other subcontractors on the Project premises and shall so carry on their work so that other cooperating subcontractors shall not be hindered, delayed or interfered with in the progress of their work and so that all of such work shall be a finished and completed in accordance with the Project schedule.

26. **DISPUTES**

Should any dispute arise between the parties respecting the true construction or interpretation of the Plans, Specifications and/or the Contract Requirements, the decision of the Owner or the Owner's designated representative as set forth in the General Contract shall be final. In the event of any such dispute, the Subcontractor shall proceed, without interruption, with the Work in such manner as directed by the Contractor, pending the decision of the Owner or its representative as set forth in the General Contract. It is further agreed that in the event of any dispute arising between the Subcontractor and Contractor as to the scope and/or intent of this Agreement, the Subcontractor shall proceed with its work without interruption pending settlement thereof.

27. **TERMINATION**

Contractor shall have the right at any time by written notice to Subcontractor to terminate this Agreement and require Subcontractor to cease work hereunder, in which case, provided the Subcontractor be not then in default, Subcontractor shall be entitled to the value of the work performed and materials furnished. In the event of termination, Subcontractor shall not be entitled to anticipated profits on work unperformed or on materials or equipment unfurnished.

In lieu of termination of Subcontractor's suppliers and subcontractors, Subcontractor shall, at Contractor's election, assign its contracts or subcontracts, as the case may be, to Contractor within ten (10) days of notice to do so.

Subcontractor's payment after termination shall become due and payable sixty (60) days after assignment of contracts or subcontracts or settlement of accounts, whichever occurs later, and the Subcontractor's compliance with any conditions to final payment that may be applicable to the termination.

28. **COMPENSATION AND LIABILITY INSURANCE**

Before commencing the Work, Subcontractor shall procure and shall thereafter maintain, at its own expense, until completion and final acceptance of the Work the types and minimum limits of insurance set forth in Schedule D.

29. **BONDS**

Before commencing the Work Subcontractor shall furnish to Contractor, at its expense, a performance bond and a separate payment bond in the amount set forth and in the form and content and from such Surety or Sureties as are satisfactory to Contractor and Owner.

30. **CHOICE OF LAW**

The performance of this Agreement and all of its terms and conditions shall be interpreted and governed by the laws of the State of Illinois.

- 13 -

31.  **NO WAIVER**

The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but such terms and conditions shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

32.  **SEVERABILITY**

If any one or more of the provisions contained in this Agreement, for any reason, are held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

33.  **OWNER APPROVAL/ SUCCESSION OF INTERESTS**

Subcontractor understands and agrees that the Owner has the right to approve or disapprove the employment of this Subcontractor and in the event that the Owner does not approve this Subcontractor, this Agreement shall become null and void.

This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors and permitted assigns of the parties hereto, but no third party benefits are created by this Agreement.

34.  **MISCELLANEOUS**

a)     All previous oral or written promises negotiations, representations or agreements relating to the subject matter of this Agreement are hereby declared to be null and void, it being expressly agreed that the terms of this Agreement shall constitute the full and complete agreement between the parties hereto.

b)     This Agreement may not be changed in any way unless such changes are in writing and signed or initialed by both parties to this Agreement, and no term or provision of this Agreement may be waived by Contractor except in writing signed or initialed by its duly authorized officer or agent.  Subcontractor shall not sell, assign, sublet, transfer, or otherwise dispose of this subcontract Agreement, or any part thereof, nor assign any moneys due or to become due hereunder, except with the prior written consent of the Contractor.

c)     The titles or headings of any term or provision of this Agreement are for convenience only and shall in no way affect the interpretation of this Agreement.

**SCHEDULE A**

**WORK:**    The Bentonite Waterproofing & Joint Sealers work shall consist of all supervision, labor, material, and equipment necessary to complete the project in accordance with the Contract Plans and Specifications including but not limited to the following:

**Specification Sections**

- **Division 1 - General Requirements (as applicable)**
- **07130 – Bentonite Waterproofing**
- **07900 – Joint Sealers**

- Provide bentonite waterproofing for concrete foundation walls and concrete slabs as specified, as indicated, as required
- Provide for all bentonite waterproofing quality assurance requirements as specified
- Provide for bentonite waterproofing 'Product Handling' requirements
- Provide for bentonite waterproofing 'Products' requirements as specified
- Joint sealants as required at exterior stoops and driveway
- Joint sealants as required at slab on grade control joints
- Joint sealants as required at interior and exterior masonry expansion joints
- Joint sealants as required at interior and exterior precast joints
- Joint sealants as required at masonry/precast joints
- Joint sealants as required at masonry/precast to existing building joints
- Joint sealants as required at interior and exterior hollow metal doors
- Joint sealants as required at interior slab edge to masonry and precast walls
- Joint sealants as required at interior masonry walls to precast wall panels
- Joint sealants as required at stair stringers
- Furnish, deliver, install all joint sealant accessory materials as specified, as required
- Furnish, deliver, install joint filler, joint cleaner, bond breaker, joint primer as specified, as required
- Provide for all joint sealant quality assurance requirements as specified
- Provide 2 year joint sealant warranty as specified
- Provide for all joint sealer 'Products' requirements as specified
- Provide for joint sealer 'Cleaning' requirements as specified
- Daily clean-up to dumpsters provided by others
- All joint sealant and bentonite waterproofing work associated with contract alternates #1-5
- Furnish, place, maintain all site safety requirements per the latest OSHA standards for all bentonite waterproofing and joint sealant related work
- Provide all submittal data required per specification
- Provide for all on-site storage, security of tools, materials, and equipment on a daily basis
- Provide for all unloading, hoisting, handling of materials, equipment related to bentonite waterproofing and joint sealer work as required

**Exclusions:**
- Sealants at hollow metal frames doors where frame abuts drywall
- Sealants at aluminum storefronts/windows
- Sealants at plumbing fixtures

**SCHEDULE B**

**CONTRACT DOCUMENTS:**
Specifications                                             October 4, 1999
Addendum No. One                                          November 23, 1999
Addendum No. Two                                          December 2, 1999

As prepared by **Burnidge Cassell Associates, Inc.**, the Contract Documents consist of:

**VOLUME 1**

**General**
G-1A            Cover Sheet
G-2             Notes

**Civil**
C1              Existing Conditions/Demo Plan, R
C2              Utility Plan, R
C3              Grading Plan, R
C4              Existing Conditions/Demo Plan, W
C5              Utility Plan, W
C6              Grading Plan, W
C7              Detail Sheet
C8              Detail Sheet
C9              General Notes

**Architectural**
A2.1            Lower Level Plan, R
A2.2            Main Floor Plan, R
A2.2a           Main Floor Plan, Detail References, R
A2.3            Mezzanine Level Plan, R
A2.4            Mechanical Level plan, R
A2.5            Catwalk Level Plan, R
A2.6            Roof Plan, R
A2.7            Partial Building A Basement Plan, W
A2.8            First Floor Plan, W
A2.8a           First Floor Plan, Section, Detail References, W
A2.9            Second Floor Plan, W
A2.9a           Second Floor Plan, Section, Detailed References, W
A2.10           Third Floor Plan, W
A2.10a          Third Floor Plan, Section, Detailed References, W
A2.10           Roof Plan, W
A3.1            Lower Level Reflected Ceiling Plan, R
A3.2            Main Floor Reflected Ceiling Plan, R
A3.3            Mezzanine Level Reflected Ceiling Plan, R
A3.4            Mechanical Level Reflected Ceiling Plan, R
A3.5            Catwalk Level Reflected Ceiling Plan, R
A3.6            Partial Building A Basement Reflected Ceiling Plan, R
A3.7            First Floor Reflected Ceiling Plan, W
A3.8            Second Floor Reflected Ceiling Plan, W
A3.9            Third Floor Reflected Ceiling Plan, W

16

**VOLUME 1**
**Architectural continued;**

| | |
|---|---|
| A5.1 | North and East Elevations, R |
| A5.2 | South and West Elevations, R |
| A5.3 | Elevations, W |
| A5.4 | Enlarged Elevations |
| A5.5 | Enlarged Elevations |
| A6.1 | Building Sections, R |
| A6.2 | Building Sections, R |
| A6.3 | Building Sections, R |
| A6.4 | Building Sections, W |
| A6.5 | Building Sections, W |
| A7.1 | Wall Sections, W |
| A7.2 | Wall Sections, W |
| A7.3 | Wall Sections, W |
| A7.4 | Wall Sections, W |
| A7.5 | Wall Sections, W |
| A7.6 | Wall Sections, W |
| A7.7 | Wall Sections, W |
| A7.8 | Wall Sections, W |
| A7.9 | Wall Sections, R |
| A7.10 | Wall Sections, R |
| A7.11 | Wall Sections, R |
| A7.12 | Wall Sections, R |
| A8.1 | Enlarged Toilet Plans |
| A9.1 | Enlarged Stair Plans, R |
| A9.2 | Enlarged Plans and Misc. Sections, R |
| A9.3 | Enlarged Stair Plans, W |
| A9.4 | Enlarged Elevator Plans |
| A9.5 | Stair Sections, R |
| A9.6 | Stair Sections, R |
| A9.7 | Stair Sections and Details, W |
| A9.8 | Stair Sections, W |
| A9.9 | Sections, R & W |
| A9.10 | Elevator Sections, R & W |
| A9.11 | Elevator Sections, R |
| A10.1 | Enlarged Plans |
| A10.2 | Geometry Plan |
| A11.1 | Interior Elevations, R |
| A11.2 | Bathroom Elevations, R & W |
| A11.3 | Interior Elevations, R |
| A11.4 | Interior Elevations, W |
| A11.5 | Interior Elevations, W |
| A12.1 | Details |
| A12.2 | Details |
| A12.3 | Details |
| A13.1 | Alternate G-1, W |
| A13.2 | Alternate G-2, R |
| A13.3 | Alternate G-4, R |

**SCHEDULE B continued:**

**VOLUME 1**

**Structural**

| | |
|---|---|
| S0.0 | General Notes |
| S1.1 | Foundation & Lower Level Plan, R |
| S1.2 | Main Floor Plan, R |
| S1.3 | Mezzanine Floor Plans, R |
| S1.4 | Mechanical Floor & Low Roof Plans, R |
| S1.5 | Catwalk & Mechanical Room Roof Plans, R |
| S1.6 | Auditorium & Mechanical Room Roof Plans, R |
| S1.7 | Grid Iron & Stage Roof Plans, R |
| S2.1 | Basement & Foundation Plan, W |
| S2.2 | Main Level Plan, W |
| S2.3 | Second Floor Framing Plan, W |
| S2.4 | Third Floor Framing Plan, W |
| S2.5 | Roof Framing Plan, W |
| S3.1 | Column Schedules |
| S3.2 | Bracing Sections & Elevations, R |
| S3.3 | Bracing Sections & Elevations, W |
| S4.1 | Foundation Sections & Details |
| S4.2 | Foundation Sections & Details |
| S4.3 | Slab Sections & Details |
| S4.4 | Concrete Sections & Details |
| S5.1 | Steel Sections & Details |
| S5.2 | Steel Sections & Details |
| S5.3 | Steel Sections & Details, R |
| S5.4 | Steel Sections & Details, W |
| S5.5 | Steel Sections & Details |

**Stage Equipment**

| | |
|---|---|
| SE1.1 | Stage Rigging Plan, R |
| SE1.2 | Stage Rigging Section, R |
| SE1.3 | Stage Rigging Fire Curtain Elevation, R |
| SE1.4 | Stage Rigging Lineset Elevation, R |
| SE1.5 | Stage Rigging Proscenium Elevation, R |
| SE2.1 | Platform Details, R |
| SE2.2 | Stage Rigging System Detail, R |
| SE2.3 | Stage Rigging System Detail, W |
| SE2.4 | Gridiron Layout, R |

## SCHEDULE B continued:

**VOLUME 2**

**General**
G-1B          Cover Sheet

**Mechanical - Heating**
H1.11         Main Level Plan-Heating-Performing Arts
H1.21         Mezzanine Level Plan-Heating-Performing Arts
H1.31         Mechanical Level Plan-Heating-Performing Arts
H1.41         Steam Piping Plan-Heating-Performing Arts
H1.51         Piping System Sketch-Heating & Cooling-Performing Arts
H1.60         Large Scale Plan-Heating-Performing Arts
H1.61         Piping Diagrams-Heating-Performing Arts
H1.71         Details-Heating-Performing Arts
H1.72         Details-Heating-Performing Arts
H1.73         Details-Heating-Performing Arts
H1.74         Details-Heating-Performing Arts
H1.75         Details-Heating-Performing Arts
H1.81         Symbols and Abbreviations-Heating-Performing Arts
H1.82         Symbols and Abbreviations-Heating-Performing Arts
H1.91         Schedules-Heating-Performing Arts
H1.92         Schedules-Heating-Performing Arts
H2.01         Basement Plan-Heating-Conference Center
H2.11         First Floor Plan-Heating-Conference Center
H2.21         Second Floor Plan-Heating-Conference Center
H2.31         Third Floor Plan-Heating- Conference Center
H2.41         Piping System Sketch-Heating & Cooling-Conference Center
H2.51         Schedules-Heating-Conference Center
H2.52         Schedules-Heating-Conference Center
H2.61         Notes, Symbols and Abbreviations-Heating-Conference Center
H2.62         Details-Heating-Conference Center
H2.63         Details-Heating-Conference Center
H2.64         Details-Heating-Conference Center
H2.65         Details-Heating-Conference Center
H2.66         Details-Heating-Conference Center

**Mechanical – Ventilation**
V1.01         Lower Level Plan-Ventilation-Performing Arts
V1.11         Main Level Plan-Ventilation-Performing Arts
V1.21         Mezzanine Level Plan-Ventilation-Performing Arts
V1.31         Mechanical Level Plan-Ventilation-Performing Arts
V1.41         Catwalk Level Plan-Ventilation-Performing Arts
V1.51         Roof Plan-Ventilation-Performing Arts
V1.60         Large Scale Plan-Ventilation-Performing Arts
V1.71         Details-Ventilation-Performing Arts
V1.72         Details-Ventilation-Performing Arts
V1.81         Symbols and Abbreviations-Ventilation-Performing Arts
V1.82         Symbols and Abbreviations -Ventilation-Performing Arts

**SCHEDULE  B continued:**

**VOLUME 2**

**Mechanical – Ventilation continued:**

| | |
|---|---|
| V1.91 | Schedules-Ventilation-Performing Arts |
| V1.92 | Schedules-Ventilation-Performing Arts |
| V1.93 | Schedules-Ventilation-Performing Arts |
| V2.01 | Basement Plan-Ventilation-Conference Center |
| V2.11 | First Floor Plan-Ventilation-Conference Center |
| V2.21 | Second Floor Plan-Ventilation-Conference Center |
| V2.31 | Third Floor Plan-Ventilation-Conference Center |
| V2.41 | Partial Floor Plan-Ventilation-Conference Center |
| V2.51 | Schedules-Ventilation-Conference Center |
| V2.52 | Schedules-Ventilation-Conference Center |
| V2.53 | Schedules-Ventilation-Conference Center |
| V2.61 | Notes, Symbols and Abbreviations-Ventilation-Conference Center |
| V2.62 | Details-Ventilation-Conference Center |

**Plumbing**

| | |
|---|---|
| P1.01 | Under Floor Lower Level Plan-Plumbing-Performing Arts |
| P1.02 | Lower Level Plan-Plumbing-Performing Arts |
| P1.11 | Under Floor Main Level Plan-Plumbing-Performing Arts |
| P1.12 | Main Level Plan-Plumbing-Performing Arts |
| P1.21 | Mezzanine Level Plan-Plumbing-Performing Arts |
| P1.31 | Mechanical Level Plan-Plumbing-Performing Arts |
| P1.41 | Catwalk Level Plan-Plumbing-Performing Arts |
| P1.51 | Enlarged Roof Plans-Plumbing-Performing Arts |
| P1.52 | Riser Diagrams-Plumbing-Performing Arts |
| P1.53 | Riser Diagrams-Plumbing-Performing Arts |
| P1.61 | Details-Plumbing-Performing Arts |
| P1.62 | Details-Plumbing-Performing Arts |
| P1.63 | Details-Plumbing-Performing Arts |
| P1.71 | Schedules, Notes, Symbols and Abbreviations-Plumbing-Performing Arts |
| P2.01 | Basement Plan-Plumbing-Conference Center |
| P2.11 | Under Floor First Floor Plan-Plumbing-Conference Center |
| P2.21 | Second Floor Plan-Plumbing-Conference Center |
| P2.31 | Third Floor Plan-Plumbing-Conference Center |
| P2.41 | Enlarged Floor Plans-Plumbing-Conference Center |
| P2.42 | Riser Diagrams-Plumbing-Conference Center |
| P2.43 | Riser Diagrams-Plumbing-Conference Center |
| P2.51 | Details-Plumbing-Conference Center |
| P2.52 | Details-Plumbing-Conference Center |
| P2.61 | Schedules, Notes, Symbols and Abbreviations- Plumbing-Conference Center |

## SCHEDULE B continued:

### VOLUME 2

**Fire Protection**

FP1.01      Lower Level Plan-Fire Protection-Performing Arts
FP1.11      Main Level Plan-Fire Protection-Performing Arts
FP1.21      Mezzanine Level Plan-Fire Protection-Performing Arts
FP1.31      Mechanical Level Plan-Fire Protection-Performing Arts
FP1.41      Catwalk Level Plan-Fire Protection-Performing Arts
FP1.51      Details-Fire Protection-Performing Arts
FP1.61      Notes, Symbols and Abbreviations-Fire Protection-Performing Arts
FP2.01      Basement Plan-Fire Protection-Conference Center
FP2.11      First Floor Plan-Fire Protection-Conference Center
FP2.21      Second Floor Plan-Fire Protection-Conference Center
FP2.31      Third Floor Plan-Fire Protection-Conference Center
FP2.41      Details-Fire Protection-Conference Center
FP2.51      Notes, Symbols and Abbreviations-Fire Protection-Conference Center

### VOLUME 3

**General**

G-1C        Cover Sheet

**Electrical**

E1.0        Electrical Site Plan-Performing Arts
E1.1        Lower Level Plan-Power-Performing Arts
E1.2        Main Level Plan-Power-Performing Arts
E1.3        Mezzanine Level Plan-Power-Performing Arts
E1.4        Mechanical Level Plan-Power-Performing Arts
E1.5        Catwalk Level Plan-Power-Performing Arts
E1.6        Chiller Room (Roof) Plan- Power-Performing Arts
E2.1        Lower Level Plan- Lighting-Performing Arts
E2.2        Main Level Plan- Lighting-Performing Arts
E2.3        Mezzanine Level Plan- Lighting-Performing Arts
E2.4        Mechanical Level Plan- Lighting-Performing Arts
E2.5        Catwalk Level Plan-Lighting-Performing Arts
E3.1 *      Floor Plan-Power-Art Gallery
E3.2 *      Floor Plan-Lighting-Art Gallery
E4.1        Symbol List-Performing Arts
E4.2        Light Fixture Schedule-Performing Arts
E4.3        Electrical One-Line Diagram-Performing Arts
E4.4        Diagrams-Performing Arts
E4.5        Panels-Performing Arts
E4.6        Panels-Performing Arts
E4.7        Details-Performing Arts
E4.8        Details-Performing Arts
E4.9        Distribution Panels-Performing Arts
E4.10       Panels-Performing Arts
E4.11       Panels-Performing Arts
E4.12       AVV System Diagram-Performing Arts

**SCHEDULE B continued:**

**VOLUME 3**

**Electrical continued:**

| | |
|---|---|
| E5.0 | Electrical Site Plan-Conference Center |
| E5.1 | Basement Plan-Power-Conference Center |
| E5.2 | First Floor Plan-Power-Conference Center |
| E5.3 | Second Floor Plan-Power-Conference Center |
| E5.4 | Third Floor Plan-Power-Conference Center |
| E6.1 | Basement Plan-Lighting-Conference Center |
| E6.2 | First Floor Plan-Lighting-Conference Center |
| E6.3 | Third Floor Plan-Lighting-Conference Center |
| E6.4 | Symbol List-Conference Center |
| E7.1 | Second Floor Plan-Lighting-Conference Center |
| E7.2 | Light Fixture Schedule-Conference Center |
| E7.3 | Electrical One-Line Diagram-Conference Center |
| E7.4 | Diagrams-Conference Center |
| E7.5 | Panels-Conference Center |
| E7.6 | Panels-Conference Center |
| E7.7 | Details-Conference Center |
| E7.8 | Details-Conference Center |
| E7.9 | Distribution Panels-Conference Center |
| E7.10 | Panels-Conference Center |
| E7.11 | Panels-Conference Center |
| E7.12 | AVV System Diagram-Conference Center |

**Communications**

| | |
|---|---|
| COM1.0 | Tunnel-Communications-Performing Arts |
| COM1.1 | Lower Level Plan-Communications-Performing Arts |
| COM1.2 | Main Level Plan-Communications-Performing Arts |
| COM1.3 | Mezzanine Level Plan-Communications-Performing Arts |
| COM1.4 | Mechanical Level Plan-Communications-Performing Arts |
| COM1.5 | Catwalk Level Plan-Communications-Performing Arts |
| COM2.1 | Floor Plan-Communications-Art Gallery |
| COM3.1 | Symbol List-Performing Arts |
| COM3.2 | Details-Performing Arts |
| COM3.3 | Details-Performing Arts |
| COM4.0 | Tunnel Plan-Communications-Conference Center |
| COM4.1 | Basement Plan Communications-Conference Center |
| COM4.2 | First Floor Plan-Communications-Conference Center |
| COM4.3 | Second Floor Plan- Communications-Conference Center |
| COM4.4 | Third Floor Plan- Communications-Conference Center |
| COM5.1 | Symbol List-Conference Center |
| COM5.2 | Details-Conference Center |
| COM5.3 | Details-Conference Center |

**Detail Book**

See Detail Book for Referenced Details
All drawings dated October 4, 1999

## SCHEDULE C

**PAYMENT SCHEDULE:**

Item _____ Base Contract Amount (including addenda, if applicable)

**Bentonite Waterproofing & Joint Sealers Work**.................................................$61,500.00

## SCHEDULE D

**INSURANCE:**

Before commencing work under this contract, the **Subcontractor** shall procure and maintain insurance covering all operations under this Agreement, whether performed by the **Subcontractor** or **Subcontractor's** third tier subcontractors. All insurers shall be licensed by the State of Illinois and rated A-10 or better by A.M. Best or Comparable rating service. **Subcontractor** shall submit a Certificate of Insurance in accordance with requirements listed below and as per sample certificate.

- Certificate shall evidence the CDB project number and CDB contract number of the project.
- Certificate shall evidence F.H. Paschen/S.N. Nielsen, Inc., CDB and the Using Agency are included as additional insured for the occurrence's arising, in the whole or in part, out of the work and operations performed. Coverage provides that the additional insured shall be on a primary non-contributory basis. (This does not apply to Worker's Compensation.)
- Certificate shall evidence that the policies will not be canceled, changed or altered until at least ten (30) calendar days prior written notice has been given to F.H. Paschen/S.N. Nielsen, Inc. and the CDB unless the same is stated in the policy provision.
- Certificate shall evidence that "The coverage and limits conform to the minimums required by Para. 00650.7 and Article 00655 of CDB's Standard Documents for Construction". Any exception or deviation shall be brought to the attention of CDB for a ruling on acceptability.
- Certificate shall evidence that The Worker Compensation Insurer Waives its Right of Subrogation to F.H. Paschen/S.N. Nielsen, Inc. The CDB and the Using Agency.

1. Worker's Compensation and Employers' Liability insurance affording compensation benefits for all employees as required by law and employers' liability insurance with limits of One Million and 00/100 Dollars, ($500,000.00) for accident or disease. Worker's Compensation Insurer shall waive its right of subrogation.

2. Commercial General Liability Insurance with a combined single limit of One Million and 00/100 Dollars, ($2,000,000.00) per occurrence for personal injury, (including wrongful death), and property damage liability. Coverage shall include Contractual Liability to cover the "Hold Harmless" clause of this contract. Policy shall include coverage for claims due to explosion, collapse, or damage to underground utilities or property. Policy shall include Personal Injury with the Employee Exclusion deleted, Broad Form Property Damage coverage, Independent Contractors coverage and Products / Completed Operations coverage. **Subcontractor** shall provide continuous Products/Completed Operations coverage for two years after Final Acceptance of the completed work by the Commission. Policy shall also contain a Severability of Interests clause for all Additional Insureds, with no cross liability suits exclusion.

3. Commercial Automobile Liability Insurance with a combined single limit of One Million and 00/100 Dollars, ($1,000,000.00) per accident for bodily injury, (including wrongful death), and property damage liability arising from owned, non-owned and hired automobiles.

4. Umbrella or Excess Liability Insurance with limits not less than Two Million Dollars, ($2,000,000.00) per occurrence which will provide additional limits for employers' general liability and automobile liability insurance.

### SCHEDULE D continued:

5. F.H. Paschen/S.N. Nielsen, Inc. shall provide All Risk Property Insurance for this project. This insurance shall be subject to a per occurrence deductible. It shall be the responsibility of the covered subcontractor to bear the expense of the deductible as it may apply to their covered loss. If a loss involves more than one insured, the deductible shall be pro-rated among the claimants based upon the percentage their loss bears to the entire eligible loss. All payments for loss under the Builders Risk policy shall be subject to the terms and conditions of the policy. Copies of the coverage will be provided upon written request of the Subcontractor.

6. "The All Risk Property Insurance shall not cover any tools, apparatus, machinery, scaffolding, hoists, forms, staging, shoring and other similar items commonly referred to as construction equipment, which may be on the Project site and the capital value of which is not included in the Work. Subcontractor shall make their own arrangements for any insurance they may require on such construction equipment."

7. Professional Liability. When any architects, engineers or consulting firms perform work in connection with the subcontract, Professional Liability insurance shall be maintained with limits of $1,000,000. The policy shall have an extended reporting period of two years. When policies are renewed or replaced, the policy retroactive date must coincide with, or precede, start of work pursuant to the contract.

8. If Subcontractor's work includes cleanup, removal, storage or otherwise handling of hazardous or toxic chemicals, materials, substances, or any other pollutants the Subcontractor shall provide at their expense Contractor Pollution Liability Insurance appropriate to cover such activities in an amount not less than $1,000,000 Combined Single Limit per occurrence / aggregate for bodily injury, property damage and remediation. Claims Made policies will include an extended reporting period of two (2) years. The policy for this insurance shall include Contractual Liability coverage. Such policy shall be endorsed to specifically provide for Work performed under the Contract, and shall extend to all third tier subcontractors engaged in hazardous material work. **THE OWNER AND CONTRACTOR**, are to be named on a primary, non-contributory basis.

9. Subcontractor shall have its general liability insurance endorsed to provide that **F.H. Paschen / S.N. Nielsen, Inc. , CDB and the Using Agency**, are to be covered as Additional Insureds with respect to liability arising out of activities performed by or on behalf of the Subcontractor; products and completed operations of the Subcontractor; and automobiles owned , hired, leased, or borrowed by the Subcontractor. The coverage shall contain no special limitations on the scope of protection afforded to Additional Insureds. The insurance afforded the Additional Insureds shall be primary over any other valid or collectible insurance that the Additional Insureds may have with respect to loss under this policy. Other insurance of any Additional Insured applicable to loss is excess over this endorsement, and the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance, provided, however, that this paragraph does not apply (I) to loss caused solely by the negligence of such Additional Insureds, or (ii) to liability of the Architects, Consultants and Engineers, and their agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or (2) the giving of or the failure to give directions or instructions by the Architect, its agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

Subcontractor hereby waives all of its rights of subrogation against the Additional Insureds.

25

## SCHEDULE E

**AFFIRMATIVE ACTION:** F.H. Paschen/SN Nielsen, Inc. is an equal opportunity employer and does not discriminate against any citizen with regard to race, creed, color, religion, ancestry, national origin, physical handicap, medical condition, martial status, Vietnam Era Veterans status, or gender. We agree to put forth the maximum effort to achieve the goals set forth by the Federal Government. Each subcontractor is to cooperate with our efforts at all times. All Federal, State, City, County and Local Agency Laws, Rules and Regulations, and Executive Orders pertaining to Equal Opportunity and Minority Utilization, that may be applicable to this project are herein incorporated by reference, and this Subcontractor agrees to be bound by same, to the extent that such Laws, Rules and Regulations apply. Per Executive Order No. 10925, all subcontractors shall not discriminate against any worker, employee, or applicant for employment because of race, creed, color, or national origin. The Subcontractor's attention is directed to *the Civil Rights Act of 1964 (P.L.88-352);* provisions of Executive Order No. 10925 of March 6, 1961, as amended, and of the rules, regulations and relevant orders of *the President's Committee on Equal Employment Opportunity* created thereby; *the Illinois Human Rights Act*, as amended (775 ILCS 5/1-101 et seq.); the *Chicago Human Rights Ordinance* (Municipal Code of Chicago Sec. 2-160-010 et seq.); and *the Commission on Human Relations* created by ordinance passed December 12, 1947, as amended, (Municipal Code of Chicago Sec. 2-120-480 et seq.); *the American Disabilities Act of 1990, 42 U.S.C. 12010 et seq.*

**Fair Employment Practices (FEP)** Capitol Development Board (CDB) encourages minority and female tradeworker participation on this project. In an effort to monitor their participation, it is necessary for each Subcontractor to submit a "Daily Jobsite Workforce Form". The Daily Jobsite Workforce Form, together with your Weekly Certified Payroll, must be received by the FHP/SNN no later than (5) days following the payroll weekending date. In the event a subcontractor is unable to achieve the goals established for this project, Karen Howell, EEO Compliance Officer for FHP/SNN, is available to provide assistance in identifying recruitment sources as well as the proper documentation of any "good faith efforts" undertaken. The minority and female tradeworker participation goals for this project are specified in **Attachment No. 2** for this Subcontract Agreement.

**Weekly Certified Payroll Reports** - (US Department of Labor Form WH-346 or equivalent) Weekly Certified Payroll Reports must be submitted in triplicate to the F.H. Paschen/SN Nielsen, Inc. Weekly Certified Payrolls must contain all information required by the Owner. The first time that the employee's name appears on a payroll, note the date that the company hired the employee, clearly identify the actual residence of every employee including zip code. Be sure to include consecutive payroll numbers, as well as week ending dates. "No Work" payrolls must also be submitted for any week work is not performed on the project. The last payroll must indicate FINAL. The Subcontractor shall maintain all relevant personnel data for a period of at least three (3) years after final acceptance of the work.

**Monthly Manpower Utilization Report Form (MMUR)** – The MMUR is used to report the number of employees and the hours worked on the jobsite. The left side of the form is used to report the total number of employees by trade category and ethnicity/gender. On the right side of the form, the total number of hours worked by all employees by trade category should be reported in the total hour's column. Minority/female employee hours should be deducted from the total hours and reported under the appropriate heading by trade category. On the backside of the form, please identify in the upper right corner, your firm name and mailing address. Also, please identify each subcontractor who performed work during the reporting period.

26

## SCHEDULE F

**ADDITIONAL PROVISIONS:**

- All Subcontractors agree to comply with all Harper College Security Requirements.

- All deliveries must be scheduled in advance with F.H. Paschen/SN Nielsen field personnel.

- The nature and complexity of this project may require multiple mobilizations of crews, materials, and equipment. It is each Subcontractor's specific responsibility to review their scope of work and provide the appropriate planning and preparation necessary to coordinate their work with that of the other trade subcontractors involved with this project. All costs associated with this planning and coordination have been included in this subcontract agreement. All contract interim milestone dates as established in writing by Contractor and agreed to by subcontractor are contractually binding. Failure to complete the work by the published date carries the same penalties set forth in the contract documents for final completion.

- All utility shutdowns of existing Harper College facilities must be approved by the Owner in writing. Subcontractor may be required to provide a shutdown request on forms provided by the Contractor or Owner.

- Upon approval by the Owner, the formal project schedule will be incorporated as part of the terms and conditions of this subcontract agreement.

- The subcontractor agrees to provide all hoisting related to the completion of their scope of work. The subcontractor also agrees to provide secured storage of their tools, equipment, and materials on a daily basis. Ensuring new materials and equipment delivered to the jobsite, but not yet installed, are kept free from damage, theft, or vandalism is the responsibility of each subcontractor.

- This project, like any other construction project, will require each subcontractor to coordinate and cooperate with many other trades on a daily basis as their particular scope of work is performed. Subcontractor personnel working on this project are required to be courteous, cooperative, and respectful at all times to all FHP/SNN employees, architect/engineer representatives, and other subcontractor personnel. FHP/SNN reserves the right to remove/dismiss subcontractor personnel from the project who demonstrate an inability to remain courteous and cooperate with others as this project progresses.

- The Subcontractor/Material Supplier agrees to provide complete submittals, shop drawings, samples, mock-ups, or any other item requiring approval, within two weeks from the issue date of this subcontract agreement. Some exceptions may be anticipated based on Subcontractor's specific scope of work.

- All Subcontractors and Material Suppliers agree to comply with all local codes, including, but not limited to those listed in Specification Section 01060, Regulatory Requirements.

27

## ACCEPTANCE OF SUBCONTRACT AGREEMENT
### CONTRACT NUMBER 353-009

The parties, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the full performance of all terms and provisions herein contained.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year written below.

**ARCHITECTURAL SEALANTS, INC.**
Subcontractor

Witness: _____

By: _____
Representative of Subcontractor
Authorized to Execute Subcontract

Dated: 7-11-00

Title: PRESIDENT

Federal ID # 36-3935228

**F. H. PASCHEN/SN NIELSEN, INC.**
Contractor

Witness: _____

By: _____

Title: VICE President

Dated: 7/20/00

29

## **CERTIFICATION**

State of Texas   )
        ) ss.
Dallas County   )

Policy Number:  CPP 3077654 01 82   Company:  Milwaukee Mutual Insurance
Named Insured:  Architectural Sealants, Inc.  As of Date or Period: 10/17/99 to 10/17/00
  Boardwalk Construction Management, Inc.

____Debbie Dodson_____, being first duly sworn on oath,
deposes and says that:

1. I am Operations Supervisor of Unitrin Business Insurance, and a fully authorized
   representative of the above named, affiliated Company.   As such, I have full access to the
   insurance records and files for the identified policy of insurance issued by the Company.

⊠ 2. I have reviewed and compared the attached pages to such records and files and
   hereby certify that with the exception of any forms or endorsements identified in
   paragraph 3, the same are a true and correct copy of the above identified policy of
   insurance as reflected in the Company's records and files as of the above date.

*(select either)*
               or

☐ 2. I have reviewed and compared the attached pages to such records and files and
   hereby certify that with the exception of any forms or endorsements identified in
   paragraph 3, the same are a true and correct copy of the above identified policy of
   insurance as reflected in the Company's records and files. The above policy was
   cancelled on  .*(insert effective date of cancellation)*

⊠ 3. The attached copy does not vary from the above identified policy.
*(select either)*
               or
☐ 3. The attached copy varies from the above identified policy, as follows:

| The original form or endorsement no. | Varies from the attached form or endorsement no. | Because (*state reason for variance*) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

Dated this 3rd day of October, 2007.

Signed and sworn to before me on the above
date by

_____
Notary Public, State of Texas
My Commission _____

**Debbie Dodson**

DANIELLE M KAZMIERCZAK
Notary Public, State of Texas
My Commission Expires
January 24, 2011

10/3/2

# Exhibit G

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

BOARD OF TRUSTEES OF WILLIAM )
RAINEY HARPER COLLEGE NO. 512, )
and ILLINOIS CAPITAL DEVELOPMENT )
BOARD, for the use and benefit of )
BOARD OF TRUSTEES OF WILLIAM )
RAINEY HARPER COLLEGE NO. 512, )
                         )
       Plaintiffs, )
                         )
v.                       )  No.
                         )
BURNIDGE, CASSELL AND )
ASSOCIATES, INC., )
                         )
     Serve:    Charles H. Burnidge )
              Burnidge-Cassell Assoc. )
              2425 Royal Blvd. )
              Elgin, IL 60123 )
                       )
and                    )
                       )
F.H. PASCHEN, S.N. NIELSEN, INC., )
                       )
     Serve:    Edward J. Burke )
              Burke Burns & Pinelli, Ltd. )
              3 1st National Plaza )
              Suite 4300 )
              Chicago, IL 60602 )
                       )
       Defendants. )

2006L005812
CALENDAR/ROOM Y
TIME 00:00
Breach of Contract

'06 JUN -5 AM 11:53
COOK

## COMPLAINT

NOW COME Plaintiffs, Board of Trustees of William Rainey Harper College No.

512, a body politic and corporate, and the Illinois Capital Development Board, an agency

of the State of Illinois, by their attorneys, Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.,



EXHIBIT
B

and for their Complaint against Defendants, state as follows:

<u>ALLEGATIONS COMMON TO ALL COUNTS</u>

1.    Plaintiff, Board of Trustees of William Rainey Harper College No. 512 ("Harper College"), is a body politic and corporate under the laws of the State of Illinois.

2.    Plaintiff, the Illinois Capital Development Board (the "CDB" and together with Harper College, "Plaintiffs"), is a body politic and corporate organized under the laws of Illinois, and has the statutory authority to enter into contracts for the construction of State agency facilities, including but not limited to those for the Board of Trustees of William Rainey Harper College No. 512, and to exercise all powers necessary to accomplish the purposes thereof.

3.    Defendant Burnidge, Cassell and Associates, Inc. ("Burnidge") is an Illinois corporation engaged in the business of performing architectural design and related construction services.

4.    Defendant F.H. Paschen, S.N. Nielsen, Inc. ("Paschen" and together with Burnidge, "Defendants") is an Illinois corporation engaged in the business of general construction contracting and other construction related services.

5.    On or about February 14, 1996, Burnidge entered into an agreement with the CDB under which it was to prepare plans and specifications for the construction of the Wojcik Conference Center and Performing Arts Center on the Harper College Campus (the "Project") and to provide full time project representation for the Project on the job site (the "Design Contract"). A copy of said agreement is attached hereto and incorporated by reference as Exhibit A.

2

6.    At all relevant times, Harper College was identified as the user agency in the Design Contract and was intended by the parties to be a direct intended third party beneficiarry of the Design Contract.

7.    The Design Contract incorporated an alternative dispute resolution clause, which provides in part:

> Each party to any dispute over $50,000 agrees, upon the request of any other party to the dispute, to submit the matter to ADR, in a form to be determined by agreement of the parties. The parties shall first confer informally with one another to attempt to resolve the dispute. In the event that the assistance of an unbiased neutral is required, the parties shall meet and come to an agreement as to what form the ADR should take and who the unbiased neutral should be. Forms of ADR that may be utilized include, but are not limited to, mediation and mini-trials, but do not include formal arbitration. (See Section 00715 of Appendix E to Design Contract, attached as **Exhibit A.**)

8.    On or about March 28, 2000, the CDB entered into a contract with Paschen to construct the Project in strict accordance with the plans and specifications prepared by Burnidge (the "Construction Contract"). A true and correct copy of the Construction Contract is attached hereto and incorporated by reference herein as **Exhibit B.** Copies of the plans and specifications which are part of the contract documents are too voluminous to attach hereto and will be supplied upon a reasonable production request.

9.    At all relevant times, Harper College was identified as the user agency in the Construction Contract and was intended by the parties to be a direct intended third party beneficiary of the Construction Contract.

10.    The Construction Contract incorporated an alternative dispute resolution clause, which provides:

> Each party to any dispute of more than $50,000 agrees upon the request of any other party to the dispute, to submit the matter to ADR, in a form to be

3

determined by agreement of the parties. The parties shall first confer informally with one another to attempt to resolve the dispute. In the event that the assistance of an unbiased neutral is required, the parties shall meet and come to an agreement as to what form the ADR should take and who the unbiased neutral should be. Forms of ADR that may be utilized include, but [are] not limited to, mediation and mini-trials, but do not include formal arbitration. (*See* Standard Documents for Construction, attached as Exhibit B, which are incorporated into the Construction Contract.)

11.     Prior to commencing this action, Harper College, through its attorneys, sent a letter to Burnidge and Paschen, requesting their participation in the process of alternative dispute resolution of the claims in this action, in accordance with the terms of the Design Contract and Construction Contract. (*See* Exhibit C.)

12.     To date, neither Burnidge nor Paschen have responded to Harper College's aforesaid request for alternative dispute resolution.

13.     Plaintiffs have observed various symptoms of problems that occurred in connection with the Project.

14.     In response to these symptoms, Plaintiffs commenced discussions with Burnidge and Paschen, during which Plaintiffs notified Burnidge and Paschen of the above-referenced symptoms, and in response to which Burnidge and/or Paschen investigated these occurrences in an effort to identify the root causes of the symptoms and propose various solutions.

15.     Burnidge and Paschen continued to attempt to identify the root causes of these occurrences and to propose solutions to Plaintiffs throughout the course of the construction of the Project and until late 2004, at which time Plaintiffs engaged the firm of Wiss, Janney, Eistner Associates, Inc. (herein after referred to as "Wiss, Janney") to

conduct an independent review and field investigation of the above-referenced symptoms and make specific recommendations to remedy the symptoms Plaintiffs had experienced.

16.    On or about December 13, 2004, Wiss, Janney submitted a written report to Harper College (hereinafter referred to as the "Wiss Janney Report"), detailing its observations of the symptoms previously recognized by Plaintiffs and its theories of their root causes.

17.    The Wiss Janney Report implied for the first time that the symptoms were caused by breaches of the Design and Construction Contracts committed respectively by Burnidge and Paschen, as more fully described in Counts I and II of this Complaint.

18.    Plaintiffs did not know and could not have reasonably known until late December 2004, when they received and reviewed the Wiss Janney Report, that the above-referenced symptoms were caused by Burnidge's and Paschen's respective breaches of the Design and Construction Contracts.

19.    After learning that the above-referenced symptoms were due to Burnidge's and Paschen's respective breaches of the Design and Construction Contracts, Plaintiffs commenced good-faith settlement discussions with Burnidge and Paschen, during which time Burnidge and Paschen represented to Plaintiffs on multiple occasions their willingness to work with Plaintiffs to resolve the issues arising from the symptoms exhibited in the construction of the Project, and indicated to Plaintiffs that both were willing to participate in mediation in accordance with the ADR provisions of the Design and Construction Contracts.

20.    Despite repeated attempts by Plaintiffs, Defendants subsequently failed to follow through with their promises and participate in mediation.

5

21.    Accordingly, Defendants are estopped from defending this action on the ground that the causes of action alleged in Counts I and II of this Complaint are barred by the statute of limitations or by any conditions precedent.

22.    Venue of this action is proper in this Court pursuant to 735 ILCS 5/2-101(2), because the Design and Construction Contracts were performed and a substantial part of the events giving rise to this action occurred in Cook County, Illinois.

## COUNT I
### (Breach of Contract - Burnidge, Cassell and Associates, Inc.)

23.    Plaintiffs Incorporate the allegations contained in Paragraphs 1 through 22 of their Allegations Common to All Counts as if stated fully herein.

24.    At all relevant times, Burnidge held itself out and represented that it had the requisite skill and expertise to provide architectural, structural, mechanical, and engineering services, including the preparation of architectural, structural, mechanical and civil drawings, project manuals, specifications, bid packages, and addenda, to review and approve shop drawings and submittals as well as to provide contract administration services and full-time on-site Project representation and inspection of the construction, which included, but was not limited to, verification of the constructed Project's conformance with the contract documents.

25.    Burnidge had a contractual duty to exercise the requisite care and skill of a professional to design and provide full-time observation of the construction of the Project in accordance with industry standards.

26.    Burnidge had a statutory duty to exercise the requisite care and skill of a professional architect in the performance of its obligations under the Design Contract.

6

27.    Burnidge had a contractual duty to exercise reasonable care to make revisions to the contract documents during construction of the Project to conform to industry standards, and to correct errors, ambiguities, or omissions in its drawings and specifications.

28.    Burnidge, as full-time Project representative, had a duty to observe the construction of the Project to guard and protect the interests of Harper College and the CDB and to assure Harper College and the CDB of conformance of construction with the contract plans and specifications.

29.    During design and construction of the Project, Burnidge materially breached its statutory, express, and implied duties and obligations to Harper College and the CDB in the following manners:

a.    the architectural drawings prepared by Burnidge do not indicate any specific type of material to be used for the exterior soffit near the dinning room, and no control joints were indicated on the drawings, and accordingly the aforesaid soffit is apparently constructed of painted gypsum sheathing without all necessary joints;

b.    the dining room roof was defectively designed such that there is ponding and leakage;

c.    portions of the roof membrane over the performing arts center exhibit blisters and ridges;

d.    a recessed floor slab in the auditorium near a wheelchair lift is constructed of insufficient thickness, allowing water intrusion and rusting of bolts;

7

e.    the masonry wall is constructed without sufficient expansion joints, and as a result cracking has occurred, which has resulted in water infiltration;

f.    the coatings on the performing arts center fly tower walls has been misapplied such that the coating does not adequately bond to the concrete surface;

g.    the conference center curtain walls leak;

h.    the performing arts center sidewalk is constructed without sufficient control joints; and

i.    by causing other design defects in the Project.

30.    As a direct and proximate result of Burnidge's aforesaid material breaches of contract, Harper College and the CDB have been damaged in an amount to be determined at trial in excess of Fifty Thousand Dollars ($50,000).

31.    The CDB, and Harper College as the intended third party beneficiary of the Design Contract between the CDB and Burnidge, have fully performed all of their obligations under the Design Contract.

WHEREFORE, Plaintiffs Board of Trustees of William Rainey Harper College No. 512 and the Illinois Capital Development Board pray for entry of a judgment in their favor and against Defendant Burnidge, Cassell and Associates, Inc. in an amount in excess of Fifty Thousand Dollars ($50,000), together with attorneys' fees and costs, and for such other and further relief as this Court deems just and proper in the circumstances.

<u>COUNT II</u>
(Breach of Contract - F.H. Paschen, S.N. Nielsen, Inc.)

8

32.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 22 of their Allegations Common to All Counts as if stated fully herein.

33.    At all relevant times, Paschen held itself out and represented that it had the requisite skill and expertise to comply with the contract plans and specifications.

34.    Paschen had an express and implied contractual duty to strictly conform to the Construction Contract prepared by Burnidge.

35.    Paschen materially breached its express and implied contract obligations and duties in the following manner:

        a.    a recessed floor slab in the auditorium near a wheelchair lift is constructed of insufficient thickness, allowing water intrusion and rusting of bolts;

        b.    the exterior soffit near the dining room is constructed without sufficient control joints;

        c.    the masonry wall is constructed without sufficient expansion joints, and as a result cracking as occurred, which has resulted in water infiltration;

        d.    the roof membrane over the performing arts center exhibits blistering and ridges;

        e.    the coatings on the performing arts center fly tower walls has been misapplied such that the coating does not adequately bond to the concrete surface;

        f.    the conference center curtain walls leak;

9

      g.     the performing arts center sidewalk is constructed without sufficient control joints; and

      h.     there is ponding and leakage in the dining room roof.

36.     Each of the aforesaid defects is a material breach of the Construction Contract.

37.     Harper College and the CDB have been damaged by the aforesaid material breaches of contract because the defective work must be replaced and/or has diminished the value of the Project.

38.     As a direct and proximate result of Paschen's aforesaid material breaches of contract, Harper College and the CDB have been damaged in an amount to be determined at trial in excess of Fifty Thousand Dollars ($50,000).

39.     The CDB, and Harper College as the intended third party beneficiary of the Construction Contract between the CDB and Paschen, have fully performed all of their obligations under the Construction Contract.

WHEREFORE, Plaintiffs Board of Trustees of William Rainey Harper College No. 512 and the Illinois Capital Development Board pray for the entry of a judgment in their favor and against Defendant Burnidge, Cassell and Associates, Inc. in an amount in excess of Fifty Thousand Dollars ($50,000), together with attorneys' fees and costs, and for such other and further relief as this Court deems just and proper in the circumstances.

                                One of the Attorneys for Board of Trustees
                                of William Rainey Harper College No. 512
                                and the Illinois Capital Development Board



Kenneth M. Florey
Scott A. Strange
ROBBINS, SCHWARTZ, NICHOLAS,
LIFTON & TAYLOR, LTD.
20 N. Clark Street, Suite 900
Chicago, Illinois 60602
(312) 332-7760
I.D. No. 115190

# Exhibit H

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS FR-8
COUNTY DEPARTMENT, LAW DIVISION

2007 AUG -7  PM 3: 16

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF WILLIAM RAINEY HARPER COLLEGE NO. 512, and ILLINOIS CAPITAL DEVELOPMENT BOARD, for the use and benefit of BOARD OF TRUSTEES OF WILLIAM RAINEY HARPER COLLEGE NO. 512, | ) ) ) ) ) ) | No. 06 L 005812 |

Plaintiffs,   )                              Judge Ronald F. Bartkowicz
              )
     v.       )                              Calendar Y
              )
BURNIDGE, CASSELL AND ASSOCIATES, )
INC., and F.H. PASCHEN, S.N. NIELSEN, )
INC.,         )
              )
     Defendants. )
_____)
              )
F.H. PASCHEN, S.N. NIELSEN, INC., an )
Illinois corporation, )
              )
     Third-Party Plaintiff, )
              )
     v.       )
              )
TUSCHALL ENGINEERING COMPANY, )
INC., UNDERLAND ARCHITECTURAL )
SYSTEMS, INC., ARCHITECTURAL, )
SEALANTS INC., BENNETT & BROUSSEAU )
ROOFING, INC., CHAKRA, INC., CROUCH- )
WALKER CORP., SPRAY INSTALLATIONS, )
INC., THE LARSON EQUIPMENT AND )
FURNITURE COMPANY, NUCON )
SCHOKBETON, INC., and OOSTERBAAN )
AND SONS COMPANY, )
              )
     Third-Party Defendants. )

**FIRST AMENDED THIRD-PARTY COMPLAINT OF DEFENDANT/THIRD-PARTY
PLAINTIFF F.H. PASCHEN, S.N. NIELSEN, INC.**

Defendant/Third-Party Plaintiff F.H. PASCHEN, S.N. NIELSEN, INC. (herein "Paschen"),

an Illinois corporation, by its undersigned attorneys, complains as follows against Third-Party

Defendants **TUSCHALL ENGINEERING COMPANY, INC., UNDERLAND ARCHITECTURAL SYSTEMS, INC., ARCHITECTURAL SEALANTS, INC., BENNETT & BROUSSEAU ROOFING, INC., CHAKRA, INC., CROUCH-WALKER CORP., SPRAY INSTALLATIONS, INC., THE LARSON EQUIPMENT AND FURNITURE COMPANY, NUCON SCHOKBETON, INC., OOSTERBAAN AND SONS COMPANY** (collectively referred to herein as the "Third-Party Defendants").

### COUNT I: Breach of Contract
### TUSCHALL ENGINEERING COMPANY, INC.

1.      At all relevant times, Paschen was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.      Upon information and belief, and at all relevant times, Third-Party Defendant Tuschall Engineering Co., Inc. (herein "Tuschall") was an Illinois corporation with its principal place of business located in Burr Ridge, Illinois.

3.      On or about July 18, 2000, Paschen and Tuschall entered into a written Subcontract Agreement (herein the "Tuschall Subcontract Agreement") whereby Tuschall agreed to provide certain construction services (herein "Tuschall's Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (herein the "Harper Project"), located in Palatine, Cook County, Illinois. See the Tuschall Subcontract Agreement, a true and accurate copy of which is attached as Exhibit A.

4.      Paschen has performed all obligations required of it pursuant to the Tuschall

2

Subcontract Agreement.

5.    Pursuant to the terms of the Tuschall Subcontract Agreement, Tuschall guaranteed, and was required, to perform Tuschall's Work, as defined therein, free from defects and in conformity with the requirements of the Tuschall Subcontract Agreement and all Project Documents. Ex. A, ¶¶13-15.

6.    Contrary to the terms contained therein, Tuschall breached the terms of the Tuschall Subcontract Agreement by failing to perform the Tuschall Work: a) in a workmanlike manner; b) free from defect; and/or c) in conformity with the requirements of the Tuschall Subcontract Agreement and of the Project Documents.

7.    As a direct and proximate result of Tuschall's breach of the Tuschall Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

    **WHEREFORE,** Defendant/Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** hereby prays for judgment in its favor and against Third-Party Defendant **TUSCHALL ENGINEERING COMPANY, INC.** and that it be granted compensatory damages in an amount shown to be due Paschen as a result of Tuschall's breach of the Tuschall Subcontract Agreement, an amount as yet to be determined at trial, but believed to be in excess of $50,000.00; plus an award of contractually allowed attorneys fees, expenses and costs; and for such other relief as this Court deems just and proper.

**COUNT II: Indemnity**
**<u>TUSCHALL ENGINEERING COMPANY, INC.</u>**

1.    At all relevant times, Paschen was an Illinois corporation. Paschen maintains its

3

principal place of business in the City of Chicago, State of Illinois.

2.    Upon information and belief, and at all relevant times, Tuschall was an Illinois corporation with its principal place of business located in Burr Ridge, Illinois.

3.    On or about July 18, 2000 Paschen and Tuschall entered into the Tuschall Subcontract Agreement whereby Tuschall agreed to provide certain construction services in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 located in Palatine, Cook County, Illinois. See Exhibit A.

4.    Pursuant to the terms of the Tuschall Subcontract Agreement, Tuschall guaranteed, and was required, to perform Tuschall's Work, as defined therein, free from defects and in conformity with the requirements of the Tuschall Subcontract Agreement and all Project Documents. Ex. A, ¶¶13-15.

5.    The terms of the Tuschall Subcontract Agreement, Paragraphs Twenty-Two and Twenty-Four, further provide that Tuschall shall indemnify, defend, and hold harmless Paschen from and against any and all claims arising from the Tuschall Work performed by Tuschall pursuant to its Subcontract Agreement with Paschen, including, without limitation, any claims that the Tuschall Work was defective or not in conformity with Tuschall Subcontract Agreement or Project Documents. Ex. A, ¶¶22 & 24.

6.    The Tuschall Subcontract Agreement also provides for payment by Tuschall of Paschen's attorneys fees, costs and expenses in relation to defense of said claims. Ex. A, ¶¶22 & 24.

7.    Upon information and belief, Tuschall performed, without limitation, defective and unworkmanlike work on the Harper Project and/or work not in conformity with the Harper Project

4

Documents.

8.    On or about June 5, 2006, a complaint was filed in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board v. Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc.,* Case Number 06 CH 005812 (herein the Underlying Litigation"). See the Complaint (minus its exhibits), a true and accurate copy of which is attached as Exhibit B.

9.    In the Underlying Litigation, Plaintiffs Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board (herein collectively the "Plaintiffs") claim that certain construction work performed at Harper College was performed defectively, or not in conformity with the Project Documents.  Ex. B, ¶35.

10.    In their Complaint, the Plaintiffs request the following relief in the Underlying Litigation: a) that Paschen pay an amount in damages in excess of $50,000.00; and b) that Paschen pay the Plaintiffs' attorneys fees and costs.

11.    In addition, on April 12, 2007, Plaintiffs, through their counsel, issued an itemized list of alleged "actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and Performing Arts Project" (herein the "List").  See the April 12, 2007, List, a true and accurate copy of which is attached as Exhibit C.

12.    Pursuant to the terms of the Tuschall Subcontract Agreement, Exhibit A hereto, in the event that there is a finding of liability against Paschen and in favor of the Plaintiffs, or in the event a settlement is reached by Paschen with the Plaintiffs in relation to the claims raised in the Underlying

5

Litigation, Paschen would be entitled to a judgment against Tuschall in an amount equal to the judgment or settlement, plus Paschen's costs or attorneys fees, or in the amount of the settlement paid by Paschen to Plaintiffs, plus Paschen's attorneys fees and costs.

      **WHEREFORE**, Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** respectfully requests that in the event a judgment is entered against it in the Underlying Litigation, or in the event Paschen settles with the Plaintiffs, that a judgment be entered in its favor and against the Third-Party Defendant **TUSCHALL ENGINEERING, INC.** in an amount equal to the amount Paschen is found liable to Plaintiffs in the Underlying Litigation or in the amount of settlement of any said claims; for an award of contractual attorney fees and costs; and for such other and further relief as this Court deems just and appropriate.

**COUNT III: Breach of Contract**
**UNDERLAND ARCHITECTURAL SYSTEMS, INC.**

    1.    At all relevant times, Paschen was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

    2.    Upon information and belief, and at all relevant times, Third-Party Defendant Underland Architectural Systems, Inc. (herein "Underland") maintained a business office in Lynwood, Illinois and its Illinois Registered Agent is located in the City of Lynwood, State of Illinois.

    3.    On or about August 29, 2000, Paschen and Underland entered into a written Subcontract Agreement (herein the "Underland Subcontract Agreement") whereby Underland agreed to provide certain construction services (herein the "Underland Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) &

6

Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (herein the "Harper Project"), located in Palatine, Cook County, Illinois. See the Underland Subcontract Agreement, a true and accurate copy of which is attached hereto as Exhibit D.

4.     Paschen has performed all obligations required of it pursuant to the Underland Subcontract Agreement.

5.     Pursuant to the terms of the Underland Subcontract Agreement, Underland guaranteed, and was required, to perform the Underland Work, as defined therein, free from defects and in conformity with the requirements of the Underland Subcontract Agreement and all Project Documents. Ex. D, ¶¶13-15.

6.     Contrary to the terms contained therein, Underland breached the terms of the Underland Subcontract Agreement by failing to perform the Underland Work: a) in a workmanlike manner; b) free from defect; and/or c) in conformity with the requirements of the Underland Subcontract Agreement and of the Project Documents.

7.     As a direct and proximate result of Underland's breach of the Underland Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

WHEREFORE, Defendant/Third-Party Plaintiff F.H. PASCHEN, S.N. NIELSEN, INC. hereby prays for judgment in its favor and against Third-Party Defendant UNDERLAND ARCHITECTURAL SYSTEMS, INC. and that it be granted compensatory damages in an amount shown to be due Paschen as a result of Underland's breach of the Underland Subcontract Agreement, an amount as yet to be determined at trial, but believed to be in excess of $50,000.00; plus an award of contractually allowed attorneys fees, expenses and costs; and for such other relief as this Court

deems just and proper.

**COUNT IV: Indemnity**
**UNDERLAND ARCHITECTURAL SYSTEMS, INC.**

1.      At all relevant times, Paschen was an Illinois corporation.  Paschen maintains its

principal place of business in the City of Chicago, State of Illinois.

2.      Upon information and belief, and at all relevant times, Third-Party Defendant

Underland Architectural Systems, Inc. (herein "Underland") maintained a business office in

Lynwood, Illinois and its Illinois Registered Agent is located in the City of Lynwood, State of

Illinois.

3.      On or about August 29, 2000, Paschen and Underland entered into a Underland

Subcontract Agreement whereby Underland agreed to provide certain construction services in

relation to a construction project known as the Harper Project, located in Palatine, Cook County,

Illinois.  See Exhibit D.

4.      Pursuant to the terms of the Underland Subcontract Agreement, Underland

guaranteed, and was required, to perform the Underland Work, as defined therein, free from defects

and in conformity with the requirements of the Underland Subcontract Agreement and all Project

Documents.  Ex. D, ¶¶13-15.

5.      The terms of the Underland Subcontract Agreement, Paragraphs Twenty-Two and

Twenty-Four, further provide that Underland shall indemnify, defend, and hold harmless Paschen

from and against any and all claims arising from the Underland Work performed by Underland

pursuant to its Subcontract Agreement with Paschen, including, without limitation, any claims that

the Underland Work was defective or not in conformity with Underland Subcontract Agreement or

8

Project Documents. Ex. D, ¶¶22 & 24.

6.    The Underland Subcontract Agreement also provides for payment by Underland of Paschen's attorneys fees, costs and expenses in relation to defense of said claims. Ex. D, ¶¶22 & 24.

7.    Upon information and belief, Underland performed, without limitation, defective and unworkmanlike work on the Harper Project and/or work not in conformity with the Harper Project Documents.

8.    On or about June 5, 2006, a complaint was filed in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board v. Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc.*, Case Number 06 CH 005812 (herein the Underlying Litigation"). See the Complaint (minus its exhibits), a true and accurate copy of which is attached as Exhibit B.

9.    In the Underlying Litigation, Plaintiffs Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board (herein collectively the "Plaintiffs") claim that certain construction work performed at Harper College was performed defectively, or not in conformity with the Project Documents. Ex. B, ¶35.

10.    In their Complaint, the Plaintiffs request the following relief in the Underlying Litigation: a) that Paschen pay an amount in damages in excess of $50,000.00; and b) that Paschen pay the Plaintiffs' attorneys fees and costs.

11.    In addition, on April 12, 2007, Plaintiffs, through their counsel, issued an itemized list of alleged "actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and

9

Performing Arts Project" (herein the "List"). See the April 12, 2007, List, a true and accurate copy of which is attached as Exhibit C.

12.     Pursuant to the terms of the Underland Subcontract Agreement, Exhibit D hereto, in the event that there is a finding of liability against Paschen and in favor of the Plaintiffs, or in the event a settlement is reached by Paschen with the Plaintiffs in relation to the claims raised in the Underlying Litigation, Paschen would be entitled to a judgment against Underland in an amount equal to the judgment or settlement, plus Paschen's costs or attorneys fees, or in the amount of the settlement paid by Paschen to Plaintiffs, plus Paschen's attorneys fees and costs.

**WHEREFORE,** Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** respectfully requests that in the event a judgment is entered against it in the Underlying Litigation, or in the event Paschen settles with the Plaintiffs, that a judgment be entered in its favor and against the Third-Party Defendant **UNDERLAND ARCHITECTURAL SYSTEMS, INC.** in an amount equal to the amount Paschen is found liable to Plaintiffs in the Underlying Litigation or in the amount of settlement of any said claims; for an award of contractual attorney fees and costs; and for such other and further relief as this Court deems just and appropriate.

### COUNT V: Breach of Contract
### <u>ARCHITECTURAL SEALANTS, INC.</u>

1.     At all relevant times, Paschen was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.     Upon information and belief, and at all relevant times, Third-Party Defendant Architectural Sealants, Inc. (herein "ASI") was an Illinois corporation with its principal place of business located in Monee, Illinois.

10

3.      On or about June 21, 2000, Paschen and ASI entered into a written Subcontract Agreement (herein the "ASI Subcontract Agreement") whereby ASI agreed to provide certain construction services (herein the "ASI Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (herein the "Harper Project"), located in Palatine, Cook County, Illinois. See the ASI Subcontract Agreement, a true and accurate copy of which is attached as Exhibit E.

4.      Paschen has performed all obligations required of it pursuant to the ASI Subcontract Agreement.

5.      Pursuant to the terms of the ASI Subcontract Agreement, ASI guaranteed, and was required, to perform the ASI Work, as defined therein, free from defects and in conformity with the requirements of the ASI Subcontract Agreement and all Project Documents. Ex. E, ¶¶13-15.

6.      Contrary to the terms contained therein, ASI breached the terms of the ASI Subcontract Agreement by failing to perform the ASI Work: a) in a workmanlike manner; b) free from defect; and/or c) in conformity with the requirements of the ASI Subcontract Agreement and of the Project Documents.

7.      As a direct and proximate result of ASI's breach of the ASI Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

WHEREFORE, Defendant/Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** hereby prays for judgment in its favor and against Third-Party Defendant **ARCHITECTURAL SEALANTS, INC.** and that it be granted compensatory damages in an amount shown to be due

11

Paschen as a result of ASI's breach of the ASI Subcontract Agreement, an amount as yet to be determined at trial, but believed to be in excess of $50,000.00; plus an award of contractually allowed attorneys fees, expenses and costs; and for such other relief as this Court deems just and proper.

**COUNT VI: Indemnity**
**ARCHITECTURAL SEALANTS, INC.**

1.    At all relevant times, Paschen was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.    Upon information and belief, and at all relevant times, ASI was an Illinois corporation with its principal place of business located in Monee, Illinois.

3.    On or about June 21, 2000, Paschen and ASI entered into the ASI Subcontract Agreement whereby ASI agreed to provide certain construction services in relation to a construction project known as the Harper College Project. See Exhibit E.

4.    Pursuant to the terms of the ASI Subcontract Agreement, ASI guaranteed, and was required, to perform the ASI Work, as defined therein, free from defects and in conformity with the requirements of the ASI Subcontract Agreement and all Project Documents. Ex. E, ¶¶13-15.

5.    The terms of the ASI Subcontract Agreement, Paragraphs Twenty-Two and Twenty-Four, further provide that ASI shall indemnify, defend, and hold harmless Paschen from and against any and all claims arising from the ASI Work performed by ASI pursuant to its Subcontract Agreement with Paschen, including, without limitation, any claims that the ASI Work was defective or not in conformity with ASI Subcontract Agreement or Project Documents. Ex. E, ¶¶22 & 24.

6.    The ASI Subcontract Agreement also provides for payment by ASI of Paschen's

12

attorneys fees, costs and expenses in relation to defense of said claims. Ex. E, ¶¶22 & 24.

      7.     Upon information and belief, ASI performed, without limitation, defective and unworkmanlike work on the Harper Project and/or work not in conformity with the Harper Project Documents.

      8.     On or about June 5, 2006, a complaint was filed in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board v. Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc.,* Case Number 06 CH 005812 (herein the "Underlying Litigation"). See the Complaint (minus its exhibits), a true and accurate copy of which is attached as Exhibit B.

      9.     In the Underlying Litigation, Plaintiffs Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board (herein collectively the "Plaintiffs") claim that certain construction work performed at Harper College was performed defectively, or not in conformity with the Project Documents. Ex. B, ¶35.

      10.    In their Complaint, the Plaintiffs request the following relief in the Underlying Litigation: a) that Paschen pay an amount in damages in excess of $50,000.00; and b) that Paschen pay the Plaintiffs' attorneys fees and costs.

      11.    In addition, on April 12, 2007, Plaintiffs, through their counsel, issued an itemized list of alleged "actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and Performing Arts Project" (herein the "List"). See the April 12, 2007, List, a true and accurate copy of which is attached as Exhibit C.

12. Pursuant to the terms of the ASI Subcontract Agreement, Exhibit E hereto, in the event that there is a finding of liability against Paschen and in favor of the Plaintiffs, or in the event a settlement is reached by Paschen with the Plaintiffs in relation to the claims raised in the Underlying Litigation, Paschen would be entitled to a judgment against ASI in an amount equal to the judgment or settlement, plus Paschen's costs or attorneys fees, or in the amount of the settlement paid by Paschen to Plaintiffs, plus Paschen's attorneys fees and costs.

WHEREFORE, Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** respectfully requests that in the event a judgment is entered against it in the Underlying Litigation, or in the event Paschen settles with the Plaintiffs, that a judgment be entered in its favor and against the Third-Party Defendant **ARCHITECTURAL SEALANTS, INC.** in an amount equal to the amount Paschen is found liable to Plaintiffs in the Underlying Litigation or in the amount of settlement of any said claims; for an award of contractual attorney fees and costs; and for such other and further relief as this Court deems just and appropriate.

### COUNT VII: Breach of Contract
### BENNETT & BROUSSEAU ROOFING, INC.

1. At all relevant times, Paschen was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2. Upon information and belief, and at all relevant times, Third-Party Defendant Bennett & Brousseau Roofing, Inc. (herein "Bennett") was an Illinois corporation with its principal place of business located in Romeoville, Illinois.

3. On or about July 14, 2000, Paschen and Bennett entered into a written Subcontract Agreement (herein the "Bennett Subcontract Agreement") whereby Bennett agreed to provide certain

14

construction services (herein the "Bennett Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (herein the "Harper Project"), located in Palatine, Cook County, Illinois. See the Bennett Subcontract Agreement, a true and accurate copy of which is attached as Exhibit F.

4.    Paschen has performed all obligations required of it pursuant to the Bennett Subcontract Agreement.

5.    Pursuant to the terms of the Bennett Subcontract Agreement, Bennett guaranteed, and was required, to perform the Bennett Work, as defined therein, free from defects and in conformity with the requirements of the Bennett Subcontract Agreement and all Project Documents. Ex. F, ¶¶13-15.

6.    Contrary to the terms contained therein, Bennett breached the terms of the Bennett Subcontract Agreement by failing to perform the Bennett Work: a) in a workmanlike manner; b) free from defect; and/or c) in conformity with the requirements of the Bennett Subcontract Agreement and of the Project Documents.

7.    As a direct and proximate result of Bennett's breach of the Bennett Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

WHEREFORE, Defendant/Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** hereby prays for judgment in its favor and against Third-Party Defendant **BENNETT & BROUSSEAU ROOFING, INC.** and that it be granted compensatory damages in an amount shown to be due Paschen as a result of Bennett's breach of the Bennett Subcontract Agreement, an amount

15

as yet to be determined at trial, but believed to be in excess of $50,000.00; plus an award of contractually allowed attorneys fees, expenses and costs; and for such other relief as this Court deems just and proper.

### COUNT VIII: Indemnity
### BENNETT & BROUSSEAU ROOFING, INC.

1.      At all relevant times, Paschen was an Illinois corporation.  Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.      Upon information and belief, and at all relevant times, Bennett was an Illinois corporation with its principal place of business located in Romeoville, Illinois.

3.      On or about July 14, 2000, Paschen and Bennett entered into the Bennett Subcontract Agreement whereby Bennett agreed to provide certain construction services in relation to a construction project known as the Harper Project.  See Exhibit F.

4.      Pursuant to the terms of the Bennett Subcontract Agreement, Bennett guaranteed, and was required, to perform the Bennett Work, as defined therein, free from defects and in conformity with the requirements of the Bennett Subcontract Agreement and all Project Documents.  Ex. F, ¶¶13-15.

5.      The terms of the Bennett Subcontract Agreement, Paragraphs Twenty-Two and Twenty-Four, further provide that Bennett shall indemnify, defend, and hold harmless Paschen from and against any and all claims arising from the Bennett Work performed by Bennett pursuant to its Subcontract Agreement with Paschen, including, without limitation, any claims that the Bennett Work was defective or not in conformity with Bennett Subcontract Agreement or Project Documents.  Ex. F, ¶¶22 & 24.

6.     The Bennett Subcontract Agreement also provides for payment by Bennett of Paschen's attorneys fees, costs and expenses in relation to defense of said claims. Ex. F, ¶¶22 & 24.

7.     Upon information and belief, Bennett performed, without limitation, defective and unworkmanlike work on the Harper Project and/or work not in conformity with the Harper Project Documents.

8.     On or about June 5, 2006, a complaint was filed in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board v. Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc.,* Case Number 06 CH 005812 (herein the Underlying Litigation"). See the Complaint (minus its exhibits), a true and accurate copy of which is attached as Exhibit B.

9.     In the Underlying Litigation, Plaintiffs Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board (herein collectively the "Plaintiffs") claim that certain construction work performed at Harper College was performed defectively, or not in conformity with the Project Documents. Ex. B, ¶35.

10.    In their Complaint, the Plaintiffs request the following relief in the Underlying Litigation: a) that Paschen pay an amount in damages in excess of $50,000.00; and b) that Paschen pay the Plaintiffs' attorneys fees and costs.

11.    In addition, on April 12, 2007, Plaintiffs, through their counsel, issued an itemized list of alleged "actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and Performing Arts Project" (herein the "List"). See the April 12, 2007, List, a true and accurate copy

17

of which is attached as Exhibit C.

12.     Pursuant to the terms of the Bennett Subcontract Agreement, Exhibit F hereto, in the event that there is a finding of liability against Paschen and in favor of the Plaintiffs, or in the event a settlement is reached by Paschen with the Plaintiffs in relation to the claims raised in the Underlying Litigation, Paschen would be entitled to a judgment against Bennett in an amount equal to the judgment or settlement, plus Paschen's costs or attorneys fees, or in the amount of the settlement paid by Paschen to Plaintiffs, plus Paschen's attorneys fees and costs.

**WHEREFORE,** Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** respectfully requests that in the event a judgment is entered against it in the Underlying Litigation, or in the event Paschen settles with the Plaintiffs, that a judgment be entered in its favor and against the Third-Party Defendant **BENNETT & BROUSSEAU ROOFING, INC.** in an amount equal to the amount Paschen is found liable to Plaintiffs in the Underlying Litigation or in the amount of settlement of any said claims; for an award of contractual attorney fees and costs; and for such other and further relief as this Court deems just and appropriate.

### COUNT IX: Breach of Contract
### CHAKRA, INC.

1.     At all relevant times, Paschen was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.     Upon information and belief, and at all relevant times, Third-Party Defendant Chakra, Inc. (herein "Chakra") was an Illinois corporation with its principal place of business located in Oak Park, Illinois.

3.     On or about October 17, 2000, Paschen and Chakra entered into a written Subcontract

18

Agreement (herein the "Chakra Subcontract Agreement") whereby Chakra agreed to provide certain construction services (herein the "Chakra Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (herein the "Harper Project"), located in Palatine, Cook County, Illinois. See the Chakra Subcontract Agreement, a true and accurate copy of which is attached as Exhibit G.

4.     Paschen has performed all obligations required of it pursuant to the Chakra Subcontract Agreement.

5.     Pursuant to the terms of the Chakra Subcontract Agreement, Chakra guaranteed, and was required, to perform the Chakra Work, as defined therein, free from defects and in conformity with the requirements of the Chakra Subcontract Agreement and all Project Documents. Ex. G, ¶¶13-15.

6.     Contrary to the terms contained therein, Chakra breached the terms of the Chakra Subcontract Agreement by failing to perform the Chakra Work: a) in a workmanlike manner; b) free from defect; and/or c) in conformity with the requirements of the Chakra Subcontract Agreement and of the Project Documents.

7.     As a direct and proximate result of Chakra's breach of the Chakra Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

**WHEREFORE,** Defendant/Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** hereby prays for judgment in its favor and against Third-Party Defendant **CHAKRA, INC.** and that it be granted compensatory damages in an amount shown to be due Paschen as a result of Chakra's

19

breach of the Chakra Subcontract Agreement, an amount as yet to be determined at trial, but believed to be in excess of $50,000.00; plus an award of contractually allowed attorneys fees, expenses and costs; and for such other relief as this Court deems just and proper.

**COUNT X: Indemnity**
**CHAKRA, INC.**

1.      At all relevant times, Paschen was an Illinois corporation.  Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.      Upon information and belief, and at all relevant times, Chakra was an Illinois corporation with its principal place of business located in Oak Park, Illinois.

3.      On or about October 17, 2000, Paschen and Chakra entered into the Chakra Subcontract Agreement whereby Chakra agreed to provide certain construction services in relation to a construction project known as the Harper Project.  See Exhibit G.

4.      Pursuant to the terms of the Chakra Subcontract Agreement, Chakra guaranteed, and was required, to perform the Chakra Work, as defined therein, free from defects and in conformity with the requirements of the Chakra Subcontract Agreement and all Project Documents.  Ex. G, ¶¶13-15.

5.      The terms of the Chakra Subcontract Agreement, Paragraphs Twenty-Two and Twenty-Four, further provide that Chakra shall indemnify, defend, and hold harmless Paschen from and against any and all claims arising from the Chakra Work performed by Chakra pursuant to its Subcontract Agreement with Paschen, including, without limitation, any claims that the Chakra Work was defective or not in conformity with Chakra Subcontract Agreement or Project Documents. Ex. G, ¶¶22 & 24.

20

6.     The Chakra Subcontract Agreement also provides for payment by Chakra of Paschen's attorneys fees, costs and expenses in relation to defense of said claims. Ex. G, ¶¶22 & 24.

7.     Upon information and belief, Chakra performed, without limitation, defective and unworkmanlike work on the Harper Project and/or work not in conformity with the Harper Project Documents.

8.     On or about June 5, 2006, a complaint was filed in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board v. Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc.,* Case Number 06 CH 005812 (herein the Underlying Litigation"). See the Complaint (minus its exhibits), a true and accurate copy of which is attached as Exhibit B.

9.     In the Underlying Litigation, Plaintiffs Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board (herein collectively the "Plaintiffs") claim that certain construction work performed at Harper College was performed defectively, or not in conformity with the Project Documents. Ex. B, ¶35.

10.     In their Complaint, the Plaintiffs request the following relief in the Underlying Litigation: a) that Paschen pay an amount in damages in excess of $50,000.00; and b) that Paschen pay the Plaintiffs' attorneys fees and costs.

11.     In addition, on April 12, 2007, Plaintiffs, through their counsel, issued an itemized list of alleged "actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and Performing Arts Project" (herein the "List"). See the April 12, 2007, List, a true and accurate copy

21

of which is attached as Exhibit C.

12.      Pursuant to the terms of the Chakra Subcontract Agreement, Exhibit G hereto, in the event that there is a finding of liability against Paschen and in favor of the Plaintiffs, or in the event a settlement is reached by Paschen with the Plaintiffs in relation to the claims raised in the Underlying Litigation, Paschen would be entitled to a judgment against Chakra in an amount equal to the judgment or settlement, plus Paschen's costs or attorneys fees, or in the amount of the settlement paid by Paschen to Plaintiffs, plus Paschen's attorneys fees and costs.

WHEREFORE, Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** respectfully requests that in the event a judgment is entered against it in the Underlying Litigation, or in the event Paschen settles with the Plaintiffs, that a judgment be entered in its favor and against the Third-Party Defendant **CHAKRA, INC.** in an amount equal to the amount Paschen is found liable to Plaintiffs in the Underlying Litigation or in the amount of settlement of any said claims; for an award of contractual attorney fees and costs; and for such other and further relief as this Court deems just and appropriate.

**COUNT XI: Breach of Contract**
**CROUCH-WALKER CORP.**

1.      At all relevant times, Paschen was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.      Upon information and belief, and at all relevant times, Third-Party Defendant Crouch-Walker Corporation (herein "Crouch") was an Illinois corporation with its principal place of business located in Chicago, Illinois.

3.      On or about July 31, 2000, Paschen and Crouch entered into a written Subcontract

22

Agreement (herein the "Crouch Subcontract Agreement") whereby Crouch agreed to provide certain construction services (herein the "Crouch Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (herein the "Harper Project"), located in Palatine, Cook County, Illinois.  See the Crouch Subcontract Agreement, a true and accurate copy of which is attached as Exhibit H.

     4.    Paschen has performed all obligations required of it pursuant to the Crouch Subcontract Agreement.

     5.    Pursuant to the terms of the Crouch Subcontract Agreement, Crouch guaranteed, and was required, to perform the Crouch Work, as defined therein, free from defects and in conformity with the requirements of the Crouch Subcontract Agreement and all Project Documents.  Ex. H, ¶¶13-15.

     6.    Contrary to the terms contained therein, Crouch breached the terms of the Crouch Subcontract Agreement by failing to perform the Crouch Work: a) in a workmanlike manner; b) free from defect; and/or c) in conformity with the requirements of the Crouch Subcontract Agreement and of the Project Documents.

     7.    As a direct and proximate result of Crouch's breach of the Crouch Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

     **WHEREFORE**, Defendant/Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** hereby prays for judgment in its favor and against Third-Party Defendant **CROUCH-WALKER CORP.** and that it be granted compensatory damages in an amount shown to be due Paschen as a

# Exhibit I

### BURKE BURNS & PINELLI, LTD.

ATTORNEYS AT LAW
SUITE 4300
THREE FIRST NATIONAL PLAZA
CHICAGO, ILLINOIS 60602-4229

EDWARD J. BURKE
MARY PATRICIA BURNS
VINCENT D. PINELLI
MARY ANN MURRAY
STEPHEN F. WELCOME
ELLEN B. EPSTEIN
DONALD F. HARMON
AMANDA RIPP
ADRIANA R. GABRIEL
BLANCA R. DOMINGUEZ
CHRISTOPHER J. HALES

TELEPHONE
(312) 541-8600

FACSIMILE
(312) 541-8603

September 12, 2007

**VIA OVERNIGHT MAIL**

Architectural Sealants, Inc.
6525 West Steger Road
Monee, Illinois
c/o Registered Agent
Corporation Agents, Inc.
611 South Milwaukee Avenue
Libertyville, Illinois 60048

Thilman & Filippini LLC
One East Wacker Drive
Suite 1800
Chicago, Illinois 60601

Re:  **Board of Trustees of Harper College, et al v. Burnidge Cassell et al.
Case No. 06 L 005812 (Circuit Court of Cook County, Illinois)**

**William Rainey Harper College
Performing Arts and Conference Centers
CDB Project No. 810-032-016, CDB Contract No. 50-0735-81**

To:  Architectural Sealants, Inc. and Thilman & Fillippini

I am one of the attorneys for F.H. Paschen, S.N. Nielsen, Inc. ("Paschen"), a named party Defendant and Third Party Plaintiff in the above-captioned litigation (the "Litigation"). Third-Party Defendant Architectural Sealants, Inc. ("Architectural") was one of Paschen's subcontractors in relation to the above captioned Harper College project (the "Project"). Plaintiffs in the Litigation claim multiple alleged defects in the construction (and design) as alleged in the Complaint and in two letters tendered by counsel for Plaintiffs dated April 12 and August 24, 2007. I have enclosed another copy of the Complaint and the April 12th Letter (sent under cover of Paschen's May 14th Letter) and also enclose a copy of the August 24th letter.

This is in follow-up to Paschen's written notice and tender of May 14, 2007. As explained in that letter the claims by Plaintiffs in the Litigation arise out of, in whole or in part, the Project work and activities performed by Architectural. In addition, Paschen was named as an additional insured under certain insurance policies provided by Architectural, including, without limitation, policies issued by Milwaukee Mutual Insurance Co., Illinois National Insurance Co., U.S. Specialty Insurance Co., Muirfield, and Virginia Surety Company, Inc.

***BURKE BURNS & PINELLI, LTD.***

September 12, 2007
Page Two

Architectural, without ambiguity, agreed in its subcontract to indemnify and hold Paschen harmless from any and all claims made against Paschen arising from the work provided by Architectural for the Project. Also, Paschen, without question, enjoys additional named insured status under the language of Architectural's insurance policies which further contain coverage insuring Architectural's indemnity obligations. Under Illinois law Architectural's policies are primary and owe both a defense and indemnity for loss to Paschen. Architectural has no basis to impose upon Paschen and its insurers the expense involved in defending the claims made by Plaintiffs in this Litigation.

Accordingly, pursuant to the terms of that certain Subcontract Agreement and the insurance policies tendered thereunder, Paschen hereby tenders its defense in relation to all matters arising out of the above captioned Litigation to Architectural to protect and save harmless Paschen from any loss, judgment, cost or expense, including legal fees, connected with the Litigation and thus, hereby demands that Architectural defend and protect all of Paschen's interest in this Litigation, that Architectural appoint qualified counsel to represent Paschen, to pay all costs and expenses incurred as a result of such representation and to pay any judgment entered against Paschen, if any, including, without limitation, any interest costs or expenses.

Please have an authorized representative of Architectural accept this tender by sending, within five days hereof, via e-mail or facsimile, the Acknowledgment provided herein reflecting Architectural's acceptance of this tender. In addition, please provide the name, address and telephone number of the attorney who will be handling this matter on behalf of Paschen in the future. Should you fail or refuse to accept further handling of Plaintiffs claims on behalf of Paschen, you are hereby placed on notice that Paschen may exercise its right of indemnifications against Architectural in a separate indemnity action.

Paschen otherwise reserves all of its rights, remedies and causes of action that it may have against Architectural and its liability insurers with respect to any damage suffered by Paschen as a result of any past and/or present action on the part of Architectural or its insured with respect to the Litigation. Further this tender does not waive Paschen's right, in its sole discretion, to retain other counsel to represent its interests in this Litigation at any time hereafter or to thereafter seek reimbursement for all resultant loss, costs, fees and expenses under the terms of the Subcontract Agreement, the policies and Illinois law.

Please contact me if you have any questions regarding the foregoing.

Very truly yours,
**BURKE BURNS & PINELLI, LTD.**

Ellen B. Epstein

EBE/ap
cc: F.H. Paschen, S.N. Nielsen, Inc.

***BURKE BURNS & PINELLI, LTD.***

September 12, 2007
Page Three

## ACCEPTANCE AND ACKNOWLEDGMENT

I, _____, _____, on behalf of **ARCHITECTURAL SEALANTS, INC.**, hereby accept Paschen's tender of the defense as requested herein and agree to defend and protect all of Paschen's interest in this Litigation, to appoint a qualified attorney to represent Paschen, to pay all fees, costs and expenses incurred as a result of such representation, and to pay any judgment entered against Paschen, if any, including, without limitation, any interest, costs and expenses charged thereon.

**ARCHITECTURAL SEALANTS, INC.**

By:_____

Its: _____

Dated: _____

# Exhibit J

# UNITRIN

December 28, 2007

Ms. Ellen Epstein
Burke Burns & Pinelli, Ltd.
Attorneys at Law
Suite 4300
Three First National Plaza
Chicago, Illinois 60602-4229

| | |
|---|---|
| Re: | ***Board of Trustees of William Rainey Harper College No. 512, et al. v. Burnidge, Cassell and Associates, Inc., and F.H.Paschen, S.N. Nielsen, Inc. v. Architectural Sealants, Inc., et. al.*** |
| Case No. | **06L005812** |
| Named Ins.: | **Architectural Sealants, Inc.** |
| Potential Addt'l Ins.: | **F.H. Paschen, S.N. Nielsen, Inc.** |
| Claim No.: | **129123997** |

Dear Ms. Epstein:

The undersigned is responsible for handling claims arising under certain Milwaukee Mutual Insurance Company ("Milwaukee") policies issued to Architectural Sealants, Inc. ("ASI"). In that context, I have received and reviewed your letter of September 12, 2007 tendering the defense of F.H. Paschen, S.N. Nielsen, Inc. ("Paschen") in connection with the above-referenced matter. For the reasons set forth below, Milwaukee hereby rejects the Paschen tender and will promptly file a declaratory judgment action.

## I.    FACTUAL BACKGROUND

The Illinois Capital Development Board ("CDB") hired Paschen as the general contractor for a project at the Performing Arts Center and at the Conference Center at Harper College. The CDB hired Burnidge, Cassell and Associates, Inc. ("Burnidge") to provide architectural and design services. Paschen then subcontracted with ASI to perform sealing and waterproofing services for the sum of $61,500.

Undefined problems developed during construction and litigation ensued. On June 5, 2006, the CDB and the Board of Trustees filed a complaint styled, *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board, for the use and benefit of Board of Trustees of William Rainey Harper College No. 512 v. Burnidge, Cassell and Associates, Inc., and F.H.Paschen, S.N. Nielsen, Inc.* ("the Complaint"). The CDB alleged that it has statutory authority to enter into contracts for the construction of state agency facilities, including for the Board of Trustees of William Rainey Harper College No. 512.

The Complaint further alleges that Plaintiffs discovered "symptoms of problems" in connection with the Project. In response, Burnidge and/or Paschen investigated the

**Unitrin Business Insurance**
Trinity Universal Insurance Co., Security National Insurance Co., Trinity Universal Insurance Co. of Kansas, Inc., Milwaukee Casualty Insurance Co.
Valley Insurance Co., Trinity Lloyd's Insurance Co., Valley Property & Casualty Insurance Co., Milwaukee Insurance Co.

12790 Merit Drive • P.O. Box 650665 • Dallas, TX 75265-0665 • Dallas Claims 888.291.8298

"symptoms" throughout the course of the project until late 2004 and tried to identify the root causes to create solutions. Plaintiffs eventually hired the firm of Wiss, Janney, Elstner Associates, Inc. to conduct an independent review and field investigation. On December 13, 2004, Wiss, Janney submitted a written report to Harper College detailing its observations which implied that the problems were caused by breaches of the design and construction contracts.

Plaintiffs have brought suit against Paschen for breach of contract. Plaintiffs allege several specific breaches of Paschen's express and implied contractual obligations and claim that they have been damaged in an amount in excess of $50,000. Paschen has tendered the defense of the Complaint as an "Additional Insured" under the ASI insurance policies.

## II.    INSURANCE POLICIES

Milwaukee issued Policy No. CPP 3077654012 to ASI for the period commencing October 17, 1999 until cancelled with limits of $1,000,000 per occurrence with $2,000,000 in the aggregate. Milwaukee also issued three subsequent annual policies from October 17, 2000 through October 17, 2003. Each policy contains the same limits, *i.e.,* $1,000,000 per occurrence and $2,000,000 in the aggregate.[1]

## III.    TRIGGER/NO PROPERTY DAMAGE/NO OCCURENCE

In order to invoke coverage, there must be "property damage" during the policy period caused by an "occurrence." However, we do not see any allegations which constitute "property damage." Illinois has held that repair and replacement costs constitute economic loss and not "property damage." Similarly, construction defects do not constitute an accident or "occurrence." It is our understanding that in Illinois where the defect is only the natural and ordinary consequences of faulty workmanship, it is not caused by an accident or occurrence. Here there are only allegations that ASI did not perform its work according to specifications. There are no allegations of consequential damages to other property. All itemized damages involve repair, replacement or correction of work. Thus there is no "occurrence." Furthermore, it is unclear from the complaint when the damage occurred. To the extent damage did not occur during the policy period, the policy would not be triggered. In sum, Milwaukee denies the claim as the Complaint does not contain allegations of "property damage" during the policy period that was caused by an "occurrence."

## IV.    EXCLUSIONS

Moreover, even if the claim fell within the Insuring Agreements, coverage would be excluded under Section I, Exclusions paragraphs j(5) and (6) which provide in relevant part that there is no coverage for 'property damage to:

---

[1] Milwaukee also issued umbrella policy no. UO 30776540082 for the period October 17, 1999 until October 17, 2000 with an aggregate limit of $5,000,000.

> (5)    that particular part of real property on which you . . . are performing operations, if the "property damage" arises out of those operations; or
>
> (6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Here, it appears we are dealing with "ongoing operations" as the damage was discovered during the course of the project but was not specifically identified until 2004, when the project purportedly was complete. Thus, coverage is precluded under Exclusions j(5) and (6).

Alternatively, to the extent the purported damage occurred after ASI's work was complete thereby invoking the products-completed operations hazard, coverage would be precluded under Exclusion l, the "Damage to Your Work" Exclusion. This Exclusion provides that there is no coverage for:

> "Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

Lastly, coverage may be barred pursuant to Exclusion m, the "Damage to Impaired Property or Property not Physically Injured" Exclusion. "Impaired property" is defined as "tangible property, other than 'your product' or 'your work' that is known or thought to be defective, deficient . . . if such property can be restored to use by: a. the repair, replacement, adjustment or removal of 'your product' or 'your work'. . . ." The exclusion applies to:

> "property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work" . . . .

To the extent ASI's work caused damage to the Harper College Performing Arts Center and/or Conference Center, coverage is negated so long as the usefulness of the Performing Arts Center and/or Conference Center could be restored by the repair or replacement of ASI's work.

## V.    CONDITIONS

Condition 2 provides that "you" must notify Milwaukee as soon as practicable of (1) an "occurrence" that may result in a claim; (2) a claim that has been made; or (3) "suit" that has been brought against any insured. Condition 2(c) requires all insureds to

"immediately send copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit'." Milwaukee did not learn of the occurrence until years after the event. Moreover, Paschen failed to notify Milwaukee of the lawsuit or send any legal papers until more than one year after litigation had begun and after settlement negotiations had taken place. Thus, coverage may be barred based on Condition 2.

## V.   CONCLUSION

Milwaukee hereby declines the defense tender on the grounds that there were no allegations constituting "property damage" or "occurrence" as those terms are defined. Moreover, even if there is "property damage" caused by an "occurrence," it is unclear if the damage occurred during the relevant policy periods. Furthermore, even assuming the claim falls within the Insuring Agreement, coverage is precluded based on Exclusions j(5) , j(6), l, and/or m. Finally, coverage is barred by failing to give proper notice.

Should you have any questions or wish to discuss this matter, please contact the undersigned. Otherwise, Milwaukee hereby continues to reserve all of its rights, claims and defense which it may have under the policies at issue. Nothing said in this letter nor left unsaid shall be deemed to be a waiver thereof.

Very truly yours,

Sara Wright   by Randall Eggers

# Exhibit K



Send certified and regular mail

Mr. Tom Tucker
Unitrin Insurance Company
P.O. Box 650665
Dallas, TX 75265-0665

> Re:   Performing Arts Center and Conference Center Project
>        William Rainey Harper College
>        Claim No.:   129123998

Dear Mr. Tucker:

Architectural Sealants, Inc. was recently named in a third party complaint filed by F.H. Paschen/SN Nielsen, Inc. in a lawsuit entitled *William Rainey Harper College et.al. v. F.H. Paschen/SN Nielsen, Inc. et. al.*, 06 L 5812, presently pending in Cook County, Illinois. Harper College is seeking compensation for alleged property damage arising out of construction defects during the construction of the Performing Arts Center and Conference Center referenced above. A copy of the third party complaint is enclosed.

Unitrin, through Milwaukee Mutual Insurance Company provided commercial general liability coverage for this project through policy number CPP3077654 effective dates October 17, 2000 through October 17, 2001, policy number CPP 3081153 effective dates October 17, 2001 through October 17, 2002 and policy number CPP 3081153 effective October 17, 2002 through October 17, 2003. A review of our records indicates that Architectural Sealants, Inc. was working on this construction project in 2001 and again from February through September 2002, clearly within the policy periods identified above.

Pursuant to the Illinois Supreme Court's decision in *John Burns Construction Company v. Indiana Insurance Company*, 189 Ill. 2d 570, 727 N.E.2d 211 (2000), Architectural Sealants is making a selective tender of the Harper College Lawsuit to Unitrin, and advising you that Architectural Sealants wishes Unitrin alone to defend and indemnify Architectural Sealants with respect to the claims asserted against it in that lawsuit.

Please notify me or my attorneys, Brenner, Ford, Monroe & Scott, Ltd., 33 N. Dearborn St., Ste. 300 Chicago, Illinois 60602, regarding your acceptance of this tender.

Respectfully,
Architectural Sealants, Inc.

Tom Best

Cc:   Brenner, Ford, Monroe & Scott, Ltd.

# Exhibit L

# UNITRIN
BUSINESS INSURANCE®

December 28, 2007

Mr. Tom Best
Architectural Sealants, Inc.
9232 W.Gulfstream Rd., Ste. B
Frankfort, IL  60423

|  |  |
|---|---|
| **Re:** | ***Board of Trustees of William Rainey Harper College No. 512, et al. v. Burnidge, Cassell and Associates, Inc., and F.H.Paschen, S.N. Nielsen, Inc. v. Architectural Sealants, Inc., et. al.*** |
| **Case No.** | **06L005812** |
| **Named Ins.:** | **Architectural Sealants, Inc.** |
| **Claim No.:** | **129123998** |

Dear Mr. Best:

The undersigned is responsible for handling claims arising under certain Milwaukee Mutual Insurance Company ("Milwaukee") policies issued to Architectural Sealants, Inc. ("ASI"). In that context, I have received and reviewed your undated letter tendering the defense of Architectural Sealants, Inc. ("ASI") in connection with the above-referenced matter. For the reasons set forth below, Milwaukee hereby rejects the defense tender and will promptly file a declaratory judgment action.

## I.     FACTUAL BACKGROUND

The Illinois Capital Development Board ("CDB") hired Paschen as the general contractor for a project at the Performing Arts Center and at the Conference Center at Harper College. The CDB hired Burnidge, Cassell and Associates, Inc. ("Burnidge") to provide architectural and design services. Paschen then subcontracted with ASI to perform sealing and waterproofing services for the sum of $61,500.

Undefined problems developed during construction and litigation ensued. On June 5, 2006, the CDB and the Board of Trustees filed a complaint styled, *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board, for the use and benefit of Board of Trustees of William Rainey Harper College No. 512 v. Burnidge, Cassell and Associates, Inc., and F.H.Paschen, S.N. Nielsen, Inc.* ("the Complaint"). The CDB alleged that it has statutory authority to enter into contracts for the construction of state agency facilities, including for the Board of Trustees of William Rainey Harper College No. 512.

The Complaint further alleges that Plaintiffs discovered "symptoms of problems" in connection with the Project. In response, Burnidge and/or Paschen investigated the "symptoms" throughout the course of the project until late 2004 and tried to identify the root causes to create solutions. Plaintiffs eventually hired the firm of Wiss, Janney, Elstner Associates, Inc. to conduct an independent review and field investigation. On December 13, 2004, Wiss, Janney submitted a written report to Harper College detailing its

**Unitrin Business Insurance**

Trinity Universal Insurance Co., Security National Insurance Co., Trinity Universal Insurance Co. of Kansas, Inc., Milwaukee Casualty Insurance Co. Valley Insurance Co., Trinity Lloyd's Insurance Co., Valley Property & Casualty Insurance Co., Milwaukee Insurance Co.

12790 *Merit Drive, Dallas, TX* 75231 • P.O. *Box* 650665, *Dallas, TX* 75265 • *Dallas Claims*: 888.291.8298 • *Western Claims*: 888.291.8290 • *Fax*: 866.958.0825

P. 2
Correspondence to Tom Best

observations which implied that the problems were caused by breaches of the design and construction contracts.

Plaintiffs have brought suit against Paschen for breach of contract. Plaintiffs allege several specific breaches of Paschen's express and implied contractual obligations and claim that they have been damaged in an amount in excess of $50,000. Paschen then filed a third-party complaint against ASI for breach of contract and for indemnification. ASI has tendered the defense of the third-party action to Milwaukee.

## II.   INSURANCE POLICIES

Milwaukee issued Policy No. CPP 3077654012 to ASI for the period commencing October 17, 1999 until cancelled with limits of $1,000,000 per occurrence with $2,000,000 in the aggregate. Milwaukee also issued three subsequent annual policies from October 17, 2000 through October 17, 2003. Each policy contains the same limits, *i.e.,* $1,000,000 per occurrence and $2,000,000 in the aggregate.[1]

## III.   TRIGGER/NO PROPERTY DAMAGE/NO OCCURENCE

In order to invoke coverage, there must be "property damage" during the policy period caused by an "occurrence." However, we do not see any allegations constituting "property damage." It is our understanding that in Illinois, repair and replacement costs constitute economic loss and not "property damage." Similarly, we understand that construction defects do not constitute an accident or "occurrence." Here there are only allegations that ASI did not perform its work according to specifications. There are no allegations of damage to other property. All itemized damages involve repair, replacement or correction of work. Thus there is no "occurrence" and no "property damage."

Furthermore, it is unclear from the complaint when the damage occurred. To the extent damage did not occur during the relevant policy period, the policy would not be triggered. In sum, Milwaukee denies the claim as the Complaint does not contain allegations of "property damage" during the policy period that was caused by an "occurrence."

## IV.   EXCLUSIONS

Moreover, even if the claim fell within the Insuring Agreements, coverage would be excluded under Section I, Exclusions paragraphs j(5) and (6) which provide in relevant part that there is no coverage for "property damage" to:

> (5)   that particular part of real property on which you . . . are performing operations, if the "property damage" arises out of those operations; or

---

[1] Milwaukee also issued umbrella policy no. UO 30776540082 for the period October 17, 1999 until October 17, 2000 with an aggregate limit of $5,000,000.

P. 3
Correspondence to Tom Best

> (6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Here, it appears we are dealing with "ongoing operations" as the damage was discovered during the course of the project but was not specifically identified until 2004, when the project purportedly was complete. Thus, coverage is precluded under Exclusions j(5) and (6).

Alternatively, to the extent the purported damage occurred after ASI's work was complete thereby invoking the products-completed operations hazard, coverage would be precluded under Exclusion l, the "Damage to Your Work" Exclusion. This Exclusion provides that there is no coverage for:

> "Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

Lastly, coverage may be barred pursuant to Exclusion m, the "Damage to Impaired Property or Property not Physically Injured" Exclusion. "Impaired property" is defined as "tangible property, other than 'your product' or 'your work' that is known or thought to be defective, deficient . . . if such property can be restored to use by: a. the repair, replacement, adjustment or removal of 'your product' or 'your work'. . . ." The exclusion applies to:

> "property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work" . . . .

To the extent ASI's work caused damage to the Harper College Performing Arts Center and/or Conference Center, coverage is negated so long as the usefulness of the Performing Arts Center and/or Conference Center could be restored by the repair or replacement of ASI's work.

## V.    CONDITIONS

Condition (2) of the Policy provides that "you" *i.e.,* the named insured ASI, must notify Milwaukee as soon as practicable of (1) an "occurrence" that may result in a claim;

(2) a claim that has been made; or (3) "suit" that has been brought against any insured. Condition 2(c) requires all insureds to "immediately send copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit'." Here ASI

P. 4
    Correspondence to Tom Best

did not notify Milwaukee of the occurrence until years later. Moreover, it did not notify Milwaukee of the third-party complaint until months after suit had been instituted and after it apparently was already being defended by another carrier. Thus, coverage may be precluded based on Condition 2(c).

### V.    CONCLUSION

Milwaukee hereby declines the defense tender on the grounds that there were no allegations constituting "property damage" or an "occurrence." Moreover, even if there is "property damage" caused by an "occurrence," it is unclear if the damage occurred during the relevant policy periods. Furthermore, even assuming the claim falls within the Insuring Agreement, Exclusions j(5), j(6), l, and/or m preclude coverage. Finally, coverage is barred by failing to give proper notice per Condition 2.

Should you have any questions or wish to discuss this matter, please contact the undersigned. Otherwise, Milwaukee hereby continues to reserve all of its rights, claims and defense which it may have under the policies at issue. Nothing said in this letter nor left unsaid shall be deemed to be a waiver thereof.

Respectfully,

Tom F. Tucker
Casualty Claim Specialist
National Claim Unit
**UNITRIN** Business Insurance ®
P.O. Box 650665
Dallas, TX 75265-0665
1-888-291-8298, ext. 8305
☎ voice: 214-360-8305
🖷 fax: 1-866-305-2313
✉Email: ttucker@unitrin.com


Cc:    Brittany Yost               Via Email: Brittany.yost@hrh.com
         Thilman Filippini, An HRH Company
         One East Wacker Drive, Ste. 1800
         Chicago, IL 60601


Cc:    Amy L. Anderson          Via Email: aanderson@brennerlawfirm.com
         Brenner, Ford, Monroe & Scott, LTD
         33 N. Dearborn Street, Ste. 300
         Chicago, IL 60602