APPENDIX OF UNREPORTED CASE REFERENCED IN
MILWAUKEE INSURANCE COMPANY'S
MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

LEXSEE 2008 ILL APP LEXIS 416

**STONERIDGE DEVELOPMENT COMPANY, INC., and HIGHLAND GLEN ASSOCIATES, Plaintiffs and Counterdefendants-Appellees, v. ESSEX INSURANCE COMPANY, Defendant and Counterplaintiff and Counterdefendant-Appellant (Residential Warranty Corporation, Western Pacific Mutual Insurance Company, John Walski, and Marie Walski, Defendants and Counterdefendants and Counterplaintiffs-Appellees).**

No. 2-06-1166

APPELLATE COURT OF ILLINOIS, SECOND DISTRICT

*2008 Ill. App. LEXIS 416*

May 6, 2008, Filed

**PRIOR HISTORY:** [*1]
Appeal from the Circuit Court of Kane County No. 03--MR--26. Honorable Michael J. Colwell, Judge, Presiding.

**DISPOSITION:** Reversed; judgment entered.

**JUDGES:** JUSTICE BOWMAN delivered the opinion of the court. CALLUM and GILLERAN JOHNSON, JJ., concur.

**OPINION BY:** BOWMAN

**OPINION**

JUSTICE BOWMAN delivered the opinion of the court:

At issue in this case is whether Essex Insurance Company (Essex) is required to provide coverage to its insured, Stoneridge Development Company, Inc., as well as to an additional insured under the policy, Highland Glen Associates (collectively Stoneridge). The policy came into play after homeowners John and Marie Walski brought suit against Stoneridge for damage to their townhome, allegedly caused by Stoneridge's construction of the residence on and/or near improperly compacted soil. The Walskis also sought relief from Residential Warranty Corporation and its underwriter, Western Pacific Mutual Insurance Company (collectively WPIC), which had provided a warranty against structural defects to the home. In the instant case, Essex appeals from the trial court's grant of summary judgment in favor of Stoneridge, WPIC, and the Walskis. The trial court ruled that Essex had an undisclosed conflict of interest with [*2] Stoneridge and was therefore estopped from denying coverage. We reverse, concluding that Essex did not have a conflict of interest and that the policy does not otherwise cover Stoneridge's liability.

I. BACKGROUND

Stoneridge is a general contractor in the business of developing and constructing new residential dwellings. Essex insured Stoneridge under a commercial general liability (CGL) policy effective between April 5, 1995, and April 5, 1996. The policy had a general aggregate limit of $ 2 million, a "Products/Completed Operations Aggregate Limit" of $ 1 million, and a per occurrence limit of $ 1 million. The policy coverage relevant here is contained in the following portions of the policy:

> "COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
>
> 1. Insuring Agreement
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages.
>
> ***

> b. This insurance applies to 'bodily injury' and 'property damage' only if:
>
> (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage [*3] territory;' and
>
> (2) The 'bodily injury' or 'property damage' occurs during the policy period."

The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." It defines "property damage" as:

> "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

The policy excludes "'[p]roperty damage' to 'your work'[1] arising out of it or any part of it and included in the 'products-completed operations hazard,'"[2] but the exclusion is inapplicable "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."

   1   "Your work" is defined as "[w]ork or operations performed by you or on your behalf," and "[m]aterials, parts or equipment furnished in connection with such work or operations."
   2   "Products-Completed Operations Hazard" is defined as "all 'bodily injury' and 'property damage' [*4] occurring away from premises you own or rent and arising out of 'your product' or 'your work,'" with the exceptions of "[p]roducts that are still in your physical possession" and "[w]ork that has not yet been completed or abandoned."

The Walskis bought a new townhome from Stoneridge in August 1995 for $ 146,163. In conjunction with the sale, the Walskis and Stoneridge enrolled in a warranty program through WPIC. The warranty insured against major structural defects for 10 years. Stoneridge was the warrantor for the first two years, and WPIC was the warrantor for years 3 through 10. Stoneridge further warranted that the home complied with certain building codes and that, if it did not, Stoneridge would be responsible for the entire 10-year period for warranty claims stemming from noncompliance. Under a membership agreement between Stoneridge and WPIC, if Stoneridge refused or was unable to fulfill its warranty obligations, WPIC was required to do so, and Stoneridge agreed to then indemnify WPIC for such expenses.

On August 6, 2001, the Walskis brought suit against Stoneridge, in McHenry County. They alleged that their house had structural problems because the land underneath it and in [*5] portions of the common area "consist[s] of unsuitable structural bearing soils and earth retention" and that "soil movement has caused and is causing the load bearing elements of [the] townhome to move, crack and fail, such that, without substantial repair, [the] townhome will in the very near future become dangerous and uninhabitable." The Walskis alleged claims of breach of the purchase contract and breach of the implied warranty of habitability. On their motion, the action was stayed in November 2001.

In January 2002, the Walskis brought an arbitration action against WPIC, under an arbitration clause in the warranty agreement. They alleged that the "footings" of their townhome had "failed due to unstable subsurface soils causing significant damage to the home." The Walskis sought to recover the home's purchase price.

In October 2002, WPIC brought a third-party action against Stoneridge within the arbitration action. WPIC alleged that the Walskis notified Stoneridge of structural problems in 1996 and notified WPIC of the soil problem in 2000. WPIC further alleged that soil testing revealed that Stoneridge had failed to properly compact the soil "on common property adjacent at or adjacent [*6] to" the Walskis' townhome. WPIC claimed that Stoneridge breached the warranty program and membership agreements by failing to properly compact the soil; comply with building codes; properly repair the damage; and obtain a WPIC compliance inspection. WPIC also asserted claims of equitable contribution, subrogation, and partnership indemnification. WPIC sought indemnification for any amounts it paid out and expenses it incurred under the warranty agreement.

In January 2003, the Walskis brought a complaint against Stoneridge within the arbitration action. As in their McHenry County action, the Walskis alleged that Stoneridge had breached the purchase contract and the implied warranty of habitability.

Stoneridge was initially defended in the McHenry County and arbitration actions by its private attorney, Thomas Scherschel of O'Hagan, Smith & Amundsen Essex then agreed to defend Stoneridge under a reservation of rights, and in February 2003, it retained Jack Riley of Johnson & Bell to defend Stoneridge Riley substituted his appearance for Scherschel's.

On April 10, 2003, Essex sent to Stoneridge a letter discussing Essex's coverage position and reiterating its reservation of rights In discussing [*7] the Walskis' arbitration complaint, Essex stated that the Walskis were alleging that Stoneridge "breached [its] contract to convey a 'Unit' as that term is 'understood' by the parties and allegedly breached the implied warranty of habitability." After reciting some of the policy provisions, Essex stated:

> "None of the complaints cited above alleges any 'bodily injury' within the definition cited above To the extent, however, the Walski Complaint, both in law and arbitration, and the Highland Glen Counter-Complaint [3] potentially allege[] 'property damage,' Essex agrees to participate in the defense of Stone Ridge [sic] under a full and complete reservation of rights. Moreover, we are unable at this point to determine factually whether the potential 'property damage' arises out of an 'occurrence' as the term is defined by the policy In the event that our investigation or discovery reveals that the alleged damages did not arise out of an 'occurrence' Essex reserves the right to withdraw from the defense of this matter if appropriate."

---

3   The Highland Glen Townhome Association (Association) was named as a defendant in the Walskis' McHenry County action, and the Association filed a countercomplaint [*8] against Stoneridge The Association is not a party to this appeal.

---

In relation to WPIC's arbitration third-party complaint against Stoneridge, Essex stated that it similarly did not allege any "bodily injury" under the policy Essex then stated:

> "Moreover, the complaint does not allege 'property damage' as that term is defined. The allegations of the complaint clearly indicate that [WPIC is] seeking indemnity and other damages from Stone Ridge [sic] based upon Stone Ridge's [sic] alleged breach of contract *We have determined that this alleged conduct does not fall within the definitions of 'bodily injury' or 'property damage,' as the claims against Stone Ridge [sic] are contractual in nature.* Furthermore, [WPIC's] claim for indemnity does not allege an 'occurrence' as that term is defined by the Policy. *It is our understanding that [WPIC's] claim arises out of the alleged failure of Stone Ridge [sic] to meet alleged contractual obligations Accordingly, this alleged breach of contract is not the consequence of any type of 'accident' as is required by the Policy "* (Emphasis added )

Essex stated that it would still defend Stoneridge, under a reservation of rights, on these matters but [*9] that it reserved the right to withdraw from the defense if it determined that WPIC's allegations did not fall within the policy.

> A few months later, on July 29, 2003, the arbitrator entered an interim award It stated: "Shortly after closing, cracks developed in the foundation of the residence and have continued to develop in other parts of the residence causing varying amounts of damage It is undisputed that a cause of this cracking is related to the fact that the house was constructed on a slope and with improperly compacted soils
>
> \* \* \*
>
> \*\*\* The cracking condition was made known to [Stoneridge] in the first year after closing in a manner sufficient to trigger the Builder's warranty obligation "

The arbitrator ruled that Stoneridge was liable to the Walskis for breach of express warranties contained in the purchase agreement and the warranty agreement Based on this ruling, the arbitrator further determined that he did "not have to reach the question whether any implied warranty of habitability applies or was waived." The arbitrator ordered Stoneridge to repurchase the property for $ 200,000, which represented the original purchase price plus diminished market value. WPIC was ordered [*10] to financially guarantee this obligation up to $ 147,773 Stoneridge was further liable to WPIC under the warranty agreement for any amount paid under this guarantee. Moreover, Stoneridge was responsible for the

Walskis' attorney fees and costs; Stoneridge and WPIC were jointly and severally liable for the arbitration expenses; and Stoneridge was liable to WPIC under the warranty agreement for costs from the Walskis' claims

The arbitrator's final award, issued on December 18, 2003, ordered Stoneridge to pay $ 291,537.04 to the Walskis for their award plus attorney fees and costs and $ 176,353.51 to WPIC for costs from the Walskis' claims The McHenry County circuit court subsequently confirmed the arbitration award.[4]

> 4 The copy of the McHenry County circuit court's order that appears in the record is unsigned and undated, but the parties do not dispute its contents

Stoneridge is now insolvent and unable to satisfy the judgment against it The Walskis have thus far received $ 153,848 from WPIC and $ 3,750 from Stoneridge pursuant to a turnover order

Stoneridge brought the instant action against Essex on January 22, 2003, while the arbitration action was still pending Stoneridge sought [*11] a declaration that Essex had a duty to defend and indemnify it against the Walskis' claims. During the course of the proceedings, Stoneridge submitted an affidavit from its principal, James Madden, stating that all the work performed on and around the Walskis' home was done by subcontractors hired through Stoneridge, as Stoneridge did not employ any carpenters or tradesmen

After the final arbitration award was entered in December 2003, Stoneridge amended its complaint to seek indemnification for the award and to add WPIC and the Walskis as defendants. In turn, Essex filed a counterclaim for a declaratory judgment against Stoneridge, WPIC, and the Walskis. Thereafter, WPIC filed counterclaims against Essex for indemnity and estoppel. WPIC alleged that Essex was estopped from denying coverage to Stoneridge, because Essex had a conflict of interest with Stoneridge in its defense of the Walskis' claims WPIC based this allegation on Essex's reservation of rights letter, which WPIC argued left Stoneridge facing a covered implied warranty of habitability claim as well as uncovered contract claims. According to WPIC, Essex failed to inform Stoneridge of this conflict of interest The Walskis [*12] also filed counterclaims against Essex on these grounds Correspondingly, Stoneridge amended its second amended complaint to include an estoppel count based on this alleged conflict of interest.

All parties then filed cross-motions for summary judgment. The trial court issued a letter opinion on July 6, 2006 It stated:

> "All parties alleging Estoppel assert that in Essex's communications with Stoneridge *** in anticipation of the above-referenced arbitration [Essex] failed to disclose a potential conflict of interest in Essex's representation of its insureds. The parties argue that in light of this lack of disclosure Essex now should be estopped from denying indemnity to Stoneridge ***."

The trial court found that, based on Stoneridge's insolvency and the final judgment against it, WPIC and the Walskis had standing to assert estoppel.

The trial court further stated that the "conflict claimed arises as a result of the tension between the different types of claims asserted in the underlying suit and the incentives Essex had in defending against those underlying claims." The trial court affirmatively quoted the following passage from WPIC's counterclaim:

> "'Essex's [April 10, 2003,] Reservation [*13] of Rights letter recognized the potential for coverage under the implied warranty of habitability claim and rejected coverage for the contract claims. The effect of the reservation of rights was to leave Stoneridge *** facing both covered and uncovered claims. Essex never informed Stoneridge *** that an attorney who was selected, retained, paid, and controlled by Essex could have an incentive to structure the defense so that Stoneridge *** [was] found liable on the uncovered contract/indemnity claims rather than on the covered implied warranty of habitability claim.'"

The trial court further found that, in addition to failing to decline to defend due to the conflict of interest, Essex also induced Stoneridge to surrender its own defense, which, under case law, amounted to prejudice sufficient to support estoppel. The trial court ruled that Essex was estopped from denying coverage, and it granted the motions for summary judgment in favor of Stoneridge, WPIC, and the Walskis.

In the letter opinion, the trial court also directed the "prevailing party [to] prepare, circulate, and present for signature any appropriate order." On August 7, 2006, Essex moved for the trial court to reconsider [*14] its ruling as set forth in its letter opinion, which Essex stated it was treating "as though it were the order entered" for purposes of the motion to reconsider

On August 15, 2006, the trial court entered a judgment order pursuant to its July 6 letter opinion. In a separate order, the court entered and continued Essex's motion to reconsider and set a briefing schedule on the matter.

On October 20, 2006, WPIC objected to the trial court's jurisdiction to hear Essex's motion to reconsider, and Stoneridge and the Walskis joined in the objection. They argued that the trial court lacked jurisdiction because Essex's motion to reconsider was filed before the entry of the trial court's final judgment and that a premature motion to reconsider could not suspend or toll the finality or enforcement of the August 15, 2006, judgment. The trial court overruled the objection and denied Essex's motion to reconsider. Essex filed its notice of appeal on November 17, 2006.

On appeal, Essex argues that: (1) the trial court erred in holding that it was estopped from denying coverage, and (2) there is no coverage under the policy for Stoneridge's liability to the Walskis and WPIC because the damage to the [*15] Walskis' home was not caused by an "occurrence," as defined by the policy, and because contractual liability for economic damages does not constitute "property damage" under the policy.

II ANALYSIS

A Jurisdiction

We first address appellees' [5] argument that we lack jurisdiction over this appeal. Appellees previously moved to dismiss the appeal for lack of jurisdiction, and this court denied the motion. However, we have an independent duty to determine whether we have jurisdiction, and we may reconsider our ruling on a motion to dismiss an appeal at any time before the disposition of the appeal. See *In re Marriage of Waddick, 373 Ill App 3d 703, 705, 869 N.E.2d 1089, 312 Ill Dec 98 (2007)*. Accordingly, we examine appellees' jurisdictional argument further.

   5  Stoneridge, WPIC, and Marie Walski filed a combined appellees' brief in this appeal. John Walski is no longer living.

Appellees contend that Essex's motion to reconsider was premature and did not toll the time for appeal, resulting in Essex's notice of appeal being untimely. Appellees note that, under *Supreme Court Rule 303(a)(1)* (Official Reports Advance Sheet No 8 (April 11, 2007), R. 303(a)(1), eff. May 1, 2007), a party must file a notice of appeal either (1) [*16] within 30 days after the entry of a final judgment, or (2) if a timely postjudgment motion "directed against the judgment" is filed, within 30 days of the order disposing of the postjudgment motion. Appellees also note that, under *Supreme Court Rule 272* (137 Ill 2d R. 272), if a trial court announces a final judgment but requires the prevailing party to draft an order, the judgment becomes final only when the signed judgment is filed. In this case, the trial court's July 6, 2006, letter opinion explicitly directed the prevailing parties to draft an order. Appellees therefore reason that the trial court's ruling granting summary judgment in their favor became final and appealable only upon the entry of the August 15, 2006, judgment order. Appellees further argue that Essex's notice of appeal was then due to be filed within 30 days after the date of the judgment, in mid-September, absent a timely filed postjudgment motion. Appellees argue, with support, that, while a timely filed motion to reconsider tolls the time for filing an appeal (see Official Reports Advance Sheet No. 8 (April 11, 2007), R 303 (a)(1), eff. May 1, 2007), a motion to reconsider that is filed before the final judgment [*17] is entered is not timely and does not extend the time for filing a notice of appeal. See *Archer Daniels Midland Co v Barth, 103 Ill. 2d 536, 538-39, 470 N E 2d 290, 83 Ill Dec. 332 (1984)* (motion to reconsider, which was filed after the trial court's grant of summary judgment but before the entry of the formal order, was premature and did not toll the time for filing an appeal); *Canfield v. Delheimer, 210 Ill App. 3d 1055, 1059, 569 N E 2d 1260, 155 Ill Dec 649 (1991)* (same). Appellees conclude that, because Essex did not file a motion to reconsider *after* the entry of the August 15, 2006, order, its November 17, 2006, notice of appeal was untimely.

Essex counters with the following four arguments: (1) the August 15, 2006, order was not a final order, because Essex's August 7 motion to reconsider remained pending at the time the order was entered; (2) if the August 15 order was final, the time to appeal was tolled because the trial court entered and continued Essex's motion to reconsider after it entered the August 15 order; (3) appellees' active participation, without objection, in posttrial proceedings on the merits revested jurisdiction in the trial court; and (4) appellees are estopped from challenging the timeliness of its motion to reconsider, [*18] because they did not object to the procedure set by the trial court for briefing and hearing the motion.

We agree with Essex's second argument. While Essex filed its motion to reconsider on August 7, 2006, after the trial court's letter opinion but before the filing of the final judgment, the final judgment corresponded to the letter opinion, and Essex's motion therefore also attacked or "was directed against" the substance of the judgment. Immediately after the trial court entered the August 15, 2006, final judgment, it "entered and continued" Essex's motion to reconsider. When a trial court enters and continues a motion, the result is that the motion is left pending. See *Yazzin v Meadox Surgimed, Inc , 224 Ill App 3d 288, 291, 586 N E 2d 533, 166 Ill Dec. 575 (1991)*. Therefore,

the effect of the trial court's action was a constructive refiling of Essex's motion to reconsider on August 15, 2006, within the 30-day period for filing an appeal, tolling the time to file a notice of appeal until the motion to reconsider was resolved This situation is readily distinguishable from *Archer Daniels Midland Co.* and *Canfield* because, in those cases, the trial courts did not enter and continue the premature motions to reconsider [*19] Accordingly, we conclude that we have jurisdiction over this appeal

B. Estoppel

Turning to the merits, Essex first argues that the trial court erred by granting appellees summary judgment based on estoppel. Summary judgment is appropriate only where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Zekman v Direct American Marketers, Inc, 182 Ill 2d 359, 374, 695 N.E.2d 853, 231 Ill. Dec 80 (1998)* We review *de novo* a grant of summary judgment *Rich v. Principal Life Insurance Co, 226 Ill 2d 359, 370, 875 N.E.2d 1082, 314 Ill. Dec. 795 (2007)* Also, the construction of an insurance policy is a question of law, to which *de novo* review applies *Rich, 226 Ill 2d at 371*

We begin by discussing the relevant case law on an insurer's duty to defend An insurer's duty to defend its insured is much broader than its duty to indemnify the insured *Outboard Marine Corp. v Liberty Mutual Insurance Co, 154 Ill 2d 90, 125, 607 N.E.2d 1204, 180 Ill Dec 691 (1992)* A duty to indemnify arises only if the insured has a judgment against it on any underlying claim and the insured's activity [*20] and the resulting loss or damage *actually* come within the policy's coverage *Outboard Marine Corp, 154 Ill. 2d at 127-28* In contrast, the precursor duty to defend arises if, liberally construing in the insured's favor the allegations in the underlying complaint against the insured, there are factual allegations that even *potentially* fall within the coverage *General Agents Insurance Co. of America, Inc. v. Midwest Sporting Goods Co, 215 Ill. 2d 146, 154-55, 828 N.E.2d 1092, 293 Ill Dec 594 (2005)*. Moreover, if the underlying complaint against the insured contains several theories of recovery and only one of the theories is potentially covered, the insurer must still defend the insured. *Midwest Sporting Goods Co, 215 Ill. 2d at 155* In this manner, the insurer may become obligated to defend against causes of action and theories of recovery that the policy does not actually cover *Illinois Masonic Medical Center v. Turegum Insurance Co, 168 Ill. App. 3d 158, 162, 522 N.E.2d 611, 118 Ill. Dec. 941 (1988)*.

In such circumstances, the insurer must either defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage *Midwest Sporting Goods Co, 215 Ill. 2d at 155*. Otherwise, the insurer "is estopped from later raising [*21] policy defenses to coverage and is liable for the award against the insured and the costs of the suit, because the duty to defend is broader than the duty to pay " *Murphy v. Urso, 88 Ill. 2d 444, 451, 430 N.E.2d 1079, 58 Ill Dec 828 (1981)*. If the insurer adequately informs the insured that it is proceeding under a reservation of rights, and the insured accepts defense counsel provided by the insurer, the insurer has not breached its duty to the insured and is not estopped from asserting policy defenses *Royal Insurance Co. v Process Design Associates, Inc, 221 Ill. App. 3d 966, 974, 582 N.E.2d 1234, 164 Ill. Dec. 290 (1991)*

An insurer's duty to defend typically includes the right to control the defense so that the insurer may protect its financial interest in the litigation's outcome and minimize unwarranted liability claims. *Illinois Masonic Medical Center, 168 Ill. App. 3d at 163* This presents no problems when the interests of the insurer and the insured are completely aligned *American Family Mutual Insurance Co. v. W H McNaughton Builders, Inc., 363 Ill. App. 3d 505, 510, 843 N.E.2d 492, 300 Ill. Dec. 234 (2006).* However, where their interests are not completely aligned, this arrangement could lead to a conflict of interest because, although the attorney retained by the insurer [*22] to represent the insured has ethical obligations to both parties, in reality the attorney may have closer ties to the insurer and thus a more compelling interest in protecting the insurer *W.H McNaughton Builders, Inc., 363 Ill. App. 3d at 510.* Where there is such a conflict of interest, the insurer must decline to defend the insured and, instead of participating in the defense, the insurer must pay for independent counsel for the insured *Murphy, 88 Ill. 2d at 451-52.* If, however, the insurer goes ahead and defends its insured without disclosing the conflict of interest in its reservation of rights, the insurer will be estopped from raising coverage defenses *Doe v. Illinois State Medical Inter-Insurance Exchange, 234 Ill. App. 3d 129, 134, 599 N.E.2d 983, 174 Ill. Dec. 899 (1992); Cowan v. Insurance Co. of North America, 22 Ill App 3d 883, 896, 318 N.E.2d 315 (1974)* ("bare notice of a reservation of rights is insufficient unless it makes specific reference to the policy defense which may be asserted and to the potential conflict of interest"). This is the type of estoppel at issue in this case While estoppel usually requires a showing of prejudice by the insured, and while the existence of such prejudice is typically a question [*23] of fact, if, "by the insurer's assumption of the defense the insured has been induced to surrender his right to control his own defense, he has suffered a prejudice which will support a finding that the insurer is estopped to deny policy coverage."

*Maryland Casualty Co v Peppers*, 64 Ill 2d 187, 196, 355 N E 2d 24 (1976)

This court recently explained the test for determining whether there is a conflict of interest:

> "[W]e must compare the allegations of the underlying complaint against the insured to the terms of the policy at issue *** If, after comparing the complaint to the insurance policy, it appears that factual issues will be resolved in the underlying suit that would allow insurer-retained counsel to 'lay the groundwork' for a later denial of coverage, then there is a conflict between the interests of the insurer and those of the insured [Citation ] Put another way, if, in the underlying suit, insurer-retained counsel would have the opportunity to shift facts in a way that takes the case outside the scope of policy coverage, then the insured is not required to defend the underlying suit with insurer-retained counsel. [Citations.] Rather, the insured is entitled to defend the suit with counsel [*24] of its choosing at the insurer's expense "

*W H McNaughton Builders, Inc*, 363 Ill App 3d at 511 The appellate court has also articulated the test as whether, when comparing the complaint's allegations to the policy's terms, the insurer's interest "would be furthered by providing a less than vigorous defense to those allegations " *Royal Insurance Co*, 221 Ill App 3d at 975-76. A conflict of interest does not exist simply because an insurer has an interest in negating coverage. *Shelter Mutual Insurance Co v Bailey*, 160 Ill App 3d 146, 154, 513 N E 2d 490, 112 Ill Dec 76 (1987).

Examples of cases where courts found conflicts of interest between insurers and their insureds are *Peppers*, *Murphy*, and *W.H. McNaughton Builders, Inc* In *Peppers*, the insured shot someone whom he thought was trying to break into his store *Peppers*, 64 Ill 2d at 191-92 The victim brought suit against the insured, alleging assault, negligence, and willful and wanton conduct *Peppers*, 64 Ill 2d at 193 The supreme court stated that a conflict of interest existed because, if the insured were found liable, the insured had an interest in a finding of negligence, for which he would be covered under the policy, whereas the insurer had an [*25] interest in a finding that the insured acted intentionally, because the policy excluded coverage for intentionally inflicted injuries. *Peppers*, 64 Ill 2d at 197-98

In *Murphy*, a woman was injured while riding as a passenger in a preschool van. The woman sued the van's driver and the van's owners, the latter on the basis that the driver was acting as an agent of the owners *Murphy*, 88 Ill 2d at 448. The supreme court stated that the owners' insurance company had a duty to defend the driver in addition to the owners because the policy covered permissive users *Murphy*, 88 Ill 2d at 452-53 However, the supreme court also determined that there was a conflict of interest between the driver and the insurance company It reasoned that, while they would both benefit from the unlikely event that the driver were found not liable, the insurance company's interest otherwise lay in a finding that the driver did not have permission to use the van, in which case the policy would not provide coverage. In contrast, the driver's interest otherwise lay in a finding that he did have permission, in which case the insurance company would pay any judgment against him *Murphy* 88 Ill 2d at 453-54.

In *W H* [*26] *McNaughton Builders, Inc*, this court held that a conflict of interest existed between an insurer and the insured builder because, although they had a mutual interest in a finding that the builder was not liable for mold damage, the insurer was equally protected if the damage were found to have occurred before the policy's inception. *W H. McNaughton Builders, Inc*, 363 Ill App. 3d at 512; see also *Illinois Masonic Medical Center*, 168 Ill App 3d at 168-69 (conflict where insurer could have interest in fixing liability outside the policy period).

Essex argues that there is no conflict of interest in this case because the Walskis' claims alleged only one underlying theory of liability, breach of contract, and the policy did not cover that type of liability Essex argues that the claims also alleged only one type of damages, economic damages arising from construction defects due to faulty workmanship, and that there was no potential for coverage Additionally, Essex maintains that this case does not present the type of situation, present in *W H McNaughton Builders, Inc*, where there was an issue as to whether the damage occurred during or outside the policy period.

Essex further argues [*27] that the trial court erred in relying on the reservation of rights letter in finding estoppel, because any conflict must appear on the face of the complaint and because Essex never stated in the letter that the breach of implied warranty of habitability claim would be covered while the breach of contract claim would not. Essex maintains that it "did not parse coverage by claims but by *damages* " (Emphasis in original ) According to Essex, it recognized with respect to the Walskis' claims that only "property damage" caused by an "occurrence" would be covered. It argues that the same is true with respect to WPIC's claims, in that it did not state that WPIC's breach of contract "claim" was not covered

but rather explained that breach of contract did not constitute an "occurrence" and that the ensuing damages were not "property damage." Essex also argues that both of the theories that the Walskis relied on, breach of contract and breach of implied warranty of habitability, are grounded in contract.

Appellees argue as follows Only two types of claims were addressed in Essex's reservation of rights letter, contract and implied warranty of habitability Essex's letter specifically ruled out [*28] coverage for the contract claims, thereby recognizing the potential for coverage under the implied warranty of habitability claim The implied warranty of habitability is a creature of public policy that is independent of contract law Appellees further maintain that, while prejudice is presumed under *Peppers* when the insured has been induced to surrender its right to control its own defense, in this case there was actual prejudice. Appellees state that Essex's retained counsel filed with the arbitrator seven briefs seeking dismissal of the implied warranty of habitability claim, the potentially covered claim, and asking that damages be limited to the contracts' remedy provisions, the uncovered contract claims Appellees contend that Essex's strategy succeeded because the arbitrator stated that, having found against Stoneridge on the breach of contract claims, he did not have to address the implied warranty of habitability claim. According to appellees, Essex then used the arbitrator's decision to support its motion for summary judgment that there was no coverage, wherein Essex stated that "[i]t is significant that the arbitrator found that Stoneridge's obligations to the Walskis arise [*29] from the purchase contract "

In analyzing this issue, we first address whether the conflict of interest must appear on the face of the complaint, as Essex argues, or whether the trial court could properly rely on Essex's reservation of rights letter Essex points out that the test for determining whether there is a conflict of interest is to "compare the allegations of the underlying complaint against the insured to the terms of the policy at issue." *W H McNaughton Builders, Inc , 363 Ill App 3d at 511*. While this may be the standard test, the appellate court has also relied on memos and letters from the insurance carrier in holding that the insurer had a conflict with its insured. See *Royal Insurance Co , 221 Ill App 3d at 977-78* Such reliance is justified because the concern surrounding a conflict of interest is that the insurer may not be fully protecting the insured's interest, and this may not always be revealed by comparing the underlying complaint's allegations to the policy For example, in *Royal Insurance Co ,* memos and letters showed that the insurance company was attempting to find a way for the insured to be found professionally negligent, because such negligence was [*30] not covered by its policy, even though the underlying complaint did not allege professional negligence. *Royal Insurance Co , 221 Ill App 3d at 977-78* Thus, we agree with appellees that the trial court could properly consider the reservation of rights letter in determining whether there was a conflict of interest

We next look to the nature of an implied warranty of habitability claim. The doctrine of implied warranty of habitability was originally created to provide some parity in landlord-tenant relationships, because tenants have much less bargaining power in such relationships and lack the same capacity to inspect and maintain the premises *Board of Directors of Bloomfield Club Recreation Ass'n v Hoffman Group, Inc., 186 Ill 2d 419, 424, 712 N E 2d 330, 238 Ill Dec 608 (1999)* It was later extended to the sale of new homes by builder-vendors, "to avoid the harshness of *caveat emptor* and the doctrine of merger and to afford a degree of relief to vendees of new homes who subsequently discover latent defects in the structure " *Petersen v Hubschman Construction Co , 76 Ill 2d 31, 38, 389 N E 2d 1154, 27 Ill Dec 746 (1979)*. The rationale for this extension is that today's new homes are typically mass-produced and the construction methods afford [*31] the buyer little or no opportunity to inspect the dwelling. Instead, the buyer, who is making a significant investment, must rely on the builder's integrity and skill. *Petersen, 76 Ill 2d at 40*. The implied warranty of habitability protects the buyer against latent defects by providing a warranty that the house is reasonably fit to use as a residence *Petersen, 76 Ill 2d at 40-42*.

The implied warranty of habitability "is implied as a separate covenant between the builder-vendor and the vendee " *Petersen, 76 Ill 2d at 41*. It "arises with the execution of the contract and survives the delivery of the deed " *Petersen, 76 Ill 2d at 41*. The implied warranty of habitability is a "creature of public policy" and a "judicial innovation " *Naiditch v. Shaf Home Builders, Inc , 160 Ill App. 3d 245, 264, 512 N E 2d 1027, 111 Ill Dec 486 (1987)*. "While [it] has roots in the execution of the contract for sale [citation], it exists independently " *Naiditch, 160 Ill App 3d at 264*

Appellees argue that an implied warranty of habitability claim is not a contract-type claim They focus on the above-quoted language that the implied warranty of habitability is a "creature of public policy" and a "judicial innovation" independent of [*32] the contract of sale Essex argues that the implied warranty of habitability is contractual because, although the covenant itself exists independently of the purchase contract, liability is still tied to the contract because that is the instrument from which the covenant is implied Essex argues that its position is further supported by courts' treatment of claims for breach of the implied warranty of habitability Essex cites *Cooper v United Development Co , 122 Ill App 3d 850, 858, 462 N E 2d 629, 78 Ill Dec 510 (1984)*, for the

proposition that such claims are governed by the statute of limitations for implied contracts. We note that this court subsequently held that a claim for breach of the implied warranty of habitability is governed by the four-year limitations period of *section 13-214* of the Code of Civil Procedure *(735 ILCS 5/13-214* (West 1996)), for the construction of improvements to real property. *Andreoli v. John Henry Homes, Inc.*, 297 Ill. App. 3d 151, 154, 696 N.E.2d 1193, 231 Ill. Dec. 622 (1998). Section 13-214 was not yet in effect when the plaintiffs in *Cooper* first brought their action. In any event, Essex additionally points out that liability for breach of the implied warranty can be disclaimed in the contract (see *Petersen, 76 Ill. 2d at 43*) [*33] and that breach of the implied warranty does not give rise to a cause of action for personal injuries or property damage (see *Abram v. Litman*, 150 Ill. App. 3d 174, 179, 501 N.E.2d 370, 103 Ill. Dec. 349 (1986)).

We agree with Essex's argument. While the doctrine is a judicial construct that exists apart from the contract of sale *(Naiditch, 160 Ill. App. 3d at 264)*, the implied warranty also "is implied as a separate covenant between the" builder and the home-buyer *(Petersen, 76 Ill. 2d at 41)*. We note that Black's Law Dictionary defines "covenant" as a "formal agreement or promise, usu. in a contract." Black's Law Dictionary 369 (7th ed. 1999). Moreover, the implied warranty of habitability "arises with the execution of the contract" *(Petersen, 76 Ill. 2d at 41)* and "has roots in the execution of the contract" *(Naiditch, 160 Ill. App. 3d at 264)*. Thus, it is fair to characterize the implied warranty of habitability generally as contractual.

We [*34] now focus our attention on Essex's reservation of rights letter. As mentioned, Essex recognized in the letter that the Walskis were alleging claims of breach of contract and breach of the implied warranty of habitability. Essex quoted some of its policy provisions and then stated:

> "None of the complaints cited above alleges any 'bodily injury' within the definition cited above. To the extent, however, the Walski Complaint, both in law and arbitration *** potentially alleges 'property damage,' Essex agrees to participate in the defense of Stone Ridge [sic] under a full and complete reservation of rights. Moreover, we are unable at this point to determine factually whether the potential 'property damage' arises out of an 'occurrence' as the term is defined by the policy. In the event that our investigation or discovery reveals that the alleged damages did not arise out of an 'occurrence' Essex reserves the right to withdraw from the defense of this matter if appropriate."

Essex next discussed WPIC's arbitration third-party complaint against Stoneridge, concluding that it did not allege any "bodily injury" under the policy. Essex then stated:

> "Moreover, the complaint does not allege 'property [*35] damage' as that term is defined. The allegations of the complaint clearly indicate that [WPIC is] seeking indemnity and other damages from Stone Ridge [sic] based upon Stone Ridge's [sic] alleged breach of contract. *We have determined that this alleged conduct does not fall within the definitions of 'bodily injury' or 'property damage,' as the claims against Stone Ridge [sic] are contractual in nature.* Furthermore, [WPIC's] claim for indemnity does not allege an 'occurrence' as that term is defined by the Policy. *It is our understanding that [WPIC's] claim arises out of the alleged failure of Stone Ridge [sic] to meet alleged contractual obligations. Accordingly, this alleged breach of contract is not the consequence of any type of 'accident' as is required by the Policy.*" (Emphasis added.)

Nevertheless, Essex agreed to defend Stoneridge, under a reservation of rights, on WPIC's claims.

We conclude that appellees have failed to show that Essex had a conflict of interest. In its letter, Essex stated that it would defend Stoneridge under a reservation of rights because the Walskis' claims potentially alleged "property damage." It further stated that it reserved the right to withdraw from [*36] the defense if the "property damage" did not constitute an "occurrence" under the policy. Therefore, Essex was focusing on whether the factual allegations of the Walskis' claims fit within its policy, rather than focusing on the Walskis' two theories of liability. A few paragraphs later, Essex stated that WPIC's complaint did not allege "property damage," an "occurrence," or an "accident," because WPIC was seeking indemnity based on breach of contract.

Contrary to appellees' argument, Essex never stated that it would potentially cover the Walskis' implied warranty of habitability claim but not their contract claim. Though it emphasized that WPIC's claims were not covered, citing their "contractual" nature, as discussed the implied warranty of habitability is also fairly characterized as "contractual in nature." Tellingly, in their alterna-

tive argument that the insurance policy itself provides coverage, appellees do not distinguish the Walskis' claim of breach of the implied warranty from their claim of breach of contract. Instead, they focus on whether the facts alleged by the Walskis show "property damage" from an "occurrence," which was the same approach Essex took to the Walskis' [*37] claims in its reservation of rights letter

In sum, to accept appellees' argument that the letter shows a conflict of interest would require adopting a strained and disjointed interpretation of the reservation of rights letter, with little, if any, support in case law. This case stands in stark contrast to *Peppers, Murphy, W.H McNaughton Builders, Inc*, and *Royal Insurance Co*, where examinations of the complaints, policies, and any relevant memos or letters revealed clear conflicts of interest. Accordingly, we conclude that the trial court erred in granting summary judgment for appellees on the basis that Essex was estopped from asserting policy defenses.

Our inquiry does not end here, however, because we may affirm the trial court's ruling on any basis supported by the record, regardless of the trial court's reasoning. *Bell Leasing Brokerage, LLC v Roger Auto Service, Inc*, 372 Ill App. 3d 461, 469, 865 N E 2d 558, 310 Ill Dec. 234 (2007) Summary judgment for appellees still may have been proper if we determine that Stoneridge's liability is covered by the insurance policy. It is to that subject that we next turn.

C Coverage Under Policy

The construction of an insurance policy is a question of law that can be appropriately [*38] disposed of through summary judgment *Crum & Forster Managers Corp. v Resolution Trust Corp*, 156 Ill. 2d 384, 391, 620 N E 2d 1073, 189 Ill Dec. 756 (1993) In construing the policy, the court must ascertain the contracting parties' intent as expressed in the agreement. *Crum & Forster Managers Corp*, 156 Ill 2d at 391. In doing so, the court must construe the policy as a whole and consider the risk undertaken, the subject matter insured, and the contract's purpose *Outboard Marine Corp*, 154 Ill. 2d at 108. Unambiguous words must be given their plain, ordinary, and popular meaning, whereas words that are susceptible to more than one reasonable interpretation are ambiguous and will be construed in favor of the insured and against the insurer that drafted the policy *Outboard Marine Corp*, 154 Ill 2d at 108-09.

The insured has the burden of establishing that a claim falls within the policy's terms. *Addison Insurance Co v Fay*, 376 Ill App 3d 85, 88, 875 N E 2d 190, 314 Ill. Dec. 680 (2007). Once the insured satisfies this burden, the insurer has the burden of proving that the loss was limited or excluded by a contract provision *Addison Insurance Co*, 376 Ill. App. 3d at 88. The plaintiff in a declaratory judgment action also has the burden of proof [*39] *Addison Insurance Co*, 376 Ill App 3d at 88 Thus, in this case, appellees bear the initial burden of proof

Essex argues that there is no policy coverage, because the damage to the Walskis' home was not caused by an "occurrence" and because contractual liability for economic damages does not constitute "property damage." We first explore the definition of "occurrence." The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy does not define "accident," but this court has defined the term as "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." *Westfield National Insurance Co v Continental Community Bank & Trust Co*, 346 Ill. App. 3d 113, 117, 804 N E.2d 601, 281 Ill Dec 636 (2003), citing *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill App. 3d 617, 619, 411 N E 2d 1157 44 Ill Dec 791 (1980). Many other cases have also applied this definition, relying primarily on *Freyer* See, *e g, Viking Construction Management, Inc. v. Liberty Mutual Insurance Co*, 358 Ill. App 3d 34, 42, 831 N E 2d 1, 294 Ill. Dec 478 (2005); *State Farm Fire & Casualty Co. v. Tillerson*, 334 Ill. App. 3d 404, 409, 777 N E 2d 986, 268 Ill Dec 63 (2002); [*40] *Monticello Insurance Co. v Wil-Freds Construction, Inc.*, 277 Ill. App. 3d 697, 703, 661 N E 2d 451, 214 Ill Dec. 597 (1996); *Indiana Insurance Co. v. Hydra Corp*, 245 Ill. App 3d 926, 929, 615 N E 2d 70, 185 Ill Dec. 775 (1993); *Travelers Insurance Cos v P C Quote, Inc*, 211 Ill. App. 3d 719, 726, 570 N.E 2d 614, 156 Ill Dec. 138 (1991); see also Black's Law Dictionary 15 (7th ed. 1999) (defining "accident" as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated") Most of these cases also state, relying ultimately on *Freyer*, that the " ' "natural and ordinary consequences of an act do not constitute an accident" ' [Citations ]" *Tillerson*, 334 Ill App. 3d at 409; see also *Continental Community Bank & Trust Co*, 346 Ill. App 3d at 117; *Wil-Freds*, 277 Ill App 3d at 703; *Hydra Corp*, 245 Ill App 3d at 930; *P C Quote, Inc*, 211 Ill App 3d at 726.

However, this definition of "accident" has not been universally accepted In *Country Mutual Insurance Co v Carr*, 372 Ill. App. 3d 335, 340, 867 N E 2d 1157, 311 Ill. Dec. 171 (2007), the court acknowledged the above-mentioned definition but then stated:

> "The Supreme Court of Illinois has stated a court should not determine whether something is an accident by looking [*41] at whether the actions

leading to the damage were intentionally done. According to the court, the real question is whether the person performing the acts leading to the result intended or expected the result. If the person did not intend or expect the result, then the result was the product of an accident." *Carr*, 372 Ill. App. 3d at 341, citing *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 77-78, 578 N.E.2d 926, 161 Ill. Dec. 280 (1991).

In a situation where the actor did not intend or expect the result, a strict application of this definition would seem to negate the previously-mentioned principle that an act's natural and ordinary consequences do not constitute an accident. However, *Carr* itself distinguished *Viking*, *Tillerson*, and *Wil-Freds*, which mentioned this principle, on the basis that those cases alleged contractual or warranty breaches, unlike the negligence alleged in *Carr*. *Carr*, 372 Ill. App. 3d at 343. In the instant case, Stoneridge was found liable for breach of contract rather than negligence, making this situation similar to *Viking*, *Tillerson*, and *Wil-Freds*, and distinguishable from *Carr*.

We also note that, while *Carr* held itself out as relying on our supreme court's definition [*42] of "accident," *Freyer*, on which many cases rely for the proposition that the natural and ordinary consequences of an act do not constitute an accident, relied on another appellate court case, *Farmers Elevator Mutual Insurance Co. v. Burch*, 38 Ill. App. 2d 249, 253, 187 N.E.2d 12 (1962), which in turn relied on a supreme court case, *Yates v. Bankers Life & Casualty Co.*, 415 Ill. 16, 19, 111 N.E.2d 516 (1953). *Carr* also cited *Yates* as support for its definition of "accident." See *Carr*, 372 Ill. App. 3d at 341. However, the *Yates* court cited with approval a United States Supreme Court case, *United States Mutual Accident Ass'n v. Barry*, 131 U.S. 100, 121, 33 L. Ed. 60, 67, 9 S. Ct. 755, 762 (1889), stating:

> "Under the rule promulgated in the *Barry* case [sic], if an act is performed with the intention of accomplishing a certain result, and if, in the attempt to accomplish that result, another result, unintended and unexpected, *and not the rational and probable consequence of the intended act*, in fact, occurs, such unintended result is deemed to be caused by accidental means." (Emphasis added.) *Yates*, 415 Ill. 2d at 19.

Thus, we believe that, even if the person performing the act did not intend or expect the result, if [*43] the result is the "rational and probable" consequence of the act (*Yates*, 415 Ill. 2d at 19) or, stated differently, the "natural and ordinary" consequence of the act (*Freyer*, 89 Ill. App. 3d at 619), it is not an "accident."

In *Tillerson*, a case similar to this one, the court held that damage to a home caused by a contractor's faulty soil compaction did not qualify as an "occurrence" or "accident." There, the insured contractor built a new room addition on a house and converted the existing carport into a garage. The homeowners later sued the contractor for breach of express and implied warranties. *Tillerson*, 334 Ill. App. 3d at 406. They alleged that the contractor had built the addition over an existing cistern and failed to properly compact the soil before constructing the addition. *Tillerson*, 334 Ill. App. 3d at 408. The contractor's insurance company sought a declaratory judgment that it had no duty to defend the contractor, but the trial court ruled against the insurance company. *Tillerson*, 334 Ill. App. 3d at 406.

The appellate court reversed. It stated that the homeowners' allegations did not fall within the meaning of an accident or an occurrence, because there were no allegations [*44] of an unforeseen, sudden, or unexpected event. *Tillerson*, 334 Ill. App. 3d at 409. The court stated that the construction defects alleged in the homeowners' complaint were not an accident, because they were the natural and ordinary consequences of the contractor's alleged improper construction techniques. The court therefore held that the insurance company had no duty to defend the contractor. *Tillerson*, 334 Ill. App. 3d at 409. Several other cases have similarly held that damages that are the natural and ordinary consequences of faulty workmanship do not constitute an "occurrence" or "accident." See *Viking*, 358 Ill. App. 3d at 53 (no "occurrence" where portion of masonry wall installed by subcontractor collapsed, because the collapse was the ordinary and natural consequence of improper bracing); *Wil-Freds*, 277 Ill. App. 3d at 704 (cracks and water damage in building and parking garage constructed by the insured contractor were the natural and ordinary consequences of the contractor's and its subcontractors' improper construction techniques and did not constitute an "occurrence"); *Hydra Corp.*, 245 Ill. App. 3d at 930 (cracks in concrete flooring and loose paint on building's exterior [*45] were the natural and ordinary consequences of installing defective flooring and applying the wrong kind of paint and did not constitute an "occurrence").

In *Viking*, the court recognized that the question of whether faulty construction is covered under CGL policies is "in great dispute" across jurisdictions. *Viking*, 358 Ill. App. 3d at 42. The court stated that Illinois follows the "majority rule" that defective construction claims do not fall within the coverage of CGL policies. *Viking*, 358 Ill.

App 3d at 42-44. Our analysis leads us to agree with this conclusion in situations where the damages were the natural and ordinary consequences of improper construction methods. As our supreme court has stated:

> " '[C]omprehensive general liability policies *** are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [Citations] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.' " *Travelers Insurance Co v. Eljer Manufacturing, Inc*, 197 Ill 2d 278, 314, 757 N.E.2d 481, 258 Ill Dec 792 (2001), [*46] quoting *Qualls v. Country Mutual Insurance Co*, 123 Ill. App. 3d 831, 833-34, 462 N.E.2d 1288, 78 Ill Dec. 934 (1984).

The *Wil-Freds* court elaborated on this principle by explaining that, if insurance proceeds could be used for damages from defective workmanship, a contractor could be initially paid by the customer for its work and then by the insurance company to repair or replace the work. *Wil-Freds*, 277 Ill App. 3d at 709. Treating a CGL policy like a performance bond would be unjust to the CGL insurer, which, in contrast to the surety on a performance bond, cannot bring suit against the contractor for the defective construction. *Wil-Freds*, 277 Ill App 3d at 709 Still, construction defects that damage something other than the project itself will constitute an "occurrence." See *Pekin Insurance Co. v. Richard Marker Associates, Inc*, 289 Ill. App. 3d 819, 823, 682 N.E.2d 362, 224 Ill Dec 801 (1997) (where faulty workmanship caused water damage to homeowners' furniture, clothing, and antiques, there was an "occurrence" under the contractor's CGL policy); *Wil-Freds*, 277 Ill App 3d at 705 (if water had damaged cars in the parking garage, or a pedestrian had been hit by falling concrete, there would have been an "occurrence").

Keeping in mind the [*47] definition of "occurrence," we now examine the definition of "property damage." The policy defines "property damage" as, in relevant part, "[p]hysical injury to tangible property, including all resulting loss of use of that property." Tangible property suffers a physical injury if the property "is altered in appearance, shape, color or in other material dimension." *Eljer Manufacturing*, 197 Ill. 2d at 301 However, regardless of how the insured describes the property damage, "CGL policies are not intended to cover breaches of contract." *Pekin Insurance Co v. Miller*, 367 Ill App 3d 263, 268, 854 N.E.2d 693, 305 Ill Dec 101 (2006). Notably, in *Viking*, which contained the same definition of "property damage" as the instant case, the court commented that the definition did not include breach of contract claims, because such claims are not the result of fortuitous events. *Viking*, 358 Ill App 3d at 42 The court held that, where the underlying complaint sought only repair and replacement of the damaged product, it sought economic damages that did not constitute "property damages," and therefore there was no coverage under the CGL policy. *Viking*, 358 Ill App 3d at 56.

As the *Tillerson* court explained, "[c]overage under [*48] contractor general liability policies is for tort liability for damage to other property, not for the insured's contractual liability for economic loss." *Tillerson*, 334 Ill. App. 3d at 410; see also *Wil-Freds*, 277 Ill App 3d at 709 (CGL policies cover tort liability for physical damage to others and not the insured's contractual liability for economic loss due to the product or completed work not meeting the bargained-for standard); *Hydra Corp*, 245 Ill App. 3d at 929 (damages from breach of contractual obligations are not "property damage"). The *Tillerson* court concluded that, in addition to failing to allege an "occurrence," the homeowners who alleged improper compaction of soil did not allege "property damage." The court stated that the homeowners were pursuing a claim only for a breach of contract to recover economic loss, that being repair or replacement of the defective work or the home's diminished value. Such economic loss was not physical injury to tangible property, because there was no allegation that the contractor tortiously injured their home. *Tillerson*, 334 Ill App 3d at 410

Applying these principles to the instant case, we conclude that the damage to the Walskis' [*49] home did not constitute an "occurrence" or "property damage." The cracks that developed in the Walskis' home were not an unforeseen occurrence that would qualify as an "accident," because they were natural and ordinary consequences of defective workmanship, namely, the faulty soil compaction. While defective workmanship could be covered if it damaged something other than the project itself (see *Richard Marker Associates, Inc*, 289 Ill App 3d at 823), in this case the Walskis alleged damage only to the home. Thus, there was no "occurrence." Also, there was no "property damage." The Walskis sought costs of repair or replacement or the diminished value of their home, which are economic losses. See *Viking*, 358 Ill App 3d at 56; *Tillerson*, 334 Ill. App. 3d at 410 Moreover, Stoneridge was found liable for breach of contract and was ordered to repurchase the property for the original purchase price plus its diminished market value. Ston-

eridge was also ordered to reimburse WPIC under the warranty agreement for amounts it paid to the Walskis, as well as for WPIC's expenses. Under the cases discussed above, such breach-of-contract damages are not covered by CGL policies. See *Miller*, 367 Ill. App. 3d at 268; [*50] *Viking*, 358 Ill. App. 3d at 42; *Tillerson*, 334 Ill. App. 3d at 410.

Appellees counter that three supreme court cases, *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 475 N.E.2d 872, 86 Ill. Dec. 493 (1985), *Wilkin Insulation Co.*, and *Eljer Manufacturing*, support their position that there was an "occurrence" and "property damage" within the coverage grant. In *Brochu*, the homeowners sued the builder for breach of contract and fraud in the inducement after their home began sinking into the ground, resulting in cracks in the foundation, sagging support beams, out-of-sync doors and frames, and interior fixtures separating from the walls. *Brochu*, 105 Ill. 2d at 492. The builder's insurance company sought a declaratory judgment that its policy did not provide coverage. *Brochu*, 105 Ill. 2d at 490. In resolving this issue, the supreme court first quoted a portion of the policy that stated that the insurer would pay "'all sums which the insured shall become legally obligated to pay as damages because of *** bodily injury or *** property damage to which this insurance applies ***.'" *Brochu*, 105 Ill. 2d at 493. The supreme court stated that "the insuring provisions of the policy initially provide coverage for the [homeowners'] [*51] claim." *Brochu*, 105 Ill. 2d at 497-98. The supreme court then proceeded to conclude that certain policy exclusions excluded coverage. *Brochu*, 105 Ill. 2d at 498.

We agree with Essex that *Brochu* is of little guidance here because it did not analyze the terms "occurrence" and "property damage," instead focusing on policy exclusions that are not at issue in this case. See also *Hydra Corp.*, 245 Ill. App. 3d at 932 (distinguishing other cases on a similar basis). The *Brochu* court also recognized, consistent with our general analysis, that the CGL "'policy in question does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident'" *Brochu*, 105 Ill. 2d at 498, quoting *Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 249, 405 A.2d 788, 796 (1979).

In *Wilkin Insulation Co.*, the second case cited by appellees, our supreme court held that the continuous release of toxic asbestos fibers into the air from insulation constituted an "accident" or "occurrence" damaging the buildings, because the damage was neither expected nor intended from the standpoint of the insured. *Wilkin Insulation Co.*, 144 Ill. 2d at 77-78. The supreme court also concluded that the asbestos [*52] caused physical injury to tangible property, or "property damage," because the fibers contaminated the buildings and their contents. *Wilkin Insulation Co.*, 144 Ill. 2d at 75-76. However, the issue in that case was a defective product that immediately began damaging the buildings and their contents in an ancillary manner, through its health risks, rather than defective workmanship that damaged solely the buildings, as in the case here. See *Diamond State Insurance Co. v. Chester-Jensen Co.*, 243 Ill. App. 3d 471, 484, 611 N.E.2d 1083, 183 Ill. Dec. 435 (1993) (damage in *Wilkin Insulation Co.* was not from asbestos's failure to perform its contractual function as an insulator, but, rather, "its detrimental impact was caused by a wholly ancillary and coincidental phenomenon, namely the diffusion of its harmful fibers"); see also *Eljer Manufacturing*, 197 Ill. 2d at 306 (*Wilkin Insulation Co.* "recognized the unique nature of asbestos products").

Appellees argue that Essex's definition of "property damage" ignores the supreme court's definition of the term in the last case in this series, *Eljer Manufacturing*. As mentioned, *Eljer Manufacturing* stated that there is physical injury to tangible property if the property "is altered [*53] in appearance, shape, color or in other material dimension." *Eljer Manufacturing*, 197 Ill. 2d at 301. Appellees argue that this definition does not limit "property damage" to personal property. We note that it was our discussion of "occurrence" that led us to conclude that property damage that is a natural and ordinary consequence of defective workmanship is not an "accident" under a CGL policy, though there would still be coverage if the construction defect results in damage to something other than the project itself. We also note that *Eljer Manufacturing* did not have occasion to discuss the principle that breach of contract claims generally are not covered by CGL policies, because *Eljer Manufacturing* involved product liability claims, which are grounded in tort. Even then, *Eljer Manufacturing* recognized the underlying principle that costs associated with repairing or replacing the insured's defective work and products are purely economic losses and are not covered by CGL policies. *Eljer Manufacturing*, 197 Ill. 2d at 314.

Appellees further argue that Essex's CGL policy could never be transformed into a performance bond, because it provides coverage for faulty work performed by a subcontractor. [*54] As mentioned, while the policy excludes "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard,'" there is an exception to the exclusion "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." It is undisputed in this case that a subcontractor failed to properly compact the soil and that Stoneridge had in fact subcontracted all of the work on the project.

Appellees maintain that National Underwriter Company, Fire Casualty & Surety Bulletins, show that the insurance industry interprets Essex's subcontractor exception to the "damage to your work exclusion" to provide

coverage for damage resulting from the work of subcontractors. However, such bulletins are not legal authority binding on this court, nor are the bulletins tailored to Illinois law

Appellees also argue that the cases cited in our analysis are distinguishable because they involve insureds who performed the defective work at issue and attempted to use their CGL policies to correct their own poor workmanship However, the *Wil-Freds* court stated that the improper construction techniques of the contractor [*55] *and its subcontractors* did not constitute an "occurrence." *Wil-Freds, 277 Ill. App. 3d at 704.* In *Viking,* the court similarly stated that a subcontractor's defective workmanship that requires removing and repairing work is not an "occurrence" (*Viking, 358 Ill App 3d at 42*), and it concluded that damages from the collapse of part of a masonry wall defectively installed by the subcontractor was not an "occurrence" (*Viking, 358 Ill App 3d at 54*) See also *American Fire & Casualty Co v Broeren Russo Construction, Inc., 54 F Supp 2d 842, 849 (C D Ill 1999)* (damage was not an "occurrence" even if subcontractor's defective work damaged the building, because the damage was still the foreseeable result of the negligent and unworkmanlike conduct). Notably, *Viking* involved the same standard policy form as this case, CG 00 01 10 93. *Viking, 358 Ill App 3d at 51 n 7.*

To be fair, the aforementioned cases did not specifically discuss the subcontractor provision relied on by appellees, and we recognize that there is case law in other jurisdictions that supports appellees' position. See *Auto Owners Insurance Co. v Newman, No. 26450, 2008 S C LEXIS 74, at *12-13 (S C March 10, 2008)* (subcontractor's exception [*56] to "your work" exclusion meant that damage to other parts of the project from subcontractor's faulty workmanship was covered by CGL policy) However, such a position does not take into account the principle that an exception to an exclusion does not create coverage or provide an additional basis for coverage (*JG Industries, Inc. v. National Union Fire Insurance Co of Pittsburgh, 218 Ill. App. 3d 1061, 1066, 578 N E 2d 1259, 161 Ill Dec. 613 (1991); Qualls, 123 Ill App. 3d at 834*), but, rather, "merely preserves coverage already granted in the insuring provision" (*Brochu, 105 Ill 2d at 498*) Thus, some cases have held that, where the damage does not fall within the policy's coverage, there is no need to consider the applicability of any exclusions See *Viking, 358 Ill App 3d at 56; Bituminous Casualty Corp v Gust K Newberg Construction Co., 218 Ill. App 3d 956, 966, 578 N E 2d 1003, 161 Ill Dec 357 (1991);* see also *Lyerla v Amco Insurance Co, No 6-679-GPM, 2007 U S Dist LEXIS 56300, at *8 (S D Ill August 2, 2007)* (declining to examine a subcontractor exclusion after determining that there was no "occurrence" or "property damage") At the same time, we are cognizant that the policy must be construed as a whole. *Outboard Marine Corp, 154 Ill 2d at 108*

In [*57] any event, the subcontractor exception cannot negate the lack of an "occurrence" here, as the damage arose from the natural and ordinary consequence of defective workmanship rather than from an "accident" [6] Therefore, the subcontractor exception does not alter our conclusion that appellees have failed to meet their burden of showing that Stoneridge's liability falls within the policy's terms, because they have failed to show that the damage to the Walskis' home was "property damage" caused by an "occurrence."

> 6    Such an interpretation does not necessarily render the subcontractor exception mere surplusage, as it could arguably still be applicable in certain situations, such as if the building were damaged because a subcontractor had confused job orders and worked on the wrong portion of the project *Millers Capital Insurance Co v Gambone Brothers Development Co, 2007 PA Super 403, 941 A 2d 706, 716 (Pa Super 2007).*

III CONCLUSION

We have determined that the trial court erred by granting summary judgment for appellees based on estoppel We have also determined that appellees' assertion that the policy provides coverage is incorrect and does not provide an alternative basis for affirming the trial court's [*58] grant of summary judgment in their favor Rather, based on our conclusion that the policy does not cover Stoneridge's liability, we reverse the trial court's ruling and, pursuant to our authority under *Supreme Court Rule 366* (155 Ill 2d R. 366), we enter summary judgment in Essex's favor.

Reversed; judgment entered.

CALLUM and GILLERAN JOHNSON, JJ., concur